**23-1324**

# United States Court of Appeals
*for the*
# Fourth Circuit

COMPASS MARKETING, INC.,

*Plaintiff/Appellant*,

– v. –

FLYWHEEL DIGITAL LLC; JAMES COLUMBUS DIPAULA, JR.; PATRICK MILLER; DANIEL J. WHITE; MICHAEL WHITE; GEORGE WHITE; ASCENTIAL PLC,

*Defendants/Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND AT BALTIMORE

# JOINT APPENDIX

Stephen B. Stern
Michael Marinello
Meagan C. Borgerson
KAGAN STERN MARINELLO & BEARD, LLC
238 West Street
Annapolis, Maryland 21401
(410) 216-7900

*Counsel for Appellant*

Tonya K. Cronin
Alison Schurick
BAKER DONELSON
100 Light Street
Baltimore, Maryland 21202
(410) 685-1120

*Counsel for Appellee Flywheel Digital LLC.*

*Additional Counsel Listed on the Inside Cover*

CP COUNSEL PRESS • VA – (804) 648-3664

Michael C. Keats
Rebecca L. Martin
Samuel H. Truesdell
FRIED, FRANK, HARRIS,
SHRIVER & JACOBSON, LLP
1 New York Plaza
New York, New York 10004
(212) 859-8914

*Counsel for Appellee Miller*

Bruce L. Marcus
Sydney M. Patterson
MARCUSBONSIB, LLC
6411 Ivy Lane, Suite 116
Greenbelt, Maryland 20770
(301) 441-3000

*Counsel for Appellee D. White*

David B. Hamilton
Harry P. Rudo
DLA PIPER US LLP
650 South Exeter Street, Suite 1100
Baltimore, Maryland 21202
(410) 580-4120

*Counsel for Appellee Dipaula, Jr.*

Judith G. Cornwell
Jeffrey M. Schwaber
STEIN SPERLING BENNETT
DEJONG DRISCOLL PC
1101 Wootton Parkway, Suite 700
Rockville, Maryland 20852
(301) 340-2020

*Counsel for Appellees*

# TABLE OF CONTENTS

## VOLUME ONE

District Court Docket Sheet ........................................ 1

Compliant,
With Attachment and Exhibit,
filed February 14, 2022 ........................................ 11

Civil Cover Sheet
dated February 14, 2022 ........................................ 96

A. Bausch & Lomb Compass Marketing 101
"Helping Companies Do Great Things"
undated ........................................ 98

Declaration of G. Stewart Webb, Jr.,
With Exhibits,
filed April 4, 2022 ........................................ 208

Exhibits:

1. True and Correct Copy of the "Agreement Relating to Employment and Post Employment" Between Mr. DiPaula and Compass,
dated February 24, 2010 ........................................ 210

2. True and Correct Copy of the PowerPoint Presentation ........................................ 215

3. A True and Correct Copy of an Article Published by Patrick Miller Entitled "The Future of Amazon Fresh?"
on August 25, 2015 ........................................ 244

4. A True and Correct Copy of an Email titled "Ecommerce Spin-Off Follow-Up," sent by Mr. DiPaula to John White
on October 1, 2014 ........................................ 250

Declaration of Louise Meads
filed April 4, 2022 ........ 255

Excerpts from Plaintiff's Opposition to Flywheel Defendants' Motion to Dismiss, With Attachment,
filed May 4, 2022 ........ 258

Declaration of Rachel A. Ward, Esquire, With Exhibits,
dated May 4, 2022 ........ 259

Exhibits:

A. Ascential Accelerating Our Strategy Focusing on Growth Annual Report
dated 2021 ........ 261

B. Crime & Courts, Government & Politics, Health & Wellness "Weeks After Being Names In Federal Lawsuit, DiPaula Resigns from UMMS Board"
dated March 10, 2022 ........ 264

C. Sky News "Cannes Lions Owners Ascential Plots f1.5bn Transatlantic Break-Up
dated April 9, 2022 ........ 268

Memorandum Opinion Granting Defendants' Motion to Dismiss
filed February 24, 2023 ........ 274

Order Granting Motions to Dismiss
filed February 24, 2023 ........ 299

Plaintiff's Notice of Appeal
filed March 24, 2023 ........ 301

APPEAL,CLOSED

**U.S. District Court**
**District of Maryland (Baltimore)**
**CIVIL DOCKET FOR CASE #: 1:22-cv-00379-GLR**

Compass Marketing, Inc. v. Flywheel Digital LLC et al
Assigned to: Judge George Levi Russell, III
Case in other court: USCA, 23-01324
Cause: 18:1964 Racketeering (RICO) Act

Date Filed: 02/14/2022
Date Terminated: 02/24/2023
Jury Demand: Plaintiff
Nature of Suit: 470 Racketeer/Corrupt Organization
Jurisdiction: Federal Question

**Plaintiff**

**Compass Marketing, Inc.**

represented by

**James J Kritsas**
Morgan Lewis and Bockius LLP
110 North Wacker Drive Ste 3400
Ste 5th Floor
Chicago, IL 60606
312-324-1000
Fax: 312-324-1001
Email: james.kritsas@morganlewis.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mark Steven Brown**
King and Spalding LLP
1700 Pennsylvania Ave NW
Ste. 200
Washington, DC 20006
12027370500
Fax: 12026263737
Email: mbrown@kslaw.com
*ATTORNEY TO BE NOTICED*

**Michael J Ableson**
Morgan Lewis and Bockius LLP
101 Park Ave
New York, NY 10178
212-309-6000
Fax: 212-309-6001
Email: michael.ableson@morganlewis.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Natalie A Bennett**
Morgan Lewis and Bockius LLP
1111 Pennsylvania Avenue NW
Washington, DC 20004
202-739-5559
Fax: 202-739-5671
Email: natalie.bennett@morganlewis.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachel A Ward**
Morgan Lewis and Bockius LLP
1701 Market Street
Philadelphia, PA 19103
215-963-4978
Email: rachel.ward@morganlewis.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rod J Rosenstein**
King & Spalding LLP

1700 Pennsylvania Avenue N.W.
Washington, DC 20006
2026269220
Email: rrosenstein@kslaw.com
*ATTORNEY TO BE NOTICED*

**Susan K Stradley**
Morgan Lewis and Bockius LLP
1000 Louisiana Ste 4000
Suite 4000
Houston, TX 77002
713-890-5151
Fax: 713-890-5001
Email: susan.stradley@morganlewis.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Troy S Brown**
Morgan Lewis and Bockius LLP
1701 Market Street
Philadelphia, PA 19103
215-963-5214
Email: troy.brown@morganlewis.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Steven Andrew Luxton**
Morgan Lewis and Bockius LLP
1111 Pennsylvania Ave NW
Washington, DC 20004
12027395452
Fax: 12027393001
Email: steven.luxton@morganlewis.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Flywheel Digital LLC**                represented by **Alison Cate Schurick**
Baker Donelson
100 Light Street
19th Floor
Baltimore, MD 21202
4106851120
Email: aschurick@bakerdonelson.com
*ATTORNEY TO BE NOTICED*

**Anthony J. Vitti , Jr.**
Venable LLP
750 E. Pratt Street
Suite 900
Baltimore, MD 21202
410-528-4776
Email: ajvitti@venable.com
*TERMINATED: 02/22/2023*

**Arthur Kutoroff**
Ford O'Brien Landy LLP
275 Madison Ave
24th Floor
10016
New York, NY 10016
212-858-0040
Email: arthur.kutoroff@friedfrank.com
*TERMINATED: 02/01/2023*
*PRO HAC VICE*

**G Stewart Webb , Jr**
Venable LLP
750 E Pratt St Ste 900
Baltimore, MD 21202
14102447565
Fax: 14102447742
Email: gswebb@venable.com
*TERMINATED: 02/22/2023*

**Michael C Keats**
Fried Frank Harris Shriver and Jacobson LLP
One New York Plaza
New York, NY 10004
212-859-8914
Fax: 212-859-4000
Email: michael.keats@friedfrank.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca L Martin**
Fried Frank Harris Shriver and Jacobson LLP
One New York Plaza
New York, NY 10004
212-859-8305
Fax: 212-859-4000
Email: rebecca.martin@friedfrank.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tonya Kelly Cronin**
Baker Donelson
100 Light Street
Baltimore, MD 21202
410-685-1120
Fax: 410-547-0699
Email: tykelly@bakerdonelson.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**James Columbus DiPaula, Jr.**    represented by    **Alison Cate Schurick**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Anthony J. Vitti , Jr.**
(See above for address)
*TERMINATED: 02/22/2023*

**Arthur Kutoroff**
(See above for address)
*TERMINATED: 02/01/2023*
*PRO HAC VICE*

**David B Hamilton**
DLA Piper LLP (US)
650 S. Exeter Street
Suite 1100
Baltimore, MD 21202
410-580-4120
Email: david.hamilton@us.dlapiper.com
*ATTORNEY TO BE NOTICED*

**G Stewart Webb , Jr**
(See above for address)
*TERMINATED: 02/22/2023*

**Michael C Keats**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca L Martin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah E Meyer**
Womble Bond Dickinson (US) LLP
100 Light Street
26th Floor
Baltimore, MD 21202
410-545-5807
Fax: 410-545-5801
Email: sarah.meyer@wbd-us.com
*TERMINATED: 02/22/2023*

**Tonya Kelly Cronin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Patrick Miller** represented by **Alison Cate Schurick**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Anthony J. Vitti , Jr.**
(See above for address)
*TERMINATED: 02/22/2023*

**Arthur Kutoroff**
(See above for address)
*TERMINATED: 02/01/2023*
*PRO HAC VICE*

**David B Hamilton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**G Stewart Webb , Jr**
(See above for address)
*TERMINATED: 02/22/2023*

**Michael C Keats**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca L Martin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Sarah E Meyer**
(See above for address)
*TERMINATED: 02/22/2023*

**Tonya Kelly Cronin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Daniel J. White** represented by **Bruce L Marcus**
Marcus Bonsib LLC
6411 Ivy Ln Ste 116
Greenbelt, MD 20770

13014413000
Fax: 13014413003
Email: bmarcus@marcusbonsib.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sydney M Patterson**
MarcusBonsib LLC
6411 Ivy Ln
Ste 116
Greenbelt, MD 20770
3014413000
Fax: 3014413003
Email: spatterson@marcusbonsib.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Michael White**                    represented by **Jeffrey M Schwaber**
Stein Sperling Bennett De Jong Driscoll PC
Suite 700
1101 Wootton Parkway
Rockville, MD 20852
13013402020
Fax: 13013548110
Email: jschwaber@steinsperling.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Judith G Cornwell**
Stein Sperling Bennett De Jong Driscoll PC
Suite 700
1101 Wootton Parkway
Suite 700
Rockville, MD 20852
3013402020
Fax: 3013548314
Email: jcornwell@steinsperling.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**George White**                    represented by **Jeffrey M Schwaber**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Judith G Cornwell**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ascential PLC**                    represented by **Alison Cate Schurick**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Anthony J. Vitti , Jr.**
(See above for address)
*TERMINATED: 02/22/2023*

**Arthur Kutoroff**
(See above for address)
*TERMINATED: 02/01/2023*
*PRO HAC VICE*

**G Stewart Webb , Jr**
(See above for address)

*TERMINATED: 02/22/2023*

**Michael C Keats**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rebecca L Martin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tonya Kelly Cronin**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/14/2022 | 1 | COMPLAINT against All Defendants ( Filing fee $ 402 receipt number AMDDC-9758426.), filed by Compass Marketing, Inc.. (Attachments: # 1 Civil Cover Sheet, # 2 Summons, # 3 Exhibit A)(Luxton, Steven) (Entered: 02/14/2022) |
| 02/14/2022 | 2 | Local Rule 103.3 Disclosure Statement by Compass Marketing, Inc. (Luxton, Steven) (Entered: 02/14/2022) |
| 02/15/2022 | 3 | Summons Issued 21 days as to Ascential PLC, James Columbus DiPaula, Jr, Flywheel Digital LLC, Patrick Miller, Daniel J. White, George White, Michael White.(kb3s, Deputy Clerk) (Entered: 02/15/2022) |
| 02/17/2022 | 4 | MOTION to Appear Pro Hac Vice for Troy S. Brown (Filing fee $100, receipt number AMDDC-9767348.) by Compass Marketing, Inc.(Luxton, Steven) (Entered: 02/17/2022) |
| 02/17/2022 | 5 | MOTION to Appear Pro Hac Vice for Natalie A. Bennett (Filing fee $100, receipt number AMDDC-9767379.) by Compass Marketing, Inc.(Luxton, Steven) (Entered: 02/17/2022) |
| 02/17/2022 | 6 | MOTION to Appear Pro Hac Vice for James J. Kritsas (Filing fee $100, receipt number AMDDC-9767411.) by Compass Marketing, Inc.(Luxton, Steven) (Entered: 02/17/2022) |
| 02/17/2022 | 7 | MOTION to Appear Pro Hac Vice for Susan K. Stradley (Filing fee $100, receipt number AMDDC-9767448.) by Compass Marketing, Inc.(Luxton, Steven) (Entered: 02/17/2022) |
| 02/17/2022 | 8 | MOTION to Appear Pro Hac Vice for Rachel A. Ward (Filing fee $100, receipt number AMDDC-9767462.) by Compass Marketing, Inc.(Luxton, Steven) (Entered: 02/17/2022) |
| 02/18/2022 | 9 | PAPERLESS ORDER granting 4 Motion to Appear Pro Hac Vice on behalf of Troy S Brown, Natalie A Bennett, James J Kritsas, Susan K Stradley. Directing attorney Troy S Brown, Natalie A Bennett, James J Kritsas, Susan K Stradley to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. Signed by Clerk on 2/18/2022. (dm4s, Deputy Clerk) (Entered: 02/18/2022) |
| 02/18/2022 | 10 | PAPERLESS ORDER granting 8 Motion to Appear Pro Hac Vice on behalf of Rachel A Ward. Directing attorney Rachel A Ward to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. Signed by Clerk on 2/18/2022. (dm4s, Deputy Clerk) (Entered: 02/18/2022) |
| 02/19/2022 | 11 | WAIVER OF SERVICE Returned Executed by Compass Marketing, Inc.. Ascential PLC waiver sent on 2/18/2022, answer due 4/19/2022; James Columbus DiPaula, Jr waiver sent on 2/18/2022, answer due 4/19/2022; Flywheel Digital LLC waiver sent on 2/18/2022, answer due 4/19/2022; Patrick Miller waiver sent on 2/18/2022, answer due 4/19/2022. (Luxton, Steven) (Entered: 02/19/2022) |
| 02/19/2022 | 12 | STIPULATION re 11 Waiver of Service Executed, *for Flywheel, Ascential, DiPaula, and Miller Answer/Motion/Response to be Due By April 4, 2022* by Compass Marketing, Inc.(Luxton, Steven) (Entered: 02/19/2022) |
| 02/21/2022 | 13 | WAIVER OF SERVICE Returned Executed by Compass Marketing, Inc.. Daniel J. White waiver sent on 2/16/2022, answer due 4/18/2022.(Luxton, Steven) (Entered: 02/21/2022) |
| 02/22/2022 | 14 | MARGINAL ORDER Granting 12 STIPULATION re 11 Waiver of Service Executed filed by Compass Marketing, Inc.. Signed by Chief Judge James K. Bredar on 2/22/2022. (kb3s, Deputy Clerk) (Entered: 02/22/2022) |
| 03/25/2022 | 15 | STIPULATION *Regarding Deadline for Defendants Michael White and George White to Respond to Complaint* by Compass Marketing, Inc.(Ward, Rachel) (Entered: 03/25/2022) |
| 03/25/2022 | 16 | MARGINAL ORDER granting 15 STIPULATION Regarding Deadline for Defendants Michael White and George White to Respond to Complaintfiled by Compass Marketing, Inc.. Signed by Chief Judge James K. Bredar on |

| | | |
|---|---|---|
| | | 3/25/2022. (kb3s, Deputy Clerk) (Entered: 03/25/2022) |
| 03/25/2022 | 17 | NOTICE of Appearance by Jeffrey M Schwaber on behalf of George White, Michael White (Schwaber, Jeffrey) (Entered: 03/25/2022) |
| 03/25/2022 | 18 | NOTICE of Appearance by Judith G Cornwell on behalf of George White, Michael White (Cornwell, Judith) (Entered: 03/25/2022) |
| 04/01/2022 | 19 | NOTICE of Appearance by G Stewart Webb, Jr on behalf of Ascential PLC, James Columbus DiPaula, Jr, Flywheel Digital LLC, Patrick Miller (Webb, G) (Entered: 04/01/2022) |
| 04/01/2022 | 20 | NOTICE of Appearance by Anthony J. Vitti, Jr on behalf of Ascential PLC, James Columbus DiPaula, Jr, Flywheel Digital LLC, Patrick Miller (Vitti, Anthony) (Entered: 04/01/2022) |
| 04/04/2022 | 21 | NOTICE of Appearance by Bruce L Marcus on behalf of Daniel J. White (Marcus, Bruce) (Entered: 04/04/2022) |
| 04/04/2022 | 22 | NOTICE of Appearance by Sydney M Patterson on behalf of Daniel J. White (Patterson, Sydney) (Entered: 04/04/2022) |
| 04/04/2022 | 23 | MOTION to Dismiss for Failure to State a Claim by Ascential PLC, James Columbus DiPaula, Jr, Flywheel Digital LLC, Patrick Miller (Attachments: # 1 Memorandum of Law, # 2 Declaration of G. Stewart Webb, Jr., # 3 Exhibit 1 to Declaration of G. Stewart Webb, Jr., # 4 Exhibit 2 to Declaration of G. Stewart Webb, Jr., # 5 Exhibit 3 to Declaration of G. Stewart Webb, Jr., # 6 Exhibit 4 to Declaration of G. Stewart Webb, Jr., # 7 Declaration of Louise Meads, # 8 Proposed Order)(Webb, G) (Entered: 04/04/2022) |
| 04/04/2022 | 24 | MOTION to Appear Pro Hac Vice for Michael C. Keats (Filing fee $100, receipt number AMDDC-9857674.) by Ascential PLC, James Columbus DiPaula, Jr, Flywheel Digital LLC, Patrick Miller(Webb, G) (Entered: 04/04/2022) |
| 04/04/2022 | 25 | MOTION to Appear Pro Hac Vice for Rebecca L. Martin (Filing fee $100, receipt number AMDDC-9857676.) by Ascential PLC, James Columbus DiPaula, Jr, Flywheel Digital LLC, Patrick Miller(Webb, G) (Entered: 04/04/2022) |
| 04/04/2022 | 26 | MOTION to Appear Pro Hac Vice for Arthur Kutoroff (Filing fee $100, receipt number AMDDC-9857678.) by Ascential PLC, James Columbus DiPaula, Jr, Flywheel Digital LLC, Patrick Miller(Webb, G) (Entered: 04/04/2022) |
| 04/04/2022 | 27 | Local Rule 103.3 Disclosure Statement by Ascential PLC identifying Other Affiliate 4k Miles Technologies Limited, Other Affiliate 4KMiles Tec Limited (NY), Other Affiliate 4KMiles Tec Limited (WA), Other Affiliate Analytic Index Holdings, LLC, Other Affiliate Analytics Index, LLC, Other Affiliate Ascential (Singapore) Pte Ltd, Other Affiliate Ascential Data Services (Shanghai) Company Limited, Other Affiliate Ascential Events (Europe) Limited, Other Affiliate Ascential Events (Hangzhou) Co Ltd, Other Affiliate Ascential Events France SAS, Other Affiliate Ascential Financing Limited, Other Affiliate Ascential Group Limited, Other Affiliate Ascential Inc., Other Affiliate Ascential Information Services Limited, Other Affiliate Ascential Japan Kabushiki-Kaisha, Other Affiliate Ascential Jersey Financing Limited, Other Affiliate Ascential Operations Limited, Other Affiliate Ascential Radio Financing Ltd, Other Affiliate Ascential Servicos De Informacao Ltda, Other Affiliate Ascential UK Holdings Limited, Other Affiliate Asian Advertising Festival (Spikes Asia) Pte Ltd, Other Affiliate ASR Group Holdings LLC, Other Affiliate Clavis Information Technology (Shanghai) Limited, Other Affiliate Clavis Technology Limited, Other Affiliate CLR Code Limited, Other Affiliate CLR Code LLC, Other Affiliate Cognitive Logic, Inc., Other Affiliate CTIC WGSN China Ltd, Other Affiliate Day 0 LLC, Other Affiliate Digital Commerce Holdings Ltd, Other Affiliate Edge by Ascential Ltd, Other Affiliate Edge by Ascential, LLC, Other Affiliate Era Servicos De Inteligencia Em Software S.A., Other Affiliate Fascam LLC, Other Affiliate Flywheel Digital Limited, Other Affiliate Flywheel Digital LLC (Maryland), Other Affiliate Flywheel Digital LLC (Washington), Other Affiliate Guangzhou 4KMiles Data Technologies, Ltd., Other Affiliate Guangzhou 4KMiles Technical Services Co., Ltd., Other Affiliate HangZhou Duozhun Data Technology Co. Ltd, Other Affiliate Hangzhou Qianli Chuanyin Data Technology Co., Ltd., Other Affiliate HangZhouYincang Danmu Data Technology Co. Ltd, Other Affiliate HBW Commerce LLC, Other Affiliate HBW LLC, Other Affiliate HMX Merger Sub, Inc, Other Affiliate HongKong 4K Miles Information Technology Limited, Other Affiliate HongKong 4kmiles Technology Limited, Other Affiliate Hudson MX, Inc, Other Affiliate Hyperdrive LLC, Other Affiliate Market Bound LLC, Other Affiliate One Space Inc., Other Affiliate Perpetua Labs Limited, Other Affiliate Perpetua Labs Ltd (Formerly Draper AI), Other Affiliate Perpetua Labs, Inc., Other Affiliate Pet Gear LLC, Other Affiliate Recon Commerce LLC, Other Affiliate Rembrandt Technology Limited, Other Affiliate Shanghai Coloro Co., Ltd, Other Affiliate Shenzhen 4KMiles Technologies, Ltd., Other Affiliate Shenzhen Yimian Network Technology Co. Limited, Other Affiliate Siberia Europe Limited, Other Affiliate Sistema Use Fashion Comercio De Informacoes Ltda, Other Affiliate Spotlight An Ascential Company Limited, Other Affiliate Spotlight Digital Commerce LLC, Other Affiliate Stylesight Information Technology (Shanghai) Company Limited, Other Affiliate Stylesight Limited, Other Affiliate Top Right Group India Knowledge Services Private Limited, Other Affiliate Trades Exhibitions Limited, Other Affiliate WARC Limited, Other Affiliate We Love Best LLC, Other Affiliate WGSN (Asia Pacific) Limited, Other Affiliate WGSN (Pty) Limited, Other Affiliate WGSN GmbH, Other Affiliate WGSN Group Limited, Other Affiliate WGSN Group Trend Forecasting Moda Danimanlik Hizmetleri Limited Sirketi, Other Affiliate WGSN Intelligence Espana S.L., Other Affiliate WGSN Ltd, Other Affiliate WhyteSpyder LLC, Other Affiliate Worth Global Style Network Ltd for Ascential PLC.(Webb, G) (Entered: 04/04/2022) |
| 04/04/2022 | 28 | Local Rule 103.3 Disclosure Statement by Flywheel Digital LLC identifying Other Affiliate 4k Miles Technologies Limited, Other Affiliate 4KMiles Tec Limited (NY), Other Affiliate 4KMiles Tec Limited (WA), Other Affiliate Analytic Index Holdings, LLC, Other Affiliate Ascential (Singapore) Pte Ltd, Other Affiliate Ascential Data Services |

| | | |
|---|---|---|
| | | (Shanghai) Company Limited, Other Affiliate Ascential Events (Europe) Limited, Other Affiliate Ascential Events (Hangzhou) Co Ltd, Other Affiliate Ascential Events France SAS, Other Affiliate Ascential Financing Limited, Other Affiliate Ascential Group Limited, Other Affiliate Ascential Inc., Other Affiliate Ascential Information Services Limited, Other Affiliate Ascential Japan Kabushiki-Kaisha, Other Affiliate Ascential Jersey Financing Limited, Other Affiliate Ascential Operations Limited, Other Affiliate Ascential Radio Financing Ltd, Other Affiliate Ascential Servicos De Informacao Ltda, Other Affiliate Ascential UK Holdings Limited, Other Affiliate Asian Advertising Festival (Spikes Asia) Pte Ltd, Other Affiliate ASR Group Holdings LLC, Other Affiliate Clavis Information Technology (Shanghai) Limited, Other Affiliate Clavis Technology Limited, Other Affiliate CLR Code Limited, Other Affiliate CLR Code LLC, Other Affiliate Cognitive Logic, Inc., Other Affiliate CTIC WGSN China Ltd, Other Affiliate Day 0 LLC, Other Affiliate Digital Commerce Holdings Ltd, Other Affiliate Edge by Ascential Ltd, Other Affiliate Edge by Ascential, LLC, Other Affiliate Era Servicos De Inteligencia Em Software S.A., Other Affiliate Fascam LLC, Other Affiliate Flywheel Digital Limited, Other Affiliate Flywheel Digital LLC (Maryland), Other Affiliate Flywheel Digital LLC (Washington), Other Affiliate Guangzhou 4KMiles Data Technologies, Ltd., Other Affiliate Guangzhou 4KMiles Technical Services Co., Ltd., Other Affiliate HangZhou Duozhun Data Technology Co. Ltd, Other Affiliate Hangzhou Qianli Chuanyin Data Technology Co., Ltd., Other Affiliate HangZhouYincang Danmu Data Technology Co. Ltd, Other Affiliate HBW Commerce LLC, Other Affiliate HBW LLC, Other Affiliate HMX Merger Sub, Inc, Other Affiliate HongKong 4K Miles Information Technology Limited, Other Affiliate HongKong 4kmiles Technology Limited, Other Affiliate Hudson MX, Inc, Other Affiliate Hyperdrive LLC, Other Affiliate Market Bound LLC, Other Affiliate One Space Inc., Other Affiliate Perpetua Labs Limited, Other Affiliate Perpetua Labs Ltd (Formerly Draper AI), Other Affiliate Perpetua Labs, Inc., Other Affiliate Pet Gear LLC, Other Affiliate Recon Commerce LLC, Other Affiliate Rembrandt Technology Limited, Other Affiliate Shanghai Coloro Co., Ltd, Other Affiliate Shenzhen 4KMiles Technologies, Ltd., Other Affiliate Shenzhen Yimian Network Technology Co. Limited, Other Affiliate Siberia Europe Limited, Other Affiliate Sistema Use Fashion Comercio De Informacoes Ltda, Other Affiliate Spotlight An Ascential Company Limited, Other Affiliate Spotlight Digital Commerce LLC, Other Affiliate Stylesight Information Technology (Shanghai) Company Limited, Other Affiliate Stylesight Limited, Other Affiliate Top Right Group India Knowledge Services Private Limited, Other Affiliate Trades Exhibitions Limited, Other Affiliate WARC Limited, Other Affiliate We Love Best LLC, Other Affiliate WGSN (Asia Pacific) Limited, Other Affiliate WGSN (Pty) Limited, Other Affiliate WGSN GmbH, Other Affiliate WGSN Group Limited, Other Affiliate WGSN Group Trend Forecasting Moda Danimanlik Hizmetleri Limited Sirketi, Other Affiliate WGSN Intelligence Espana S.L., Other Affiliate WGSN Ltd, Other Affiliate WhyteSpyder LLC, Other Affiliate Worth Global Style Network Ltd, Other Affiliate Analytic Index, LLC for Flywheel Digital LLC.(Webb, G) (Entered: 04/04/2022) |
| 04/06/2022 | 29 | STIPULATION *Extending Pleading and Motion Deadlines by and among Plaintiff Compass and Defendants Ascential, Flywheel, DiPaula, and Miller* by Compass Marketing, Inc.(Ward, Rachel) (Entered: 04/06/2022) |
| 04/06/2022 | 30 | PAPERLESS ORDER granting 24 Motion to Appear Pro Hac Vice on behalf of Michael C Keats, Rebecca L Martin, Arthur Kutoroff. Directing attorney Michael C Keats, Rebecca L Martin, Arthur Kutoroff to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so; granting 25 Motion to Appear Pro Hac Vice on behalf of Michael C Keats, Rebecca L Martin, Arthur Kutoroff. Directing attorney Michael C Keats, Rebecca L Martin, Arthur Kutoroff to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so; granting 26 Motion to Appear Pro Hac Vice on behalf of Michael C Keats, Rebecca L Martin, Arthur Kutoroff. Directing attorney Michael C Keats, Rebecca L Martin, Arthur Kutoroff to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. Signed by Clerk on 4/6/2022. (dm4s, Deputy Clerk) (Entered: 04/06/2022) |
| 04/07/2022 | | Case Reassigned to Judge George Levi Russell, III. Chief Judge James K. Bredar no longer assigned to the case. (kns, Deputy Clerk) (Entered: 04/07/2022) |
| 04/08/2022 | 31 | MARGINAL ORDER Approving 29 STIPULATION Extending Pleading and Motion Deadlines by and among Plaintiff Compass and Defendants Ascential, Flywheel, DiPaula, and Miller by Compass Marketing, Inc filed by Compass Marketing, Inc.. Signed by Judge George Levi Russell, III on 4/8/2022. (kb3s, Deputy Clerk) (Entered: 04/08/2022) |
| 04/13/2022 | 32 | STIPULATION *Regarding Deadline for Defendants Michael White and George White to Respond to Complaint* by George White, Michael White(Cornwell, Judith) (Entered: 04/13/2022) |
| 04/13/2022 | 33 | MARGINAL ORDER Granting 32 STIPULATION Regarding Deadline for Defendants Michael White and George White to Respond to Complaint filed by George White, Michael White. Signed by Judge George Levi Russell, III on 4/13/2022. (kb3s, Deputy Clerk) (Entered: 04/13/2022) |
| 04/14/2022 | 34 | NOTICE of Appearance by Mark Steven Brown on behalf of Compass Marketing, Inc. (Brown, Mark) (Entered: 04/14/2022) |
| 04/14/2022 | 35 | STIPULATION *Extending Pleading and Motion Deadlines By and Among Plaintiff and Certain Defendants* by Compass Marketing, Inc.(Ward, Rachel) (Entered: 04/14/2022) |
| 04/15/2022 | 36 | NOTICE of Appearance by Rod J Rosenstein on behalf of Compass Marketing, Inc. (Rosenstein, Rod) (Entered: 04/15/2022) |

| | | |
|---|---|---|
| 04/15/2022 | 37 | NOTICE of Appearance by David B Hamilton on behalf of James Columbus DiPaula, Jr, Patrick Miller (Hamilton, David) (Entered: 04/15/2022) |
| 04/15/2022 | 38 | NOTICE of Appearance by Sarah E Meyer on behalf of James Columbus DiPaula, Jr, Patrick Miller (Meyer, Sarah) (Entered: 04/15/2022) |
| 04/18/2022 | 39 | MARGINAL ORDER granting 35 STIPULATION Regarding Deadline for Defendants Michael White and George White to Respond to Complaint filed by Compass Marketing, Inc.. Signed by Judge George Levi Russell, III on 4/18/2022. (kb3s, Deputy Clerk) (Entered: 04/18/2022) |
| 04/25/2022 | 40 | *George White's* ANSWER to 1 Complaint *Count XXII* by George White.(Cornwell, Judith) (Entered: 04/25/2022) |
| 04/25/2022 | 41 | MOTION to Dismiss *Plaintiff's Complaint* by George White, Michael White(Cornwell, Judith) (Entered: 04/25/2022) |
| 04/25/2022 | 42 | MOTION to Dismiss *Plaintiff's Complaint* by Daniel J. White (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Marcus, Bruce) (Entered: 04/25/2022) |
| 04/26/2022 | 43 | Request for Hearing re 41 MOTION to Dismiss *Plaintiff's Complaint* (Cornwell, Judith) (Entered: 04/26/2022) |
| 05/04/2022 | 44 | RESPONSE in Opposition re 23 MOTION to Dismiss for Failure to State a Claim filed by Compass Marketing, Inc.. (Attachments: # 1 Attachment Declaration of Rachel A. Ward, Esq., # 2 Exhibit A to Declaration, # 3 Exhibit B to Declaration, # 4 Exhibit C to Declaration, # 5 Text of Proposed Order Proposed Order)(Ward, Rachel) (Entered: 05/04/2022) |
| 05/11/2022 | 45 | MOTION to Appear Pro Hac Vice for Michael J. Ableson (Filing fee $100, receipt number AMDDC-9927334.) by Compass Marketing, Inc.(Luxton, Steven) (Entered: 05/11/2022) |
| 05/13/2022 | 46 | PAPERLESS ORDER granting 45 Motion to Appear Pro Hac Vice on behalf of Michael J Ableson. Directing attorney Michael J Ableson to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 5/13/2022. (dm4s, Deputy Clerk) (Entered: 05/13/2022) |
| 05/16/2022 | 47 | RESPONSE in Opposition re 41 MOTION to Dismiss *Plaintiff's Complaint*, 42 MOTION to Dismiss *Plaintiff's Complaint (Response in Opposition to Motions to Dismiss of Defendants Daniel White, George White, and Michael White)* filed by Compass Marketing, Inc.. (Attachments: # 1 Text of Proposed Order)(Brown, Troy) (Entered: 05/16/2022) |
| 05/25/2022 | 48 | REPLY to Response to Motion re 23 MOTION to Dismiss for Failure to State a Claim filed by Ascential PLC, James Columbus DiPaula, Jr, Flywheel Digital LLC, Patrick Miller.(Vitti, Anthony) (Entered: 05/25/2022) |
| 05/31/2022 | 49 | RESPONSE in Support re 41 MOTION to Dismiss *Plaintiff's Complaint* filed by George White, Michael White. (Schwaber, Jeffrey) (Entered: 05/31/2022) |
| 05/31/2022 | 50 | RESPONSE in Support re 42 MOTION to Dismiss *Plaintiff's Complaint* filed by Daniel J. White.(Marcus, Bruce) (Entered: 05/31/2022) |
| 06/01/2022 | 51 | NOTICE by George White, Michael White (Schwaber, Jeffrey) (Entered: 06/01/2022) |
| 01/20/2023 | 52 | (FILED IN ERROR) NOTICE by Ascential PLC, James Columbus DiPaula, Jr, Flywheel Digital LLC, Patrick Miller - *Withdrawal of Appearance of Counsel as to Arthur Kutoroff* (Vitti, Anthony) Modified on 1/20/2023 (ybs, Deputy Clerk). (Entered: 01/20/2023) |
| 01/20/2023 | 53 | QC NOTICE: 52 Notice (Other) filed by Patrick Miller, James Columbus DiPaula, Jr., Flywheel Digital LLC, Ascential PLC was filed incorrectly.<br>***Leave of Court is required to strike counsel per Local Rule 101.2. Each attorney must file their own request to withdraw.* (ybs, Deputy Clerk) (Entered: 01/20/2023) |
| 01/20/2023 | 54 | MOTION to Withdraw as Attorney by Ascential PLC, James Columbus DiPaula, Jr, Flywheel Digital LLC, Patrick Miller (Attachments: # 1 Text of Proposed Order)(Kutoroff, Arthur) (Entered: 01/20/2023) |
| 02/01/2023 | 55 | ORDER granting 54 Motion to Withdraw as Attorney. Attorney Arthur Kutoroff terminated. Signed by Judge George Levi Russell, III on 2/1/2023. (ybs, Deputy Clerk) (Entered: 02/01/2023) |
| 02/14/2023 | 56 | NOTICE of Appearance by Tonya Kelly Cronin on behalf of Ascential PLC, James Columbus DiPaula, Jr, Flywheel Digital LLC, Patrick Miller (Cronin, Tonya) (Entered: 02/14/2023) |
| 02/14/2023 | 57 | NOTICE of Appearance by Alison Cate Schurick on behalf of Ascential PLC, James Columbus DiPaula, Jr, Flywheel Digital LLC, Patrick Miller (Schurick, Alison) (Entered: 02/14/2023) |
| 02/14/2023 | 58 | MOTION to Withdraw as Attorney by Ascential PLC, James Columbus DiPaula, Jr, Flywheel Digital LLC, Patrick Miller (Attachments: # 1 Text of Proposed Order)(Webb, G) (Entered: 02/14/2023) |
| 02/15/2023 | 59 | NOTICE of Change of Address by David B Hamilton (Hamilton, David) (Entered: 02/15/2023) |
| 02/15/2023 | 60 | QC NOTICE: 59 Notice of Change of Address filed by Patrick Miller, James Columbus DiPaula, Jr. was filed incorrectly. |

| | | |
|---|---|---|
| | | ***Attorneys must change their address of record through the Maintain Your Account menu in CM/ECF.* (ybs, Deputy Clerk) (Entered: 02/15/2023) |
| 02/15/2023 | 61 | MOTION to Withdraw as Attorney by James Columbus DiPaula, Jr, Patrick Miller (Attachments: # 1 Text of Proposed Order)(Meyer, Sarah) (Entered: 02/15/2023) |
| 02/22/2023 | 62 | ORDER granting 58 Motion to Withdraw as Attorney. Attorney Anthony J. Vitti, Jr and G Stewart Webb, Jr terminated. Signed by Judge George Levi Russell, III on 2/22/2023. (ybs, Deputy Clerk) (Entered: 02/22/2023) |
| 02/22/2023 | 63 | ORDER granting 61 Motion to Withdraw as Attorney. Attorney Sarah E Meyer terminated. Signed by Judge George Levi Russell, III on 2/22/2023. (ybs, Deputy Clerk) (Entered: 02/22/2023) |
| 02/24/2023 | 64 | MEMORANDUM OPINION. Signed by Judge George Levi Russell, III on 2/24/2023. (ybs, Deputy Clerk) (Entered: 02/24/2023) |
| 02/24/2023 | 65 | ORDER granting 41 Motion to Dismiss; granting 42 Motion to Dismiss; granting 23 Motion to Dismiss for Failure to State a Claim; CLOSING case. Signed by Judge George Levi Russell, III on 2/24/2023. (ybs, Deputy Clerk) (Entered: 02/24/2023) |
| 03/24/2023 | 66 | NOTICE OF APPEAL as to 64 Memorandum Opinion, 65 Order on Motion to Dismiss,, Order on Motion to Dismiss for Failure to State a Claim by Compass Marketing, Inc.. Filing fee $ 505, receipt number AMDDC-10508283.(Luxton, Steven) (Entered: 03/24/2023) |
| 03/27/2023 | 67 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 66 Notice of Appeal. IMPORTANT NOTICE: To access forms which you are required to file with the United States Court of Appeals for the Fourth Circuit please go to http://www.ca4.uscourts.gov and click on Forms & Notices.(av4s, Deputy Clerk) (Entered: 03/27/2023) |
| 03/28/2023 | 68 | USCA Case Number 23-1324 for 66 Notice of Appeal filed by Compass Marketing, Inc.. Case Manager - Rachel Phillips (av4s, Deputy Clerk) (Entered: 03/28/2023) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 06/06/2023 14:57:44 | | | |
| **PACER Login:** | mborgerson238 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:22-cv-00379-GLR |
| **Billable Pages:** | 13 | **Cost:** | 1.30 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

COMPASS MARKETING, INC.
105 Eastern Avenue
Annapolis, Maryland 21403
(Anne Arundel County),

*Plaintiff*,

v.

FLYWHEEL DIGITAL LLC
1801 Porter Street Suite 300
Baltimore, Maryland 21230
(Anne Arundel County),

JAMES COLUMBUS "CHIP" DIPAULA, JR.
11 Devon Hill Road, Unit 4B
Baltimore, Maryland 21210
(Baltimore County),

PATRICK MILLER
743 Bywater Road
Gibson Island, Maryland 20008
(Anne Arundel County),

DANIEL WHITE
21900 Fairway Drive
Leonardtown, Maryland 20659
(St. Mary's County),

MICHAEL WHITE
39650 Hiawatha Circle
Mechanicsville, Maryland 20659
(St. Mary's County),

GEORGE WHITE
15125 Woodville Road
Waldorf, Maryland 20601
(Charles County), and

ASCENTIAL PLC,
The Prow, 1 Wilder Walk
London, England W1B 5AP.

*Defendants*.

Case Number: ________________

**COMPLAINT AGAINST**
**FLYWHEEL DIGITAL LLC AND RELATED PARTIES**

**TABLE OF CONTENTS**

NATURE OF THE ACTION ..... 1

THE PARTIES ..... 5

JURISDICTION AND VENUE ..... 7

FACTUAL BACKGROUND ..... 9

A. Compass Origins and Longstanding Investment in the eCommerce Space ..... 9

I. Compass Recognizes the eCommerce Opportunity ..... 9

II. Compass Builds Out Its Operations to Assist Clients on the Amazon Platform ..... 15

III. Compass Develops Valuable Trade Secrets and Proprietary Business Know How that Position it for Success ..... 18

IV. The eCommerce Guide Teaches the Compass Trade Secrets and Compass Implements Reasonable Measures to Protect These Valuable Assets ..... 20

B. DiPaula & Miller Secretly Found a Competing eCommerce Marketing Company Called Flywheel ..... 24

I. DiPaula and Miller Leave Compass ..... 24

II. DiPaula and Miller Poach Compass's eCommerce Team ..... 26

C. Compass Opens an Internal Investigation into Michael and Daniel White ..... 28

I. The Secret Compass Bank Account Scheme (Money Laundering, Embezzlement, Mail Fraud & Wire Fraud) ..... 31

II. The Ghost Employee Scheme (Embezzlement) ..... 32

III. The IRS Tax Check Scheme (Embezzlement) ..... 33

IV. The Shareholder Loan Scheme (Embezzlement) ..... 34

V. Information Technology Lockout of Compass Business Records and Accounts (Attempted Extortion) ..... 36

VI. Sham Legal Campaign ..... 39

VII. Anonymous Campaign Against Compass (Mail and Wire Fraud) ..... 40

VIII. Personal Use of Compass Corporate Credit Cards (Embezzlement) ..... 41

D. Compass Discovers Miller, DiPaula, and Flywheel's Trade Secret Theft ..... 42

E. Compass Discovers Michael and Daniel White are Connected to Miller, DiPaula, and Flywheel's Trade Secret Theft ..... 48

F. Ascential's Role as a Co-Conspirator in Flywheel's Misappropriation of Compass's Trade Secrets ..... 50

I. Ascential Receives Notice of the Flywheel's Improper Origins and Opts to Perpetuate the Harms Against Compass ..... 51

COUNT I – DEFEND TRADE SECRETS ACT OF 2016 (DTSA) (Flywheel, DiPaula, Miller, and Ascential) ..... 54

COUNT II MARYLAND UNIFORM TRADE SECRETS ACT (MUTSA) (Flywheel, DiPaula, Miller, and Ascential) ..... 54

COUNT III – CIVIL RICO 18 U.S.C. § 1962(c) (All Defendants) ..... 59

COUNT IV – CIVIL RICO CONSPIRACY 18 U.S.C. 1962(d) (All Defendants) ..... 61

COUNT V – BREACH OF CONTRACT (DiPaula & Miller) ..... 63

COUNT VI – TORTIOUS INTERFERENCE WITH CONTRACT (DiPaula, Miller, and Flywheel) ..... 65

COUNT VII – TORTIOUS INTERFERENCE WITH PROSPECTIVE ADVANTAGE (Flywheel, DiPaula, Miller) ..... 66

COUNT VIII – UNFAIR COMPETITION (Flywheel, DiPaula, Miller, and Ascential) ..... 66

COUNT IX – UNJUST ENRICHMENT (DiPaula, Miller, Flywheel, and Ascential) ..... 67

COUNT X – FRAUDULENT CONCEALMENT/FRAUD (All Defendants) ..... 69

COUNT XI – CONSPIRACY TO MISAPPROPRIATE TRADE SECRETS (All Defendants) ..... 70

COUNT XII – CONSPIRACY TO BREACH CONTRACT (DiPaula & Miller) ..... 71

COUNT XIII – CONSPIRACY TO TORTIOUSLY INTERFERE WITH CONTRACTS (DiPaula, Miller, and Flywheel) ..... 72

COUNT XIV – CONSPIRACY TO TORTIOUSLY INTERFERE WITH PROSPECTIVE ADVANTAGE (DiPaula, Miller, and Flywheel) ..... 72

COUNT XV – CONSPIRACY TO UNFAIRLY COMPETE (All Defendants) ..... 72

COUNT XVI – CONSPIRACY TO COMMIT FRAUDULENT CONCEALMENT/FRAUD (All Defendants) ..... 73

COUNT XVII – AIDING AND ABETTING MISAPPROPRIATION OF TRADE SECRETS (DiPaula, Miller, and Flywheel) ..... 74

COUNT XVIII – AIDING AND ABETTING TORTIOUS INTERFERENCE WITH CONTRACTS (DiPaula, Miller, and Flywheel) ..... 74

COUNT XIX – AIDING AND ABETTING TORTIOUS INTERFERENCE WITH PROSPECTIVE ADVANTAGE (DiPaula, Miller, and Flywheel) ..... 75

COUNT XX – AIDING AND ABETTING UNFAIR COMPETITION (DiPaula, Miller, and Flywheel) ..... 75

COUNT XXI – AIDING AND ABETTING FRAUDULENT CONCEALMENT/FRAUD (All Defendants) ..... 75

COUNT XXII – CONVERSION (Michael and George White) ..... 76

COUNT XXIII – BREACH OF FIDUCIARY DUTY ..... 77

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 19 of 306

JURY DEMAND ........ 78

PRAYER FOR RELIEF ........ 78

iii

JA15

Plaintiff Compass Marketing, Inc. ("Compass"), by and through its undersigned counsel, files this Complaint against Defendants Flywheel Digital LLC ("Flywheel"), James Columbus "Chip" DiPaula, Jr. ("DiPaula"), Patrick Miller ("Miller"), Daniel J. White ("Daniel" or "Daniel White"), Michael R. White ("Michael" or "Michael White"), George White ("George" or "George White"), and Ascential PLC ("Ascential") (collectively "Defendants"), and states as follows:

**NATURE OF THE ACTION**

1. This lawsuit seeks redress for extensive, pervasive, wrongful, and actionable misconduct committed by each of the named defendants, including years of covert trade secret theft, that has inflicted grievous financial harm on Compass. Individual Defendants DiPaula and Miller are former Compass executives who were given the opportunity to run the best-in-class electronic commerce ("eCommerce") marketing arm for Compass. DiPaula and Miller were trusted with, and permitted to immerse themselves in, Compass's most sensitive trade secret information and proprietary business know how that Compass had been developing for more than a decade. Unbeknownst to Compass, DiPaula and Miller secretly secured embezzled Compass funds from former Compass directors Daniel White and Michael White, and launched and thereafter operated a competing company, Defendant Flywheel. Flywheel has competed with Compass ever since and has done so by misusing stolen trade secrets and proprietary information while poaching Compass's clients and leveraging myriad former Compass eCommerce employees. Defendants DiPaula, Miller, Michael White, and Daniel White have conspired to conceal their misappropriation and cover up their actionable misconduct. Their acts in furtherance of this conspiracy continue to present, as set forth in detail in this Complaint.

2. Compass is a marketing company that was founded in 1998 prior to the rise of eCommerce platforms that fundamentally changed the way consumers interact with and purchase

retail goods. At its start, Compass assisted Fortune 100 companies that sold consumer packaged goods ("CPGs") in brick-and-mortar stores. In 2005, as consumer access to the internet expanded, Compass added online marketing eCommerce services to its CPG clients to support sales to online retailers including Staples.com, OfficeDepot.com, OfficeMax.com, SamsClub.com, Walmart.com, and Amazon.com.

3.      Compass was introduced to Amazon, which at the time was an internet bookstore looking to expand its portfolio of products offered into the online shopping market by adding CPG products. Compass then began helping its CPG clients position, advertise, and sell products to online retailers, including on www.amazon.com (hereinafter, the "Platform" or "Amazon platform"). It was an instant success. Within several years, Compass had a dedicated eCommerce Department that served the biggest CPG manufacturers in the world on the Amazon platform, as well as on the Staples, Office Depot, and other online retailer platforms.

4.      Compass spent years and invested substantial resources perfecting its proprietary business methods, processes, and platform communication strategies to allow Compass to drive sales of its clients' products, including on the Amazon platform. Prior to 2016, Amazon offered no back-end automation or application programming interface ("API") for sellers on its Platform. Consequently, Compass created an integrated set of processes to manually interact with the Platform. The Compass eCommerce team developed deep expertise by, among other things, downloading Amazon data, querying that data through keyword searches, and then manually entering data inputs into Compass internal spreadsheets and software to develop proprietary formulas, methods, strategies, and tools (including formulas) to interact with the Platform.

5.      In 2010 and 2011, Compass hired DiPaula and Miller to run the eCommerce team. DiPaula and Miller lacked any experience or familiarity with the CPG industry or the emerging

eCommerce space. Compass trained DiPaula and Miller on its proprietary business methods, processes, and platform communication strategies. DiPaula and Miller subsequently emerged as what Compass then believed to be trusted senior executives who ran the fastest growing part of Compass.

6.     What Compass (i) did not know in 2014, (ii) did not and could not have known when DiPaula and Miller launched Flywheel, and (iii) did not and could not have known when DiPaula and Miller resigned from Compass and, later in 2016, poached virtually all its eCommerce talent, was that DiPaula and Miller, upon information and belief using in whole or part embezzled funds from Compass, secretly built Flywheel upon the trade secret information and proprietary business know how that rightfully belonged to Compass following more than a decade of intensive and expensive research and development. Indeed, due to extensive and ongoing concealment efforts, Compass did not learn until 2020 that DiPaula and Miller stole and used Compass materials to build out Flywheel as an enterprise to eventually offer identical services as Compass to the identical Compass clients and customers.

7.     From its inception, though unbeknownst to Compass, Flywheel conspired to compete unfairly, both by using Compass's secretly stolen intellectual property, while concealing the fraud, and by spreading false information about Compass, all the while poaching flagship Compass clients and customers.

8.     By the time the extensive and brazen conspiracy by DiPaula, Miller, Daniel White, and Michael White was discovered, and Compass initiated an investigation into it and the surrounding misconduct discovered as set forth in this Complaint, Flywheel had leveraged the stolen trade secrets and proprietary information to turn itself into what Compass was on the trajectory towards becoming based on all of its invaluable intellectual property before the theft.

9.      In just a few years, the startup Flywheel, turned its theft into a company that was acquired by the United Kingdom-based, international conglomerate Ascential.  Ascential either knew or should have known of the genesis of Flywheel's brazen origins, or it acted in reckless disregard of facts that it should have investigated in connection with its due diligence, or it took a "see no evil, hear no evil, focus on financial upside" approach to the acquisition. Ascential rewarded the theft and misconduct by paying up to $400 million to acquire Flywheel, with an up-front payment of $60 million and the possibility of as much as an additional $340 million based on contingencies tied to aggressive growth performance metrics. The structure and payment terms of the Ascential acquisition of Flywheel created a strong financial incentive and motive for Flywheel to continue its fraudulent concealment and its poaching of Compass clients.  Ascential has had to restate its estimated acquisition cost because of the extraordinary growth of Flywheel since the purchase, based on core intellectual property stolen from Compass. Further, Ascential has pivoted its 100 year-old company, according to its most recent interim report, to focus virtually exclusively on the CPG and eCommerce markets, since its acquisition of Flywheel.

10.     Today, notwithstanding that Compass has informed Ascential's executive management and Board of Directors of the material facts underlying the theft and wrongful conduct by Flywheel, DiPaula, and Miller, Ascential has elected to act in concert with Flywheel to further the misappropriation of Compass's trade secrets and proprietary business know how, unfairly compete with Compass, conceal the theft, sabotage Compass's business, and perpetuate the widespread fraud that drives Flywheel's success.

11.     On January 20, 2020, during the course of a review, Compass's Controller located on the internet a Flywheel-branded Power Point presentation created by Patrick Miller that

revealed, for the first time, that Flywheel had stolen and was continuing to misuse for unauthorized purposes Compass's trade secrets and proprietary business know how.

12.    Upon information and belief, the metadata revealed that the Flywheel-branded Presentation was created in 2013, when DiPaula and Miller worked at Compass.

13.    Compass is pursuing this action against Defendants seeking compensatory damages, punitive damages, treble damages, a court order, injunctive relief, and fees and costs for Defendants' misappropriation of Compass's trade secrets under the Defend Trade Secrets Act ("DTSA") (Count I) and under the Maryland Uniform Trade Secrets Act ("MUTSA") (Count II), for Racketeer Influenced and Corrupt Organizations ("RICO") Act violations (Count III), RICO civil conspiracy (Count IV), breach of contract (Count V), tortious interference with contracts (Count VI), tortious interference with prospective advantage (Count VII), unfair competition (Count VIII), unjust enrichment (Count IX), fraudulent concealment (Count X), conspiracy (Counts XI-XVI), aiding and abetting claims (Counts XVII-XXI), conversion (Count XXII), and breach of fiduciary duty (Count XXIII).

## THE PARTIES

14.    Plaintiff Compass is incorporated in the Commonwealth of Virginia and is a foreign corporation registered with the state of Maryland. Its principal place of business is located at 105 Eastern Avenue, Annapolis, Maryland, 21403. At all relevant times herein, Compass has been in good standing with the Commonwealth of Virginia and State of Maryland.

15.    Defendant Flywheel is a Maryland limited liability company licensed to do business in the State of Maryland. Its principal place of business is located at 1801 Porter St., Suite 300, Baltimore, MD 21230. Flywheel is an eCommerce marketing company built using Compass's stolen trade secrets and proprietary information and know how, as well as built upon information and belief in whole or in part on funds embezzled from Compass. DiPaula and Miller incorporated

Flywheel on September 3, 2014, the day before they both resigned from Compass. On information and belief, since its formation through the present, Flywheel's Board of Governors and/or registered agents have been comprised by individual defendants DiPaula and Miller, Ascential CEO Duncan Painter, and Ascential CFO Mandy Gradden, as well as non-party individuals Dayna Acevedo, Shiwen Xu, and Rachel McGuckian.

16.    Defendant Chip DiPaula is an individual and resident of Baltimore County, Maryland. DiPaula served as Senior Vice President of the Compass International Division from March 1, 2010 to 2012, and as Executive Vice President managing the Compass eCommerce team from 2012 until he resigned from the company on September 4, 2014. While still employed at Compass, DiPaula founded Flywheel with Patrick Miller.

17.    Defendant Patrick Miller is an individual and resident of Anne Arundel County, Maryland. Miller was Vice President of Digital Strategy for the Compass eCommerce team from January 31, 2011 until he resigned from the company on September 4, 2014. While still employed at Compass, Miller founded Flywheel with DiPaula.

18.    Defendant Daniel White is an individual and resident of St. Mary's County, Maryland. Daniel served as Compass legal counsel and acted as its General Counsel from 1998 to November 23, 2018 and was a member of the Compass Board of Directors from 1998 to February 14, 2019. Daniel currently owns 150 shares of Compass, which represents a 16.6% ownership stake in the company. Daniel is the brother of Compass's Executive Chairman John White, and of individual Defendant Michael White.

19.    Defendant Michael White is an individual and a resident of St. Mary's County, Maryland. Michael was Vice President of Operations and Comptroller of Compass from 2011 to November 23, 2018 and was a member of the Compass Board of Directors from 2011 until

February 14, 2019. Michael currently owns 150 shares of Compass, which represents a 16.6% ownership stake in the company.

20. Defendant George White is an individual and resident of Charles County, Maryland. George worked at Compass managing Compass's IT systems from January 1, 2004 to April 29, 2019. George is the son of individual defendant Michael White.

21. Defendant Ascential is a public limited company in the United Kingdom, with its principal place of business at The Prow, 1 Wilder Walk, London, England W1B 5AP. Ascential operates offices internationally and throughout the United States, including in Maryland. Ascential acquired Flywheel on or around November 1, 2018.

**JURISDICTION AND VENUE**

22. This Court has federal question subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Compass asserts a claim under 18 U.S.C. § 1836, The Defend Trade Secrets Act ("DTSA"). This Court has supplemental or pendant jurisdiction over Compass's remaining claims pursuant to 28 U.S.C. § 1367 because such claims are so related to Compass's DTSA claim that they form part of the same case or controversy under Article III of the United States Constitution.

23. Alternatively, this Court has federal question subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because Compass asserts a claim under 18 U.S.C. § 1965, the RICO Act, against Defendants. This Court has supplemental or pendant jurisdiction over Compass's remaining claims pursuant to 28 U.S.C. § 1367 because such claims are so related to the RICO claim that they form part of the same case or controversy under Article III of the United States Constitution.

24. Defendant Flywheel is subject to personal jurisdiction in this Court by virtue of being a Maryland corporation, having a principal place of business in Maryland, doing business in

Maryland, engaging in tortious conduct in Maryland related to the misappropriation and use of Compass's trade secrets, having contact with Maryland in furtherance of a conspiracy, and interfering with Compass's valid and enforceable Maryland contracts.

25. Defendant DiPaula is subject to personal jurisdiction in this Court by virtue of being a citizen and resident of Maryland, doing business in Maryland, engaging in tortious conduct in Maryland related to the misappropriation and use of Compass's trade secrets, having contact with Maryland in furtherance of a conspiracy, and entering into valid and enforceable Maryland contracts among other wrongful acts that relate to this litigation.

26. Defendant Miller is subject to personal jurisdiction in this Court by virtue of being a citizen and resident of Maryland, doing business in Maryland, engaging in tortious conduct in Maryland related to the misappropriation and use of Compass's trade secrets, having contact with Maryland in furtherance of a conspiracy, and entering into valid and enforceable Maryland contracts among other wrongful acts that relate to this litigation.

27. Defendant Daniel White is subject to personal jurisdiction in this Court by virtue of being a citizen and resident of Maryland, doing business in Maryland, engaging in tortious conduct in Maryland, and having contact with Maryland in furtherance of a conspiracy, among other wrongful acts that relate to this litigation.

28. Defendant Michael White is subject to personal jurisdiction in this Court by virtue of being a citizen and resident of Maryland, doing business in Maryland, engaging in tortious conduct in Maryland, and having contact with Maryland in furtherance of a conspiracy, among other wrongful acts that relate to this litigation.

29. Defendant George White is subject to personal jurisdiction in this Court by virtue of being a citizen and resident of Maryland, doing business in Maryland, engaging in tortious

conduct in Maryland, and having contact with Maryland in furtherance of a conspiracy, among other wrongful acts that relate to this litigation.

30. Defendant Ascential is subject to personal jurisdiction in this Court by virtue of doing business in Maryland, engaging in tortious conduct in Maryland related to the misappropriation and use of Compass's trade secrets, and having contact with Maryland in furtherance of a conspiracy. Ascential officers, including its CEO Duncan Painter and its CFO Mandy Gradden, served on the Flywheel Board of Directors, and upon information and belief, regularly travel to Maryland to manage Flywheel operations.

31. Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTUAL BACKGROUND

### A. Compass Origins and Longstanding Investment in the eCommerce Space

32. Compass was founded on February 4, 1998, as a marketing company for CPGs. CPGs are products that customers consume and replace on a frequent basis. Examples of CPGs include beverages, cosmetics, and cleaning products.

33. John White envisioned Compass as a company focused on the marketing evolution and expansion of the traditional marketplace for CPGs. Compass initially worked with manufacturers to place CPGs in brick-and-mortar big-box retailers and creative locations, such as the check-out counters of home improvement stores.

#### I. *Compass Recognizes the eCommerce Opportunity*

34. At the time Compass was founded, the eCommerce industry was in its infancy. Cadabra, Inc. (now known as Amazon.com, Inc.) launched its online bookstore four years prior, and eCommerce giants like Etsy and Alibaba did not exist. Foreseeing the massive need for its services in the eCommerce space, and the significant lucrative financial upside associated with

being one of the first developers of a proprietary eCommerce strategy, in 2005, Compass created its eCommerce digital marketing and sales service so it could market CPG clients' products online.

35. The eCommerce expansion was a quick success. Compass represented iconic brands such as Splenda, Duracell, Neutrogena, Band Aid, Motrin, and Tylenol across Amazon, Target, Walmart, and Staples internet platforms, among many others listed below. Its revenue increased more than 1300% in only six years, increasing from $284,894 in 2002, to $3,779,203 in 2008.

Exhibit A to Complaint (hereinafter "Compass Marketing Deck"), Slide 66.

36. John White recognized in the early 2000s that family norms in America had changed such that single family income was being replaced by dual family income (both members of a couple working). With Americans spending more time outside of the home, John White recognized that consumer behavior would continue to shift towards the convenience of purchasing consumer goods online.

37. Compass saw Amazon as the future of eCommerce, correctly predicting by 2013 that "[t]he number of consumers researching or shopping online is steadily growing and will surpass 200 million by 2015." Compass understood that "Amazon customers are driven to purchase based on price, selection and convenience." Compass foresaw that pricing is "critical," but "shoppers are looking to save both time & money by shopping online." Compass was studying those "core drivers" that were "very important" to fueling the imminent online shopping explosion:

Compass Marketing Deck, Slide 60.

38. Compass saw the online explosion coming a decade before it arrived. Compass estimated, based on internal Amazon data in 2013, that Amazon.com would be a $50 billion dollar business in the US by 2022. The actual growth has exceeded even Compass's lofty growth projections.



Compass Marketing Deck, Slide 96.

39. Compass also predicted the sales opportunity in Amazon's nascent specialty channels, such as Amazon Fresh (groceries) and Amazon Supply (office supplies), and in the data-valuable search and social platform Amazon was building. The unique monthly visitors Amazon had in 2013 was 104 million in the US alone. Compass knew that optimizing its search campaigns for its clients would grow in value so Compass built unique processes and formulas to optimize its clients' campaigns. Today Amazon's unique monthly visitors exceed 2.5 billion worldwide.

40. Compass positioned itself to be at the forefront of non-traditional channels of distribution for CPGs. Compass was at the ground level in assisting its clients to increase distribution and sales through eCommerce. In 2013, Compass positioned itself at the intersection of core growth areas underpinning eCommerce: sales, analytics, marketing, and logistics.



Compass Marketing Deck, Slide 10.

41. Compass's early adoption of an eCommerce focus uniquely positioned the Company to grow alongside Amazon and other platforms. In 2013, Compass was primed for unparalleled success.

Compass Marketing Deck, Slide 12.

42. By 2013, Compass was deeply invested in its partnership with Amazon, and that investment was paying dividends. Compass relied on its knowledge of best practices regarding

how to compete in this new retail channel to advise its clients. Compass also partnered with Amazon to launch the "Add-on Store" that has become a ubiquitous part of the Amazon shopping experience:

Compass Marketing Deck, Slide 80.

43. Compass distinguished itself in the market by analyzing internal Amazon data, such as "market basket" data, to determine how to drive sales of its clients' products. The Company's analytics skillsets deepened such that by manually assessing Amazon data, Compass developed proprietary methods and protocols to increase page views and drive conversion that would been unachievable otherwise. Compass's clients realized astounding results by 2013 as a direct result of Compass's trade secrets and proprietary business know how.



Compass Marketing Deck, Slide 87.

**II. *Compass Builds Out Its Operations to Assist Clients on the Amazon Platform***

44. Compass, due in large part to the early success of its eCommerce Department, secured significant growth from 2005 to 2014. Compass made significant operational investments in its eCommerce Department, including a college intern program specifically set up to recruit and hire students from the University of Maryland.

45. On March 1, 2010, Compass hired Chip DiPaula as Executive Vice-President of the International Division. DiPaula accepted and entered into the "Agreement Relating to Employment and Post Employment") ("the DiPaula Agreement"). The DiPaula Agreement contained the following confidentiality provision:

> Employee shall not, during or after termination of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where recognized by law, any Proprietary Information which is not generally known to the public, or has not otherwise been disclosed or recognized as standard practice in the industries in which COMPASS is engaged. Employment Agreement at 1.

46. The DiPaula Agreement contained the following Non-Solicitation Agreement:

> During the period of Employee's employment with COMPASS and for a period of two years following the termination of Employee's employment, regardless of the reason for termination, Employee shall not, directly or indirectly: (i) induce or encourage any employee of COMPASS to leave the employ of COMPASS, (ii) hire any individual who is or was an employee of COMPASS as of the date of employee's termination of employment or within a one year period prior to such date, or (iii) induce or encourage any customer, client, potential customer, potential client and/or other business relation of COMPASS to not do business or cease or reduce doing business with COMPASS or in any way interfere with the relationship between any such customer, client, potential client, supplier or other business relation and COMPASS. Employment Agreement at 2.

47. On January 31, 2011, Compass hired Patrick Miller as Vice President of Digital Strategy for the Compass eCommerce team. Miller also accepted and entered into an "Agreement Relating to Employment and Post Employment," which contained the same relevant terms and conditions as those contained in the DiPaula Agreement ("the Miller Agreement").

48. As part of routine employee onboarding, Compass gave each of DiPaula and Miller an Employee Handbook ("the Handbook"). The Handbook also prohibited

> Theft, misappropriation or unauthorized possession or use of property, documents, records or funds belonging to the Company, or any client or employee; removal of same from Company premises without authorization.
>
> Divulging trade secrets or other confidential business information to any unauthorized persons or to others without an official need to know.
>
> Obtaining unauthorized confidential information pertaining to clients or employees. Compass Employee Handbook at 12.

49. Miller was especially familiar with the Compass Employee Handbook and the Company's expectations regarding handling of confidential and trade secret information because in his supervisory role, he was tasked with enforcing Handbook policies with subordinates on the eCommerce team.

50. In 2012, DiPaula was promoted to Executive Vice President of the eCommerce team.

Compass Marketing Deck, Slide 92. DiPaula (second from the right) and Miller (far left) with the Compass eCommerce Department in 2013

51. Critically, DiPaula and Miller had no prior eCommerce experience. Compass trained DiPaula and Miller on its proprietary marketing protocols it had developed over the prior six years. Compass created these proprietary business methods, processes, and platform communication strategies through years of time, effort, financial investment, and unique access to and analysis of eCommerce data.

52. By 2014, Compass had more than 60 employees in 15 cities in the United States and abroad. Compass also expanded its eCommerce services to support its clients' businesses internationally. It launched services in Canada, the United Kingdom, France, Germany, and Japan. On behalf of Compass, Miller visited Amazon's United Kingdom headquarters. DiPaula and John White visited India with client Proctor & Gamble ("P&G") to explore eCommerce opportunities in India. DiPaula oversaw Compass's efforts to hire a team in and expand into China, including by directing Compass employees to visit Alibaba in China.

### III. *Compass Develops Valuable Trade Secrets and Proprietary Business Know How that Position it for Success*

53. Before DiPaula and Miller took the helm, the Compass eCommerce team forged relationships with the biggest CPG manufacturers in the world. Compass stood out as a resource for CPG manufacturers because while eCommerce remained a nascent field, access to consumer sales data was extremely limited. It therefore required substantial effort to gain access and unpack the consumer sales data that was instrumental to successfully marketing and selling products on eCommerce platforms.

54. Access to the Amazon.com platform remains scarce. In its early years, Amazon further limited access to its data. Compass was one of very few companies with a close enough relationship to Amazon suppliers to have been recognized as a certified Amazon partner and to therefore have access to receive real time Amazon consumer search, sales, and supply chain data. Because of Compass's unique and diverse client portfolio, Compass was granted access to Amazon vendor sales data beginning in 2011.

55. As an Amazon vendor partner, Compass manually pulled Amazon data on behalf of its clients, by logging in with authorization to a restricted Amazon portal known as Amazon Vendor Central. From the inception of Compass's access to Amazon sales data in 2011 until around 2016, software tools were not available to automate review of the data. Compass had to manually download and review client sales information provided in Amazon reports by custom building proprietary formulas into excel spreadsheets.

56. For more than a decade, Compass exerted significant time, resources, investment, and employee effort to analyze the Amazon sales data and eCommerce algorithms in order to build its proprietary formulas and platform. Its diversified client portfolio allowed Compass to study a high enough volume of client sales reports provided by Amazon to permit Compass the unique

ability to understand and discern what pricing, promotions, and search strategies optimized sales and profitability for its clients. Over a long period of time, Compass compiled enough information to understand how Amazon interacted with consumers through promotional tactics to increase or drive those consumers' purchases on Amazon. Compass was specifically able to determine which Amazon promotional vehicles deliver the most value and under what circumstances.

57. These determinations and data-driven insights enabled Compass to effectively advise clients on the entire Amazon process. Compass understood all aspects of the sales/marketing strategy for CPGs selling to consumers on Amazon, including when products were likely to sell, how to stock inventory by season, how to forecast for upcoming quarters, and how to interact with Amazon on critical supply chain details.

58. Compass's intricate understanding and years of dedicated research and investment allowed it to build out work product that described the proprietary business methods, processes, and platform communication strategies that were protected as trade secrets.

59. By 2014, Compass's services to clients were informed by a scientific approach to achieving success for CPGs on the Amazon platform. Compass had dissected the Amazon sales data to look "under the hood" of each Compass client's vendor account at Amazon, as Amazon's algorithms affected all vendor sales dramatically. This unique line of sight into platform minutia allowed Compass to develop and offer clients unparalleled advice and services in the core areas such as search optimization, merchandizing, pricing, content, graphic design, and supply chain operations. Each area of service was optimized with Compass's proprietary system.

60. Compass converted its unique line of sight into the Amazon platform into a significant business opportunity. Prior to the tortious conduct that launched Flywheel, Compass was dominant in the eCommerce marketing space.

61. The opportunities available to Compass changed drastically, however, when Flywheel arrived on the scene. Flywheel offered and continues to offer identical services as Compass and is Compass's main competitor.

62. Flywheel's success is no accident. Flywheel offers identical services as Compass to the same market because Flywheel misappropriated the foundational information that Compass compiled for more than a decade to assist clients in navigating eCommerce platforms, especially the Amazon platform.

**IV. *The eCommerce Guide Teaches the Compass Trade Secrets and Compass Implements Reasonable Measures to Protect These Valuable Assets***

63. In November 2013, at John White's direction and after DiPaula and Miller joined the eCommerce Department, the eCommerce team created the Compass eCommerce Guide ("the eCommerce Guide"). The eCommerce Guide compiled Compass's trade secret, proprietary and confidential Amazon protocols into a step-by-step guide used to train the Compass eCommerce team and execute on Compass's business strategy. The eCommerce Guide memorialized years of research and work that Compass invested to develop its proprietary processes designed to increase and maximize its clients' sales on Amazon and other platforms.

64. A sampling of representative trade secret categories disclosed or referred to in the eCommerce Guide include:

- Methods Compass has used and on which it continues to rely to interact with the back end of Amazon.com, known as vendorcentral.amazom.com, through its ASIN;
- Processes and communication strategies Compass has used and on which it continues to rely to interact with the back end of Amazon.com to enhance the

visibility of its CPG clients' brands on the Amazon platform, including product positioning in response to user searches;

- Methods and communication strategies Compass has used and on which it continues to rely to interact with the back end of Amazon.com to implement strategic pricing;

- Processes and communication strategies Compass has used and on which it continues to rely to optimize efficiencies for clients in navigating the Amazon supply chain, including processes to ensure on time arrival of products purchased on the Amazon platform;

- Methods Compass has used and on which it continues to rely to generate a "vendor score card" for its CPG clients that positions the products on the Amazon platform for maximum user visibility;

- Methods, protocols, and communication strategies Compass has used and on which it continues to rely to generate pricing values for its CPG clients offering products on the Amazon platform that incorporate past sales activity, cost of goods sold, supply chain costs, and packaging costs into the recommended user-facing pricing values;

- Compilation of protocols to assist CPG clients navigating the competitive eCommerce landscape (*e.g.*, implementing target marketing, predicting user purchasing behavior, pricing products relative to competitors, increasing the rate of conversion, and improving supply chain efficiency);

- Methods and protocols Compass has used and on which it continues to rely to dissect Amazon sales data to generate pricing and forecasting recommendations for its CPG clients;

- Methods and formulas Compass has used and on which it continues to rely to generate a proprietary "Master Client Sheet" for each CPG client to optimize its positioning and sales offerings on the Amazon platform; and

- Formulas Compass has used and on which it continues to rely, including the "base equation," that automatically update data inputs in a client's "Master Client Sheet."

65.    At the time of DiPaula and Miller's original trade secret theft, the representative trade secret categories disclosed or referred to in the eCommerce Guide were maintained in a PowerPoint format that was descriptive of data stored, analyzed, and manipulated in corresponding spreadsheets.

66.    Today, the representative trade secret categories disclosed or referred to in the eCommerce Guide have migrated to an open-source software tool known as the Compass Digital Analytics Program ("CDAP"). CDAP is an application platform for building and managing data applications and training videos in hybrid and multi-cloud environments.

67.    Compass adapted its CDAP to automate the same processes that Compass was undertaking manually at the time of the original trade secret theft by DiPaula and Miller in 2014.

68.    Given the value of the trade secrets within the eCommerce Guide, Compass implemented safeguards to ensure that the information was protected. For example, Compass limited access to only the employees working in Compass's Amazon Division of the eCommerce Department. The Amazon Division never consisted of more than 25 employees. The Amazon Division was housed in a single physical location in Annapolis, Maryland.

69. During new employee training for the eCommerce Department, Compass informed each individual that its processes were highly confidential and not to be shared with employees outside the eCommerce Department. New employees were required to complete a course to learn the confidential, proprietary, and trade secret information. Once the new employee completed their training, Compass instructed them that they would be working in a separate branch of Compass. This ensured that the confidential, proprietary, and trade secret information never left the domain of the eCommerce team.

70. Compass kept only one hard-copy version of the eCommerce Guide, which was stored in a single secure room accessible only to the members of the eCommerce Department. Compass restricts access to the room by lock and key. No employee was permitted to remove the eCommerce Guide from the building. Compass has continuously implemented to this day these safeguards to ensure that the information is protected.

71. During the relevant time period, only DiPaula, Miller and individuals on the eCommerce team had an electronic copy of the eCommerce Guide. Access required a username and password.

72. Today, only two Compass employees have access to the CDAP source code that automates the same processes that Compass was undertaking manually at the time of the original trade secret theft by DiPaula and Miller in 2014.

73. Compass did not share and has not shared the trade secrets within the eCommerce Guide or CDAP with its clients, even those clients it advises regarding the Amazon platform.

74. As further outlined in paragraphs 184 through 191, Compass recently discovered that former Compass executives DiPaula and Miller misappropriated the trade secrets described herein in or around September 2014 and used Compass trade secrets to form Flywheel to unfairly

compete with Compass. Flywheel's success has been the direct result of its ongoing use of Compass's valuable trade secrets. Ascential is aware of Flywheel's wrongful origins and has taken no steps to mitigate the damage to Compass or otherwise correct the continued trade secret misappropriation and unfair competition. Flywheel and Ascential continue to use Compass's trade secrets and compete with Compass unfairly.

**B. DiPaula & Miller Secretly Found a Competing eCommerce Marketing Company Called Flywheel**

**I. *DiPaula and Miller Leave Compass***

75. In 2014, DiPaula and Miller quit Compass. On September 4, 2014, DiPaula and Miller each sent resignation emails at the same time to John White. In Miller's email, he stated "[t]hank you for the opportunity to start and grow the Compass eCommerce business. I'm proud of what we have built and have lots of great memories of shared success. Like you, I've long wanted to own my own company. To do so, I'm giving you my two weeks' notice and resigning from Compass."

76. Although Compass did not know it at the time, DiPaula and Miller's departure was part of a calculated plan, with surreptitious support by Daniel and Michael White, to start a rival eCommerce company by stealing virtually all of Compass's trade secrets and proprietary business know how and employing it in their new, competing eCommerce company. Thereafter, DiPaula and Miller planned to poach Compass employees who were knowledgeable in these unique eCommerce processes, and pursue virtually all of Compass's clients, which included many of the largest companies in the CPG industry.

77. On September 3, 2014, the day before they resigned from Compass, DiPaula and Miller formed Flywheel Digital LLC ("Flywheel") with the Maryland Secretary of State in furtherance of this plan.

78. On October 1, 2014, less than one month after their resignation from Compass, DiPaula emailed John White to ask if DiPaula and Miller could purchase the eCommerce Department: "Patrick and I remain interested in the spin-off concept, as we feel vested ***in our colleagues we recruited and trained***, and ***the clients we have nurtured*** these past few years."

79. In the October 1 email, DiPaula misrepresented the true projected value of Compass's Amazon eCommerce business by stating it would be a "break-even year for the division." DiPaula also failed to include or even note a revenue projection compiled by Miller in November 2013 that forecasted more than $1 billion in sales revenue from Compass's eCommerce customers by 2023.

Miller Compass Revenue Projection in 2013.

80. DiPaula again emailed John White on October 8, 2014, expressing his "disappointment with the pace of [Compass's] response" and "the urgency of completing an agreement quickly," reiterating his and Miller's desire to purchase and own Compass's eCommerce business and all of its associated trade secrets and proprietary information and know

how which, unbeknownst to John White and Compass, DiPaula and Miller had already stolen and were using for Flywheel's benefit to Compass's detriment.

81. With respect solely to the question concerning whether Compass should seek to enforce the non-competition provisions in the DiPaula Agreement and the Miller Agreement, and with no corresponding knowledge or suspicion that DiPaula and Miller had stolen Compass's trade secrets and proprietary information and know how, John presented the emails to Daniel White, Compass's acting General Counsel, and sought legal advice regarding how the Company should proceed. Daniel advised John White that Compass should not pursue legal action against Flywheel, DiPaula, and/or Miller, and should instead compete with Flywheel in the marketplace, where Compass's trade secrets and proprietary information and know how provided Compass with such a substantial competitive advantage in comparison to a newly formed business like Flywheel without such information. At that time, John White had no reason to question Daniel White's duty of loyalty to Compass, and John followed Daniel's advice.

**II. *DiPaula and Miller Poach Compass's eCommerce Team***

82. Following's Daniel's advice, Compass did not bring any legal action against DiPaula, Miller, or Flywheel for the breaches of DiPaula's and Miller's Agreements, and instead worked to compete against Flywheel in the marketplace, leveraging its status as a fixture in the eCommerce industry with over a decade of established client relationships and a dedicated eCommerce department with long-developed and incredibly valuable and protectable intellectual property, whereas Flywheel was a newcomer to the industry with no established clients or personnel or intellectual property of its own.

83. In October 2016, two years and one month after DiPaula and Miller resigned, there was a mass exodus of Compass's eCommerce Department employees. On October 19, 2016, Justin Liu (eCommerce Account Manager), Andrew Fox (eCommerce Account Manager), and Mike

O'Donnell (eCommerce Strategist) resigned. The next day, on October 20, 2016, Alex McCord (Vice President and Accounts Manager of eCommerce) resigned. Several days later, on October 21, Dayna Acevedo (formerly Dana Bernard) (Chief of Staff) and Mike Menefee (eCommerce Account Executive) resigned. All of these former Compass employees now work at Flywheel.

84. DiPaula and Miller recruited the Compass eCommerce team to Flywheel with the specific objective of using former Compass employees to unlawfully compete with Compass using Compass's trade secrets and proprietary information and know how, of which each of the outgoing Compass employees had detailed knowledge. On information and belief, DiPaula and Miller recruited these individuals specifically because of their deep knowledge of Compass's trade secrets and proprietary business know how.

85. The departing Compass employees not only took with them nearly a decade of specialized training in Compass's proprietary eCommerce methods and processes, but, on information and belief, left with electronic or hard copy files that memorialized Compass's trade secret, proprietary, and confidential information regarding maximizing sales on Amazon—the crowning achievement of Compass's eCommerce business.

86. Rather than compete fairly, DiPaula and Miller have leveraged the collective knowledge of this group of former Compass employees and the trade secrets and proprietary business know how stolen during this exodus to build out Flywheel as a successful enterprise that interferes with Compass business opportunities and poaches its clients.

87. Flywheel used Compass's trade secrets to specifically target Compass clients that worked with the former Compass employees and has been successful in converting them to Flywheel clients because, by basing Flywheel's services on Compass's stolen trade secrets and proprietary business know how, Flywheel offered and continues to offer identical services as

Compass to Compass's former clients. Moreover, by relying on Compass's trade secrets that it misappropriated, Flywheel was able to rapidly accelerate, or avoid altogether, any research and development required to provide these services.

88.     Flywheel's achievements are not a business success story, but rather are attributable to DiPaula and Miller's long-secret scheme to steal Compass's trade secrets and proprietary business know how to unfairly compete with Compass.

89.     Again, John White brought his concerns to Daniel White and asked for legal advice concerning whether Compass could pursue DiPaula, Miller, and Flywheel for non-solicitation issues associated with the 2016 gutting of the eCommerce Department. Once again, Daniel advised Compass against from pursuing legal action, advising that any legal action would require Compass clients to get involved and likely needlessly involve them in litigation. In fact, Daniel told John that Daniel would not participate in any legal action against the former employees, DiPaula, Miller, or Flywheel, and if Compass wished to pursue the claims, it would need to hire outside counsel to do so.

90.     At the time, Compass was unaware of Daniel's involvement in Flywheel, his conflict of interest, or the real reasons (as set forth below) why his legal advice was to not have the Company pursue non-solicitation litigation. As a result, Compass accepted Daniel's legal advice and decided not to pursue non-solicitation legal remedies at that time.

**C. Compass Opens an Internal Investigation into Michael and Daniel White**

91.     Within days of Compass learning that Flywheel had been sold to Ascential for an amount up to $400 million, a storm began brewing inside the Company that involved Michael and Daniel White.

92.     Compass was organized such that John, Daniel, and Michael chose to oversee separate aspects of Compass. As depicted in the below organizational chart from 2013, John

managed sales and ran the Company as CEO. As the only attorney and Certified Public Accountant

("CPA") in the family, Daniel oversaw legal and accounting, and Michael directed operations and

finances. Each brother ran their unit of the business largely independent from one another. While

John served as Compass CEO for the longest period, he did not supervise the day-to-day operations

that he entrusted to and that fell under Daniel's and Michael's purviews.



Compass Marketing Deck, Slide 4. 2014 Compass organization chart (DiPaula and Miller circled in red; Michael, Daniel, and George circled in yellow; and the Compass employees poached by Flywheel are circled in green – note Mike O'Donnell and Justin Liu do not appear on the chart).

93.    As Vice President of Operations and Comptroller of Compass, Michael was the

sole administrator of Compass's payroll and served as the sole trustee of the company's 401(k)

plan. His responsibilities included overseeing the bookkeeping and financial accounts. Michael

also worked with Daniel and an outside CPA to prepare and file Compass's annual income tax

returns. Accordingly, Daniel and Michael each owed a fiduciary duty to Compass.

94.    On October 25, 2018, only five days before the November 1, 2018 publicly

announced sale of Flywheel to Ascential, Michael White sent out a company-wide e-mail

disparaging John White, and suggesting that the Compass Board of Directors and others would be meeting soon to address issues. On November 20 and 21, 2018, Michael White and DiPaula exchanged phone calls with one another. On November 23, 2018, John White fired Daniel and Michael, though each remained on the Compass Board of Directors and each maintained a minority ownership interest in Compass.

95. On February 14, 2019, the Compass Board of Directors held a special meeting and removed Daniel and Michael from the Board. They were replaced by Jerry Cain and Todd Mitchell.

96. After the termination and removal, Compass hired criminal investigator Ron Bateman ("Bateman") to investigate Daniel's and Michael's conduct as Compass officers. Compass also hired Luis Fernandez ("Fernandez"), a certified forensic fraud examiner as its new Controller. As part of his onboarding, Fernandez examined Compass's books and records.

97. The investigation and examination uncovered 14 years of substantial mail and wire fraud, money laundering, embezzlement, and attempted extortion perpetrated by Daniel and Michael.

98. It is clear from the schemes discovered and detailed below that Daniel and Michael exploited Compass and used Company funds to finance a life of luxury for themselves and their immediate family members. Daniel and Michael repeatedly violated their fiduciary duties to Compass and elevated their own wants and conveniences above what was in the best interest of Compass, its clients, and its many employees. After Compass removed Daniel and Michael as directors and employees, Daniel and Michael orchestrated a far-reaching cover up of their wrongdoing, and they set out on a revenge campaign intended to destroy the Company and punish their brother John for removing them from Compass.

### I. *The Secret Compass Bank Account Scheme (Money Laundering, Embezzlement, Mail Fraud & Wire Fraud)*

99. On or about December 1, 2008, Michael and Daniel opened a checking account in Compass's name at Community Bank of the Chesapeake (formerly County First Bank) ("Community Bank"). Michael and Daniel were and remain the only authorized signatories on the checking account.

100. On or about June 15, 2009, Michael opened a savings account in Compass's name at Community Bank. Michael White was the only authorized signatory on the savings account.

101. The address associated with both Community Bank accounts ("the Secret Bank Accounts") is Michael's home address.

102. These Secret Bank Accounts were created without Compass's knowledge or approval.

103. Daniel and Michael White improperly deposited Compass client checks into the Secret Bank Accounts and then used the funds for personal gain.

104. From 2008 to 2020, Michael and Daniel White used these Secret Bank Accounts to financially benefit themselves, their wives Debra White ("Debra") and Kelly White ("Kelly"), and corporations they owned or operated, including W-7 Enterprises LLC, Woodville Pines LLC, Leonardtown Investments LLC, Compass Limousines LLC, Spinnaker Group LLC, and Compass Foundation LLC.

105. For example, the Secret Bank Accounts were used to make monthly payments on life insurance policies held by Michael and Daniel; pay money to Michael's unrelated gambling business; and initiate a $200,000 wire transfer to the Washington Football Team (now the Washington Commanders).

106. To date, disbursements from the Secret Bank Accounts show that more than $3.4 million was disbursed to Michael, and more than $632,000 was disbursed to Daniel. In just the four months between January and April of 2019, Daniel and Michael withdrew at least $370,000 from the Secret Bank Accounts via checks written to themselves.

107. Upon information and belief, around the time that Compass terminated Michael and Daniel's employment, they drained the Secret Bank Accounts. Each of these actions also were a breach of fiduciary duty to Compass.

**II. *The Ghost Employee Scheme (Embezzlement)***

108. Daniel and Michael added their family members Debra, Kelly, and Emile White ("Emile") to the Compass payroll and benefits programs even though Debra, Kelly, and Emile were never Compass employees.

109. In or around 1998, Daniel and Michael added Debra (Michael's wife) to the payroll without Compass's knowledge or approval.

110. Prior to April 1, 2010, Daniel and Michael added Kelly (Daniel's wife) to the payroll without Compass's knowledge or approval.

111. In August of 2017, Daniel and Michael added Emile (Daniel's daughter) to the Compass payroll without Compass's knowledge or approval.

112. In or around 2015, Daniel and Michael added Julie White (Daniel's colleague with no familial relation) as an employee without Compass's knowledge or approval.

113. From 2010 to 2019, Kelly received biweekly direct deposits from Compass into an account she maintained at Capital One.

114. From 2013 to 2019, Debra received biweekly payroll direct deposits from Compass into an account she maintained at M&T Bank.

115. From 2017 to 2019, Emile received biweekly payroll direct deposits from Compass.

116. From 2014 to 2016, Julie received more than $3,600 in gifts and compensation from Compass.

117. Michael and Daniel also caused Kelly and Debra to enroll in the company's 401(k) retirement plan, whereby portions of Kelly and Debra's "salaries" and matching contributions from Compass were deposited into accounts in each of their names.

118. From 1998 to 2019, Michael intentionally covered up these ghost employees in the Compass payroll system by creating fictitious spreadsheets and reports to provide to corporate leadership instead of running payroll reports through Compass's third-party payroll provider portal Paychex. Michael's falsified records prevented Compass from discovering the ghost employee scheme until Compass later initiated an investigation following the removal of Daniel and Michael from their roles at Compass.

**III.** ***The IRS Tax Check Scheme (Embezzlement)***

119. Michael created a tax check scheme that allowed him and Daniel to have money embezzled from Compass be rebated back from and through the Internal Revenue Service ("IRS") ("IRS Tax Check Scheme").

120. Michael created the IRS Tax Check Scheme whereby he would issue additional electronic payroll payments to himself and various employees that he coded as "tax checks." These payments were in addition to normal payroll payments, but were very large, were designated as 100% tax withholding, and would go to the IRS and to the state of Maryland.

121. Michael exclusively controlled on whose behalf the IRS received additional payments, as well as the payment frequency and magnitude.

122. For example, in 2015, Michael processed $520,000 in 100% tax withholding payments to himself and $530,000 to Daniel.

123. In 2018, Michael processed $270,000 in 100% tax withholding payments to himself, and $230,000 to Daniel.

124. Daniel and Michael also used the IRS Tax Check Scheme to benefit their families. In 2017, Michael processed $20,000 in 100% tax withholding payments for Debra and another $20,000 for Kelly, although neither was ever employed by Compass.

125. As a result of the IRS Tax Check Scheme, Michael and Daniel knowingly funneled money through the IRS through payroll disbursements that far exceeded their normal federal payroll tax withholdings to obtain large refunds, thereby embezzling millions of dollars from Compass.

**IV.** ***The Shareholder Loan Scheme (Embezzlement)***

126. Michael caused Compass to issue payments to himself and Daniel purportedly as reimbursement for personal loans that were never made to the company. Michael then caused Compass to issue payments to himself and Daniel purporting to be principal and interest payments against the fake loans ("the Shareholder Loan Scheme"), in violation of their fiduciary duties to Compass.

127. On or about June 7, 2015, Daniel received a check from Compass for $100,000 with "LTC" written on the memo line. Upon information and belief, "LTC" stands for loan to company.

128. On or about May 19, 2016, Daniel received a check from Compass for $70,000 with "LTC" written on the memo line.

129. On or about January 24, 2019, Daniel received a check from Compass for $50,000 with "LTC" written on the memo line.

130. On or about June 5, 2015, Michael received a check for $200,000 with "LTC" written on the memo line.

131.    On or about October 15, 2015, Michael received two checks for $100,000 each with "LTC" written on the memo line.

132.    On or about February 9, 2016, Michael received a check for $450,000 with "LTC" written on the memo line.

133.    On or about March 1, 2016, Michael received a check for $450,000 with "LTC" written on the memo line.

134.    On or about June 17, 2016, Michael received a check for $50,000 with "LTC" written on the memo line.

135.    On or about June 29, 2016, Michael received a check for $100,000 with "LTC" written on the memo line.

136.    On or about November 12, 2016, Michael received a check for $300,000 with "LTC" written on the memo line.

137.    On or about June 14, 2018, Michael received a check for $100,000 with "LTC" written on the memo line.

138.    On or about February 12, 2019, Michael received a check for $200,000 with "LTC" written on the memo line.

139.    On or about April 2, 2014, Daniel received a check for $62,451.87 with "2013 loan to company interest" in the memo line.

140.    On or about February 18, 2015, Michael received a check for $90,235.89 with "2014 Interest on K1 Loans to Company 9%" in the memo line and Daniel received a check for $91,107 with "state taxes 2014 interest on K1 loans to company" in the memo line.

141. On or about April 11, 2016, Daniel received a check for $55,459.48 with "2015 Interest Payment" in the memo line and Michael received a check for $71,865.89 with "2015 Interest Payment" in the memo line.

142. In an e-mail dated August 21, 2017 that Compass recently discovered in connection with its internal investigation into this wrongdoing, Daniel White wrote the following to Michael White regarding setting up Emile White as a ghost employee: "Anything she makes can come out of my BS loan."

143. Michael and Daniel continued to use Compass funds from the secret Compass bank account they controlled to repay their fake loans even after they were fired and removed as Compass directors. Each of these actions also were a breach of fiduciary duty to Compass.

### V. *Information Technology Lockout of Compass Business Records and Accounts (Attempted Extortion)*

144. George White ("George") is Michael's son. Prior to May 2019, George was the IT Administrator at Compass while at the same time working full time as a Maryland State Trooper. In this role at Compass, George had administrator access to Compass's GSuite email, Microsoft, and QuickBooks accounts.

145. Specifically, George controlled the Compass domain, including credentials and access to Compass Networking Administrator Credential login password and user ID; Compass servers, switches, and wireless access points; NAS (Synology, etc.); Firewall-Cisco ASA; Compass Marketing Routers; all Compass printers; all Compass phone systems; and Network Solutions Account for Compass's Domain Name Registrar. George had the ability to change all of the above business records and accounts via his administrator access.

146. On or about April 29, 2019, after Daniel and Michael were voted off the Board of Directors, George had reason to believe that his removal was also imminent. George attempted to

leverage his control over the Compass IT systems to extort additional payments for himself prior to his departure. Specifically, George demanded that Compass give him a promotion including a $100,000 signing bonus with a new title, a base salary of $225,000 with stepped raises quickly increasing the salary to $297,000, and a severance package guaranteeing a full year base salary in the event his employment was terminated.

147.    When Compass refused, George resigned.

148.    On or about April 30, 2019, a company hard drive and laptop assigned to George was stolen. On information and belief, George took his company hard drive and laptop with him upon resigning from Compass so that he could continue to maintain control over Compass IT systems.

149.    Sometime after April 30, 2019, George intentionally and maliciously cut off Compass access to employee email accounts with the compassmarketinginc.com domain, Microsoft, QuickBooks, and other business records and accounts ("the July Extortion Attempt").

150.    Ever since, Compass has attempted to regain control of its books and records, with limited success.

151.    To this day, Compass remains locked out of its own compassmarketinginc.com domain. Compass does not have access to any of the employee email accounts or other business records maintained on QuickBooks that were maintained within the compassmarketinginc.com domain. Consequently, the Compass sales force was not able to communicate by email with clients or otherwise access the records required to do business. Compass had no choice but to start over with its IT infrastructure and establish a new compassmarketinginc.net domain at significant expense.

152.    A further consequence of the IT lockout and the Company's continued inability to access the compassmarketinginc.com domain is that evidence for this lawsuit and others cannot be preserved. For example, evidence of wrongdoing by Daniel or Michael and evidence of misappropriation of trade secrets and other proprietary business know how by DiPaula and Miller almost certainly resides on the compassmarketinginc.com domain. That evidence is no longer within Compass's control. That evidence could not aid its internal investigations and cannot be relied on for purposes of litigation. Moreover, even if access to the compassmarketinginc.com domain was somehow recovered pursuant to court order, it is likely that George, Michael, and whoever else has access to the domain has destroyed relevant evidence to cover up past wrongdoing.

153.    Because Compass has been unable to determine the full extent of the harms incurred in relation to the IT lockout in 2019, it has been unable to meaningfully assess whether the IT lockout was a further effort to misappropriate trade secrets and other proprietary business know how residing in Compass's electronic files. Compass has reason to believe that the IT lockout coincided with additional misuse of its proprietary information, including valuable trade secret information.

154.    The July Extortion Attempt and subsequent IT lockout substantially impacted Compass. It strained client relationships due to lost research and development, reports, sales, and account data. The July Extortion Attempt also impeded Compass's ability to file its income tax returns in 2019.

155.    To repair the situation, Compass expended significant effort, time, and money to create new accounts and business records. Compass employees engaged in the timely task of

reaching out to clients and leads to address problems arising from missing records and provide new contact information.

156. Today, George and Michael maintain dominion and control over the lost accounts and business records. A third-party service provider was able to give Compass access to all incoming (but not ongoing) messages for its old domain. Each month, Compass receives a Google invoice to George White at Compass Marketing for the domain name compassmarketnginc.com and an email from Google Payments to Michael White for the domain name compassmarketnginc.com.

157. In October 2021, Compass received an email from Google Invoice which showed that the number of individual email addresses under the compassmarketnginc.com domain was decreased from 79 to 60. This decrease in individual email addresses raises concern for Compass that the actors in control of the domain have already engaged in spoliation.

**VI. *Sham Legal Campaign***

158. After Compass fired Michael and Daniel and the Board removed them as directors, Michael and Daniel attempted to cover up their illicit conduct by filing a regulatory complaint and a lawsuit to dissolve Compass in its entirety.

159. On or about October 8, 2019, Daniel sent letters to the General Counsel of Principal Financial Group (Compass's 401(k) plan administrator) and to the United States Department of Labor ("DOL") falsely representing that he was the trustee for Compass's 401(k) plan. Daniel claimed that then Compass President Todd Mitchell embezzled funds.

160. Principal Financial Group ("Principal") performed an investigation and concluded that Daniel was not the trustee and there were no improprieties with Compass's 401(k) plan.

161. DOL's investigation is ongoing. As a result of Daniel's false allegations, Compass is incurring substantial legal fees as it cooperates with the DOL investigation.

162. On or about December 2, 2019, Michael and Daniel filed a lawsuit against Compass in the Commonwealth of Virginia: *White et al. v. Compass Marketing, Inc. et al.*, Case No. CL19003628-00 (the "Virginia Lawsuit"). The Virginia Lawsuit sought judicial dissolution of Compass claiming, among other things, that the owners are deadlocked on management of the company.

163. Through false representations, the Virginia Lawsuit sought to transfer control of Compass from John as retribution for removing Michael and Daniel from their roles at Compass.

164. On or about April 2, 2021, Daniel and Michael abruptly non-suited the case after the Virginia court granted a motion to compel that required Daniel and Michael to produce documents, answer interrogatories, and appear for depositions.

**VII. *Anonymous Campaign Against Compass (Mail and Wire Fraud)***

165. From October 2019 to present, an anonymous author has sent letters using the United States mail service and email across state lines to individuals, companies, and the government to damage Compass's reputation.

166. On or about October 16, 2019, an anonymous letter was mailed to Compass client Colgate Company ("Colgate"). As a result, Colgate pulled out of a Compass pilot program related to direct-to-consumer marketing.

167. Similar letters were mailed to Compass clients Johnson & Johnson, Duracell, and Bush's Beans.

168. A series of emails from www.protonmail.com ("Protonmail") were sent to Compass client Duracell and potential client, Microsoft. Protonmail is an email service that houses its servers in Switzerland so that Swiss privacy laws protect the user's identity. Protonmail does not have Internet Protocol Address logs, so the user's identity is untraceable.

169. Daniel White purchased an annual subscription for a Protonmail account and paid for it with his Compass American Express credit card.

170. This anonymous campaign has severely damaged Compass's reputation and interfered with ongoing and potential business relationships.

**VIII.** ***Personal Use of Compass Corporate Credit Cards (Embezzlement)***

171. Michael and Daniel used Compass corporate credit cards to charge personal expenses to Compass.

172. Compass issues American Express Blue Business Plus credit cards ("AmEx Blue") to its employees. Each employee's AmEx Blue card is integrated with a platform called Expensables. Every charge made on an AmEx Blue card is automatically logged to the appropriate employee's Expensables registry.

173. Compass uses Expensables to review, approve, and categorize charges. Compass entrusted Michael with reviewing and approving the Expensables reports each month.

174. In or around February 2012, the link between Daniel's AmEx Blue card and Expensables was terminated, and his charges were not visible to Compass.

175. Between 2012 and 2017, Daniel's expense reports were submitted to Michael in batches that listed nothing more than a total dollar figure and the description "personal expenses."

176. Daniel's expenses included tuition for his three children to attend a private high school; purchases related to his coin collecting hobby; an annual subscription to a Switzerland based Proton email account; and vacations for Julie White.

177. Between 2013 and 2019, Daniel incurred more than $950,000 in personal charges on the AmEx Blue card. Daniel intentionally failed to reimburse Compass for any of these personal expenditures.

178. Prior to 2012, Michael opened an American Express Business Green Rewards Card ("AmEx Green") in the Compass account. Michael did not link the AmEx Green card to the Expensables platform and the charges were not visible to Compass.

179. The AmEx Green Card was obtained without Compass's knowledge or approval.

180. The personal expenses Michael charged to the AmEx Green Card included purchases with the Washington Football Team (now the Washington Commanders) and vacations and flights for friends and family.

181. Between 2012 and 2019, Michael incurred more than $980,000 in personal charges on the AmEx Green card. Michael intentionally failed to reimburse Compass for any of these personal expenditures.

182. Importantly, the financial records show that Daniel and Michael continued to charge personal expenses to Compass after the date they were fired and removed from the Board.

**D. Compass Discovers Miller, DiPaula, and Flywheel's Trade Secret Theft**

183. As set forth in more detail in paragraphs 202 through 208 of this Complaint, Compass later discovered the connection between the extensive wrongdoing by Daniel, Michael and George White set forth above, and the theft of Compass's trade secrets and proprietary information and know how by Flywheel, DiPaula, Miller.

184. On or about January 20, 2020, while performing a review, Compass Controller Luis Fernandez discovered an article written by Miller entitled "The Future of Amazon Fresh?"[1] dated August 25, 2015. The last line of the article stated that "Patrick Miller, Co-Founder, Flywheel Digital spent the last four years deconstructing eCommerce sites and helping American

[1] https://www.profitero.com/2015/08/the-future-of-amazon-fresh/

manufacturers figure out Amazon from a brand, search, social, customer service, supply chain, pricing and sales perspective.”

185. From August 25, 2015, “the last four years” encompass the period from August 25, 2011, to August 25, 2015. Miller was employed with Compass from February 1, 2011, to September 4, 2014—meaning that all but 11 months of that period were during his Compass employment.

186. Fernandez engaged in further research and located a Flywheel-branded Power Point presentation and voiceover that Miller gave at the Online & Digital Grocery Summit USA on November 5, 2015 (“the Digital Grocery Presentation”). Miller’s introduction included a review of his clients: P&G, J&J, Mars, McCormick, Ferrero, 5 Hour Energy, and Colgate. All of of these companies were Compass clients or former Compass clients.

**Discovering how Amazon is a Brand, Social and Search Platform**
Patrick Miller, *Co-Founder,* **Flywheel Digital**

Screenshot from Digital Grocers Summit USA Website. Available at: https://www.digitalgrocerysummit.com/presentations.

187. Fernandez gave the article and the Digital Grocery Presentation to John White, who (i) immediately recognized the clients Miller claimed were Flywheel clients as Compass’s clients, and (ii) further recognized the contents of the Digital Grocery Presentation as content that could only have been generated with knowledge of Compass’s trade secret information and proprietary business know how. The Digital Grocery Presentation revealed that Flywheel, DiPaula, and Miller were in possession of the more comprehensive repository of Compass trade secrets, the eCommerce Guide. The Digital Grocery Presentation included key pieces of information that could only be known from the original Compass eCommerce Guide.

188. For example, the Digital Grocery Presentation provided information concerning Compass's general strategy to prioritize customer search results on Amazon. Even more significantly, the Digital Grocery Presentation represented an approach to selling clients' products through Amazon that precisely mirrors the Compass approach and could only be accomplished with possession of the eCommerce Guide.

189. As previously outlined, Compass maintained only a single printed version of the eCommerce Guide as part of the protocol to maintain its confidentiality. However, while at Compass, Miller had access to the electronic version. Upon information and belief, Miller misappropriated the electronic version of the Compass eCommerce Guide, then he and DiPaula used it to develop the Flywheel business model. Based on Flywheel's own description of its business on the Flywheel website, that use of the misappropriated Compass information continues today:

WE ACCELERATE WORLDWIDE BRAND GROWTH IN DIGITAL RETAIL

As an early leader in Amazon Advertising, and certified partner, our massive scale allows us to cull insights to better inform our technology and client brand strategy, creating additional value and superior results.

Our team of account managers, search specialists, analysts, data scientists, and software developers work together to help brands come to life across digital retailers and execute so customers convert. We love the hard questions and want the clients that dig in to understand this massive opportunity.

Flywheel Website: Who We Are Page. Available at: https://www.flywheeldigital.com/who-we-are/ 2/7/22.



amazonadvertising

As an early leader in Amazon Advertising, our massive scale allows us to cull insights to better inform our technology and our client's brand strategy, creating additional value and superior results. We believe the first dollar should be spent on search, but once you max out on sponsored ads, Amazon's programmatic display and video ad buying platform is where you should focus next to drive sales online and off. In addition to managing media efficiencies, we have created a series of ensemble models to forecast business growth down to an ASIN so you have better visibility to what Amazon will order.

Flywheel Website: Retail Platforms. Available at https://www.flywheeldigital.com/retail-platforms/ 2/7/22.

190. The metadata for the Digital Grocery Presentation is prima facie evidence of misappropriation in 2014 around the time that DiPaula and Miller launched Flywheel and then left Compass. The metadata indicates that the Digital Grocery Presentation was created on November 12, 2013, while Miller and DiPaula were still at Compass. Then, on November 4, 2015, one day before the Online & Digital Grocery Summit, Miller updated the file, presumably to reflect Flywheel branding and to remove the original Compass-branding.

191. It was not until January 20, 2020, that Compass discovered this prima facie evidence of Flywheel's misappropriation activities. Given the contents of the Digital Grocery Presentation, which was copied from Compass's files, there is every reason to believe that the eCommerce Guide was also copied or otherwise exported to Flywheel by DiPaula and/or Miller. This information was not known to Compass and could not reasonably have been known because DiPaula and Miller had acted in secret and concealed the existence of the misappropriation.

192. After Compass discovered the stolen trade secrets, it investigated whether any of the clients that left Compass since 2014 subsequently engaged Flywheel for identical eCommerce services.

193. On information and belief, using Compass's trade secrets, Flywheel has poached a long list of Compass eCommerce clients, including well-established brands such as P&G, Allergan, Amplify Snacks Brands, Colgate, Ferrero, Johnson & Johnson, Mars, McCormick, Old Wisconsin, and 5 Hour Energy.

194. Before their resignations, DiPaula, Miller, Alex McCord ("McCord") (then-Vice President of eCommerce at Compass, and now an Executive Vice President at Flywheel), and another Compass employee had been interviewing with P&G for a specific eCommerce engagement. P&G was a long-time Compass client that used Compass's traditional marketing services.

195. Before their resignations, DiPaula and Miller, along with McCord, pitched P&G (led by Miller) to expand the relationship, which P&G expressed interest in doing.

196. Shortly after DiPaula and Miller left Compass, however, P&G representatives became unresponsive to Compass's outreach, at that point led by McCord. McCord recommended that Compass no longer pursue the expansion of the P&G relationship into the eCommerce space.

197. On information and belief, DiPaula and Miller falsely told P&G representatives that Compass was exiting the eCommerce business, and that was Flywheel was being set up to service the P&G account. Upon information and belief, DiPaula told multiple Compass employees that Flywheel would not be competing with Compass in any respect. P&G terminated its engagement with Compass shortly thereafter, and upon information and belief, contracted with Flywheel for eCommerce service.

198.    Upon information and belief, after duping P&G into believing that Compass was exiting the eCommerce space and secretly luring away the P&G account, Flywheel, at DiPaula and Miller's direction, assigned a student from the University of Maryland, Shiwen Xu ("Xu"), to lead Flywheel's analytics group using Compass's stolen trade secrets, and to specifically manage analytics reporting for Flywheel's P&G account.  Xu also became the registered agent for Flywheel in California, and the only other Director/Officer besides DiPaula listed on the Flywheel's California Board of Directors in 2017.

199.    Today, both Flywheel and Ascential publicly tout their client relationship with P&G. For example, Miller referenced P&G as a client in a June 2020 media interview.[2]

200.    Flywheel, Miller, DiPaula have intentionally impeded Compass's business opportunities with P&G and other Compass clients, directly and indirectly.  Because of their ongoing efforts to conceal their misconduct, Compass has only recently discovered some of these material facts, and in connection with its investigation into wrongdoing, has documented evidence of such efforts.

201.    Flywheel, Miller, and DiPaula were only in a position to pursue Compass's employees and clients because they founded a company built on misappropriation of Compass's trade secrets and proprietary business know how, and future strategic plans. Because of this misappropriation and interference, Flywheel has been unfairly competing with, and continue to unfairly compete with, Compass.  Further, because of this misappropriation and interference, Flywheel, Miller, and DiPaula have profited from, and continue to profit from, Compass's investment in its eCommerce capabilities. Compass brings this lawsuit to hold these actors accountable for the harms this conduct has inflicted on Compass.

---

[2] https://www.alistdaily.com/media/warc-effectiveness-in-ecommerce-lions-live/.

**E. Compass Discovers Michael and Daniel White are Connected to Miller, DiPaula, and Flywheel's Trade Secret Theft**

202. A Compass auditor on the internal investigation team discovered multiple checks issued from Daniel White's personal account to Chip DiPaula. These checks were the start of a trail that led Compass to recently discovery that Michael and Daniel White are part of the conspiracy by DiPaula and Miller to found and operate Flywheel as a competitor of Compass's using Compass's stolen trade secrets and proprietary information and know how.

203. On October 14, 2015, more than 13 months after DiPaula resigned from Compass, Daniel had M&T Bank issue a cashier's check for $10,000 to DiPaula, using Daniel's personal funds.

204. On December 1, 2015, nearly 15 months after DiPaula and Miller resigned from Compass, Michael White secretly issued to Daniel White a check from Compass's M&T bank account for $65,000. The memo portion of the check read "Final Payments to James DiPaula and Patrick Miller."

COMPASS MARKETING INC
222 SEVERN AVE, SUITE 200
ANNAPOLIS, MD 21403

MANUFACTURERS & TRADERS TR CO
07-011/520

09376

12/01/2015

PAY TO THE ORDER OF Daniel J White $ **65,000.00

Sixty-five thousand and 00/100********** DOLLARS

222 Severn Ave Suite 200
Annapolis Maryland 21403

MEMO Final Payments to James DiPaula and Patrick Miller

⑈009376⑈ ⑆052000113⑆ 97008124 3⑈

205. Eight days later, on December 9, 2015, Daniel had M&T Bank issue another cashiers check for $25,000 to DiPaula, using Daniel's personal funds.

OFFICIAL CHECK

M&T Bank
Manufacturers and Traders Trust Company
BUFFALO, N.Y. 14240

300696854-4
10-4/220

Daniel White
REMITTER

DATE 12/09/2015

PAY TO THE ORDER OF James Chip Dipaula $ 25,000.00

***TWENTY FIVE THOUSAND and 00/100***USDollars

TWO AUTHORIZED SIGNATURES REQUIRED FOR AMOUNTS $10,000.00 & OVER

#6335 - Edgewater

AUTHORIZED SIGNATURE

AUTHORIZED SIGNATURE

⑈300696854⑈ ⑆022000046⑆ 17003019937150⑈

206. Compass did not owe any severance to DiPaula or Miller, either upon their voluntary resignations in September 2014, in October and December of 2015, or at any other time. In any event, the "severance payment scheme" was false, and any such purported payments to DiPaula and Miller, whether from Compass's M&T Bank account or from Daniel White's personal M&T Bank account, was in violation of Compass policies.

207. Upon information and belief, Daniel provided the funds set forth in paragraphs 202 through 206 to DiPaula and Miller to support their funding and operation of Flywheel.

208. Upon information and belief, Daniel and Michael knew and encouraged DiPaula and Miller's theft of Compass trade secrets, and wanted Flywheel to succeed to the detriment of Compass. Moreover, Daniel's involvement with and interest in Flywheel created a conflict of interest for him while he was serving as General Counsel for Compass, which he failed to disclose to Compass in violation of his duties thereto.

**F. Ascential's Role as a Co-Conspirator in Flywheel's Misappropriation of Compass's Trade Secrets**

209. On or about November 2, 2018, four years after Flywheel was founded, Ascential, a London-based global specialist information company, acquired Flywheel for the purchase price of approximately $400 million, with an initial payment of $60 million and $340 million of contingent earn out payments over the following three years in the event certain milestone and performance metrics were achieved.

210. Flywheel has re-branded itself as an "Ascential Company," as seen on the home page of the Flywheel website[3]:

[3] https://www.flywheeldigital.com/

211. The Ascential press release that announced the acquisition defined the Flywheel business model as "a provider of managed services to consumer product companies trading on Amazon."[4] Ascential also stated that "Flywheel offers customers Amazon-specific software, tools and expertise to drive sales and brand performance across Amazon platforms by directly actioning solutions for clients."

212. Ascential's subsequent 2021 Interim Report noted Flywheel's astounding growth. In 2016, Flywheel operated in one marketplace in one country. By 2020, Flywheel was operating in 60 marketplaces in 14 countries.

**I. *Ascential Receives Notice of the Flywheel's Improper Origins and Opts to Perpetuate the Harms Against Compass***

213. Upon realizing the misappropriation, interference, and unfair competition that is ongoing, Compass sought to engage with Ascential, as Flywheel's parent company, with the goal of working through Ascential to remediate past harms. Compass compiled known facts of Flywheel's misappropriation and other misdeeds as of May 2021 and contacted Duncan Painter, the Ascential CEO, and Scott Forbes, the Chair of Ascential's Board, to initiate what Compass hoped would be productive settlement discussions.

214. Jeff Moorad, acting as an advisor to Compass and a long-time friend of John White, first initiated contact with Duncan Painter, Ascential's CEO, on May 9, 2021, to discuss, among other things, Ascential's acquisition of Flywheel and inform him of Compass's contention that Flywheel stole and continued to use Compass's trade secrets and proprietary information and know how. After receiving no response, Mr. Moorad contacted Scott Forbes, the Chairman of Ascential's Board of Directors, on May 17, 2021.

[4] https://www.ascential.com/sites/default/files/content-files/press-releases/acquisition-of-flywheel-digital-01-11-18.pdf

215. Mr. Forbes accommodated Mr. Moorad's request for a meeting, and they met over lunch on May 24, 2021 at the Four Seasons Park Lane in London. During that lunch meeting, Mr. Moorad communicated Compass's concerns relating to Flywheel's pre-acquisition conduct, including its investigation that discovered extensive evidence of Flywheel's use of Compass's misappropriated trade secrets and proprietary information and know how. Mr. Moorad advised Mr. Forbes of Compass's desire to engage in direct discussions with Ascential to find a business solution short of contentious, public, and long-tail litigation that would ensue to remedy the substantial harm inflicted upon Compass by Flywheel, DiPaula, Miller and others.

216. On May 26, 2021, Mr. Forbes wrote to Mr. Moorad to confirm that Compass's concerns and desire for a business resolution had been communicated to Ascential: "I just want to acknowledge that as promised, I communicated your messages promptly to Ascential on Monday."

217. Thereafter, Mr. Moorad responded to Mr. Forbes: "Specific to the Ascential/Compass part of our discussion, as mentioned, I'd be happy to share additional details around the situation and explore ways to work together to find a business solution - if Ascential is interested in this approach, I'm happy to facilitate discussions - I know you mentioned that you'd reach back out and I'll wait on your timing - if there is a way to manage reputational risk and shareholder value for both companies, that would be a win/win result."

218. Mr. Moorad followed up with Mr. Forbes on June 5, 2021, and on June 7, 2021, Mr. Moorad and Mr. Forbes spoke briefly by phone to discuss the Compass/Flywheel situation.

219. On June 24, 2021, Mr. Moorad emailed Mr. Forbes, and Mr. Forbes responded that day, noting that he would pass Mr. Moorad's note "along to the lawyers."

220. On July 1, 2021, Mr. Moorad emailed Mr. Forbes to update him on issues that were arising between Compass and Flywheel. According to Mr. Moorad's email, Dayna Acevedo (former Compass Chief of Staff and current Flywheel Vice President of People & Digital Commerce) held a meeting in her home on or about June 24, 2021, where she questioned a Compass employee about the lunch and discussion between Mr. Moorad and Mr. Forbes. Mr. Moorad again relayed in this email Compass's concerns about Ascential's due diligence failures in acquiring Flywheel, including that DiPaula had incorporated Flywheel while still an employee at Compass and that Acevedo was a managing director of Flywheel. Mr. Moorad closed the email by noting his hopefulness that a resolution could be reached without resorting to litigation.

221. In response, on July 5, 2021, at attorney from Fried, Frank, Harris, Shriver & Jacobson LLP, who represents Ascential, emailed Mr. Moorad and asked him to "discontinue all communications with Mr. Forbes regarding these matters."

222. On October 7, 2021, Compass sent a formal cease and desist communication to Ascential and Flywheel.

223. Since May 2021, and certainly by no later than early July 2021, Ascential has been fully on notice of Compass's claims of misappropriation of Compass's trade secrets and proprietary information and know how by Flywheel, DiPaula, and Miller. Notwithstanding this notice, Ascential has chosen to allow the harms to continue and to escalate, continuing to profit from same as the parent company of Flywheel. Ascential's endorsement of and continued facilitation of Flywheel's wrongful conduct renders Ascential a participant in the ongoing misappropriation and unfair competition, as well as an active participant in the ongoing conspiracy pled in this Complaint.

**COUNT I – DEFEND TRADE SECRETS ACT OF 2016 (DTSA)**
**(Flywheel, DiPaula, Miller, and Ascential)**

**– and –**

**COUNT II MARYLAND UNIFORM TRADE SECRETS ACT (MUTSA)**
**(Flywheel, DiPaula, Miller, and Ascential)**[5]

224. Compass incorporates the prior paragraphs as if fully set forth herein.

225. Compass is the owner of trade secrets that were accessed by DiPaula and Miller by virtue of their employment with Compass's eCommerce team.

226. Compass is also the owner of trade secrets that were misappropriated during the course of the 2019 IT lockout or other points when certain of the Defendants, as pleaded above, accessed, acquired, used and/or disclosed Compass property following DiPaula and Miller's departure from Compass.

227. The representative categories of trade secrets identified in the factual background at paragraph 64 are owned by Compass and constitute trade secrets within the meaning of 18 U.S.C. § 1839 and the Maryland Uniform Trade Secrets Act ("MUTSA").

228. Flywheel is headquartered in Maryland, but operates in other states, and regularly transacts business in states other than Maryland, including in person and by phone, internet, and mail. Compass's misappropriated trade secrets relate to Flywheel's business operations and are used by Flywheel in interstate commerce. In particular, Flywheel and Ascential have used and continue to use the misappropriated Compass trade secrets, which include, among other categories, formulas, marketing, pricing, sales, and business information, in interstate commerce by soliciting business across state lines.

[5] The same set of allegations underlie two separate counts for trade secret misappropriation under the Defend Trade Secrets Act and the Maryland Uniform Trade Secrets Act.

229. Notably, the trade secrets misappropriated by Flywheel, DiPaula, Miller, and Ascential are related to services that are used and/or intended to be used in interstate commerce, as Compass and Flywheel both use the trade secrets to maximize supplier sales on Amazon, which sells consumer products worldwide and to all fifty states.

230. Compass has taken reasonable measures under the circumstances to protect its trade secrets, including, but not limited to, by limiting access to the eCommerce Guide to only members of the eCommerce team with whom Compass had confidentiality agreements, maintaining only one physical copy of the eCommerce guide kept in a monitored location with limited access, limiting electronic access to the eCommerce guide through password protection, and only allowing select eCommerce team members to maintain and access the eCommerce Guide.

231. As a result of the above-mentioned protective measures, the trade secrets at issue in this matter are not generally known or readily available to the public or Compass's competitors.

232. Alternatively, to the extent that the trade secrets at issue in this matter are now generally known or readily available to the public or Compass's competitors due to the misappropriation and subsequent disclosure by Flywheel, DiPaula, Miller, and Ascential, at the time of misappropriation, the trade secrets were not generally known or readily available to the public or Compass's competitors. Any such unauthorized disclosures of Compass's trade secrets by Flywheel, DiPaula, Miller, and Ascential, were separate acts of misappropriation. Moreover, at the time of misappropriation, Flywheel benefitted from the fact that the information it stole was not generally known or readily available to the public or its competitors.

233. The trade secrets at issue in this case have independent economic value to Compass by virtue of being unknown or not readily available to others in the industry.

234. Compass spent more than a decade compiling the information underlying the misappropriated trade secrets and engaged in the reasonable protection measures outlined herein to ensure that this trade secret information and proprietary business know how would not fall into the hands of competitors. Compass sought to protect the misappropriated information because Compass understood the trade secret information and proprietary business know how to be objectively valuable—*i.e.*, its "crown jewels"—and provided Compass with competitive advantages in the marketplace.

235. Flywheel and Ascential's access to, acquisition of, and subsequent unauthorized use of the Compass trade secret information and proprietary business know how has driven Flywheel's position in the market to the disadvantage of Compass, who would have otherwise maintained its relationships with clients solicited by Flywheel.

236. The independent economic value of the misappropriated trade secret information and proprietary business know how is reflected in the $400 million that Ascential paid to acquire Flywheel and Ascential's recent projections as to Flywheel's future growth, as identified above in paragraph 212 (depicting Ascential's Interim Report dated July 2021 with Flywheel financial projections).

237. Compass took reasonable steps to maintain the secrecy of the trade secret information and proprietary business know how. To the extent that the trade secrets at issue in this matter are now available to the public or Compass's competitors, it is because Defendants made such disclosures without Compass's authorization.

238. By misappropriating Compass's trade secrets, Flywheel, DiPaula, Miller, and Ascential are benefitting and have benefited from Compass's significant investment of energy, resources, and time. For example, DiPaula, Miller, Flywheel, and Ascential are using Compass's

client relationships, relationships with Amazon, independent analysis and scrutiny of Amazon's complex sales and marketing algorithms, and independent and unparalleled access to sales and consumer information from Amazon's platforms in order to compete with Compass in the eCommerce industry. Through this misappropriation, Flywheel, DiPaula, Miller, and Ascential have received an illicit head start and saved untold millions of dollars in independent client development and data analysis.

239. The article and the Presentation discovered by Fernandez on January 20, 2020, demonstrates that Flywheel, DiPaula, Miller, and Ascential have used and are continuing to use Compass's trade secrets and proprietary business know how to profit from a competitive company built on Compass's experience and investments in the eCommerce industry such that Flywheel and Ascential can unfairly compete against Compass.

240. Flywheel's business incorporates trade secrets and other proprietary business know how that DiPaula and Miller learned and developed while part of Compass's eCommerce team. Flywheel and Ascential use this misappropriated information to provide the same services Compass provides to many of the same clients that had previously been Compass eCommerce clients.

241. Because DiPaula and Miller had little to no experience in the CPG or eCommerce industries prior to joining Compass, the proprietary business methods, processes, and platform communication strategies DiPaula and Miller utilize at Flywheel was fully conceived during their employment with Compass and constitutes Compass's trade secret information.

242. DiPaula and Miller knew or had reason to know that their use of Compass's trade secrets was improper because they had a duty to limit the use of the trade secrets under the terms

of their employment with Compass. Flywheel, DiPaula, Miller, and Ascential had neither express nor implied consent from Compass to use its trade secrets to compete with Compass.

243.    Ascential has been fully on notice as to the trade secret misappropriation contentions set forth herein since May 2021 and has chosen to enable, participate in, and profit from the past and continued misappropriation of Compass's trade secret information.

244.    The actions alleged herein by Flywheel, DiPaula, Miller, and Ascential constitute misappropriation under the DTSA, as well as under the MUTSA.

245.    The misappropriation has caused and will continue to cause damage to Compass including, but not limited to, Compass's competitive disadvantage in relation to Flywheel, Compass's loss of business and market share to Flywheel to Flywheel's unjust enrichment, and the devaluation of Compass's trade secrets. Therefore, Compass is entitled to and requests an award of damages in its favor for actual loss caused by the misappropriation, damages for all unjust enrichment caused by the misappropriation that is not addressed in computing damages for actual loss, and/or damages measured by imposition of liability for a reasonable royalty for the unauthorized disclosure or use of Compass's trade secrets.

246.    Flywheel, DiPaula, Miller, and Ascential have willfully and maliciously misappropriated Compass's trade secrets and have profited and continue to profit from Compass's trade secrets. Compass therefore is entitled to and requests exemplary damages in an amount not more than double Compass's actual damages, plus reasonable attorneys' fees and costs.

247.    As a result of Defendants' misappropriation of Compass's trade secrets, Compass has suffered and continues to suffer irreparable harm for which no adequate remedy at law exists, including without limitation the unauthorized use and disclosure of Compass's trade secrets and harm to Compass's competitive market position and business reputation.

248. Under the DTSA and MUTSA, Compass is entitled to and requests permanent injunctive relief to prohibit Flywheel, DiPaula, Miller, and Ascential from using, disclosing, or retaining any of Compass's trade secrets.

**COUNT III – CIVIL RICO 18 U.S.C. § 1962(c)**
**(All Defendants)**

249. Compass incorporates the prior paragraphs as if fully set forth herein.

250. Defendants Flywheel, DiPaula, Miller, and Ascential share the common purpose of using Compass stolen trade secrets, proprietary business know how, and confidential information for economic gain.

251. Since 2014, Miller, DiPaula, and Flywheel have used Compass's stolen trade secrets and Compass's proprietary information and business know how on a daily basis to run Flywheel's operations and create value for their customers in the eCommerce industry. This daily conduct amounts to misappropriation of trade secrets pursuant to 18 U.S.C. § 1832.

252. Since Ascential's 2018 acquisition of Flywheel, Ascential has financially benefitted from Compass stolen trade secrets, proprietary business know how, and confidential information. This competitive benefit based on the acquirer's misuse of Compass's valuable and closely held information amounts to misappropriation of trade secrets pursuant to 18 U.S.C. § 1832.

253. Defendants Flywheel, DiPaula, Miller, and Ascential share an economic relationship with one another and knowingly participate in the misappropriation of Compass's trade secrets, proprietary business know how, and confidential information.

254. Defendants Michael, Daniel, and George White share the common purpose of harming Compass to hide the impropriety of their corporate spending for personal financial gain and their acts of facilitating and helping fund the use of the misappropriated Compass trade secrets,

proprietary business know how, and confidential information by Defendants Flywheel, DiPaula,

Miller, and Ascential.

255.    Since 2008, Michael and Daniel have knowingly engaged in a pattern of egregious

behavior that includes:

      a.   Fraudulently representing their ownership interests in Compass;

      b.   Stealing money from Compass for fraudulent severance payments to DiPaula and Miller used to operate Flywheel in competition with Compass;

      c.   Creating unauthorized bank accounts to funnel Compass revenue to themselves in their personal capacity and through doing so committing money laundering (18 U.S.C. § 1956), mail fraud (18 U.S.C. § 1314), wire fraud (18 U.S.C. § 1343), and financial institution fraud (18 U.S.C. § 1314);

      d.   Giving corporate compensation and pension benefits to Debra, Kelly, and Emile White who were not Compass employees and in doing so committing embezzlement of a pension fund 18 U.S.C. § 664);

      e.   Issuing themselves unwarranted "tax checks" for personal financial gain and in doing so committing embezzlement;

      f.   Fraudulently claiming that they issued loans to the company and writing reimbursement checks to themselves from the Compass bank account for fake principal and interest payments in Maryland from June 7, 2015 to February 12, 2019; and

      g.   Filing lawsuits (December 2, 2019) and federal agency grievances (October 2019 with the U.S. Department of Labor) with knowingly false statements for the purpose of causing Compass financial harm and reputational damage.

256.    Since April 29, 2019, George and Michael White have knowingly locked Compass

out of the compassmarketinginc.com domain and held Compass business records and accounts

hostage. The IT Lockout was done to cause Compass financial harm and reputational damage, and

pressure Compass to accede to George's demands for a raise, additional benefits, and severance

package and in doing so committing extortion (18 U.S.C. § 1961(1)).

257. The above allegations show that the Defendants conducted an enterprise through a pattern of racketeering activity in interstate commerce involving at least two predicate acts within a 10-year period.

258. As a result of Defendants' coordinated effort to cause Compass financial harm and reputational damage, Compass has suffered and continues to suffer actual damages.

**COUNT IV – CIVIL RICO CONSPIRACY 18 U.S.C. 1962(d)**
**(All Defendants)**

259. Compass incorporates the prior paragraphs as if fully set forth herein.

260. Defendants Flywheel, DiPaula, Miller, and Ascential share the common purpose of using Compass stolen trade secrets and Compass proprietary business know how for economic gain. Defendants Flywheel, DiPaula, Miller, and Ascential agreed to conspire to accomplish the wrongful acts detailed below as is evidenced by their past and continuing collaboration, duplicate acts, and common goals.

261. Since 2014, Defendants Miller, DiPaula, and Flywheel have used Compass's stolen trade secrets and Compass's proprietary information and business know how on a daily basis to run Flywheel's operations and create value for their customers in the eCommerce industry. This past and ongoing conduct amounts to misappropriation of trade secrets pursuant to 18 U.S.C. § 1832.

262. Since Ascential's 2018 acquisition of Flywheel, Ascential has financially benefitted from Compass stolen trade secrets, proprietary business know how, and confidential information. This competitive benefit based on the acquirer's misuse of Compass's valuable and closely held information amounts to misappropriation of trade secrets pursuant to 18 U.S.C. § 1832.

263. Defendants Flywheel, DiPaula, Miller, and Ascential share an economic relationship with one another and knowingly participate in the misappropriation of Compass's trade secrets, proprietary business know how, and confidential information.

264. Defendants Michael, Daniel, and George White share the common purpose of harming Compass to hide the impropriety of their corporate spending for personal financial gain and their acts of facilitating and helping fund the use of the misappropriated Compass trade secrets, proprietary business know how, and confidential information by Defendants Flywheel, DiPaula, Miller, and Ascential.

265. Since 2008, Michael and Daniel have knowingly engaged in a pattern of egregious behavior that includes:

a. Fraudulently representing their ownership interests in Compass;

b. Stealing money from Compass for fraudulent severance payments to DiPaula and Miller used to operate Flywheel in competition with Compass;

c. Creating unauthorized bank accounts to funnel Compass revenue to themselves in their personal capacity and through doing so committing money laundering (18 U.S.C. § 1956), mail fraud (18 U.S.C. § 1314), wire fraud (18 U.S.C. § 1343), and financial institution fraud (18 U.S.C. § 1314);

d. Giving corporate compensation and pension benefits to Debra, Kelly, and Emile White who were not Compass employees and in doing so committing embezzlement of a pension fund 18 U.S.C. § 664);

e. Issuing themselves unwarranted "tax checks" for personal financial gain and in doing so committing embezzlement;

f. Fraudulently claiming that they issued loans to the company and writing reimbursement checks to themselves from the Compass bank account for fake principal and interest payments in Maryland from June 7, 2015 to February 12, 2019; and

g. Filing lawsuits (December 2, 2019) and federal agency grievances (October 2019 with the U.S. Department of Labor) with knowingly false statements for the purpose of causing Compass financial harm and reputational damage.

266. Since April 29, 2019, George and Michael White have knowingly locked Compass out of the compassmarketinginc.com domain and held Compass business records and accounts hostage. The IT Lockout was done to cause Compass financial harm and reputational damage, and pressure Compass to concede to George's demands for a raise, additional benefits, and severance package and in doing so committing extortion (18 U.S.C. § 1961(1)).

267. The above allegations show that the Defendants conducted an enterprise through a pattern of racketeering activity in interstate commerce involving at least two predicate acts within a 10-year period.

268. As a result of Defendants' coordinated effort to cause Compass financial harm and reputational damage, Compass has suffered and continues to suffer actual damages.

**COUNT V – BREACH OF CONTRACT**
**(DiPaula & Miller)**

269. Compass incorporates the prior paragraphs as if fully set forth herein.

270. Compass's offer of employment required DiPaula and Miller to be bound by the terms of the "Agreement[s] Relating to Employment and Post Employment," the Employee Handbook, and Compass policies and procedures.

271. The "Agreement Relating to Employment and Post Employment" states:

a. Employee shall not, during or after termination of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where recognized by law, any Proprietary Information which is not generally known to the public, or has not otherwise been disclosed or recognized as standard practice in the industries in which COMPASS is engaged. Employment Agreement at 1.

b. During the period of Employee's employment with COMPASS and for a period of two years following the termination of Employee's employment, regardless of the reason for termination, Employee shall not, directly or indirectly: (i) induce or encourage any employee of COMPASS to leave the employ of COMPASS, (ii) hire any individual who is or was an employee of COMPASS as of the date of employee's termination of employment or within a one year period prior to such date, or (iii) induce or encourage any customer, client,

potential customer, potential client and/or other business relation of COMPASS to not do business or cease or reduce doing business with COMPASS or in any way interfere with the relationship between any such customer, client, potential client, supplier or other business relation and COMPASS. Employment Agreement at 2.

272. The Employee Handbook prohibits:

a. Theft, misappropriation or unauthorized possession or use of property, documents, records or funds belonging to the Company, or any client or employee; removal of same from Company premises without authorization.

b. Divulging trade secrets or other confidential business information to any unauthorized persons or to others without an official need to know.

c. Obtaining unauthorized confidential information pertaining to clients or employees. Employee Handbook at 12.

273. DiPaula and Miller agreed to the terms of the "Agreement Relating to Employment and Post Employment," the Employee Handbook, and Compass policies and procedures in consideration for jobs, salaries, and benefits, including $1,000 for agreeing to be bound by the terms of the "Agreement Relating to Employment and Post Employment."

274. DiPaula and Miller breached the terms of the "Agreement Relating to Employment and Post Employment" by:

a. Stealing Compass trade secrets, and proprietary business know how to found and operate their business at Flywheel;

b. Soliciting Compass clients to join Flywheel; and

c. Soliciting potential eCommerce client Proctor and Gamble ("P&G") by lying about the state of Compass's eCommerce Department and slowing negotiations with P&G while DiPaula and Miller were still Compass employees.

275. DiPaula and Miller breached the terms of the Employee Handbook by:

a. Stealing Compass trade secrets and in particular, misappropriating the Compass eCommerce Guide;

b. Divulging trade secrets and/or confidential and proprietary business information to Flywheel, its clients, and the general public as evidenced by Miller's 2015 Flywheel Power Point presentation at the Grocers Summit; and

c. Obtaining unauthorized confidential information pertaining to clients or employees by requesting client information from Compass employees after DiPaula and Miller left the Company and started Flywheel.

276. As a result of the above breaches of contract, DiPaula and Miller caused Compass to incur significant actual damages. These damages are ongoing since Flywheel, DiPaula, Miller, and Ascential continue to use Compass trade secrets and proprietary know how to operate the Flywheel business.

**COUNT VI – TORTIOUS INTERFERENCE WITH CONTRACT**
**(DiPaula, Miller, and Flywheel)**

277. Compass incorporates the prior paragraphs as if fully set forth herein.

278. Compass entered into valid and enforceable contracts with CPG clients.

279. Defendants DiPaula, Miller, and Flywheel knew about the contracts because they were former Compass employees who worked with these CPG clients on a daily basis.

280. Defendants intentionally interfered with the Compass contracts by poaching a long list of Compass eCommerce clients, including well-established brands such as Allergan, Amplify Snacks Brands, Colgate, Ferrero, J&J, Mars, McCormick, Old Wisconsin, Proctor and Gamble ("P&G") and 5 Hour Energy.

281. Defendants also intentionally interfered with Compass contracts by recruiting Compass employees who worked on the CPG client accounts to join Flywheel, knowing that the brain trust provided a valuable service that could not be duplicated.

282. Defendants' actions caused these eCommerce clients to terminate their contracts with Compass and hire Flywheel so the clients could receive the same services by the same employees that handled the accounts at Compass.

283. As a result of Defendants' interference, Compass suffered actual damages.

**COUNT VII – TORTIOUS INTERFERENCE WITH PROSPECTIVE ADVANTAGE**
**(Flywheel, DiPaula, Miller)**

284. Compass incorporates the prior paragraphs as if fully set forth herein.

285. Defendants DiPaula and Miller intentionally and maliciously lied to potential Compass eCommerce client Proctor & Gamble when they said that Compass was getting out of the eCommerce business.

286. DiPaula and Miller lied in an attempt to end the Compass and P&G relationship, to prevent P&G from entering into an eCommerce contract with Compass, and to facilitate Flywheel's engagement of P&G as a client.

287. As a result of DiPaula and Miller's deceit, Compass lost the prospective advantage as P&G ceased conversations about hiring Compass for its eCommerce services.

288. Later, Flywheel acquired and retained P&G as an eCommerce client.

289. As a result of DiPaula, Miller, and Flywheel's conduct, Compass suffered actual damages.

**COUNT VIII – UNFAIR COMPETITION**
**(Flywheel, DiPaula, Miller, and Ascential)**

290. Compass incorporates the prior paragraphs as if fully set forth herein.

291. Defendants Flywheel, DiPaula, Miller, and Ascential engaged in a coordinated series of unfair and deceptive acts intended to damage and destroy Compass's business and ultimately steal Compass's eCommerce customers.

292. Flywheel, Miller, and DiPaula stole Compass's trade secrets and other proprietary and confidential business information and know how, and used same to form the competitor entity Flywheel and continue to use Compass's trade secrets, proprietary business know how, and confidential information to poach clients and Compass employees.

293. Flywheel's success both in terms of increased revenue year over year and its eventual $400 million acquisition by Ascential would not have been possible but for Flywheel's reliance on Compass's stolen trade secrets and proprietary information and know how.

294. Flywheel's continued success following the Ascential acquisition would not have been possible but for Ascential's reliance on Compass's stolen trade secrets and proprietary information and know how.

295. As a result of the unfair and deceptive statements and conduct directed at Compass and Compass's eCommerce customers by Flywheel, DiPaula, Miller, and Ascential, Compass's business was severely damaged through the loss of valuable business relationships with eCommerce customers in Maryland and other locations.

296. When they were employees and executives of Compass, DiPaula and Miller owed fiduciary duties to Compass.

297. DiPaula and Miller breached their fiduciary duties through their misappropriation of trade secrets and other confidential and proprietary information belonging to Compass.

298. DiPaula and Miller's breaches of their fiduciary duties harmed Compass, including because Compass's confidential and proprietary information, including its business know how, was misused to usurp from Compass its corporate opportunities and Compass's resources were converted for the benefit of others.

299. As a result of Flywheel, DiPaula, Miller, and Ascential's conduct, Compass suffered actual damages.

**COUNT IX – UNJUST ENRICHMENT**
**(DiPaula, Miller, Flywheel, and Ascential)**

300. Compass incorporates the prior paragraphs as if fully set forth herein.

301.    By reason of improper conduct by Flywheel, DiPaula, Miller, and Ascential, Defendants have enriched themselves and the corporate entities with which they are affiliated.

302.    Flywheel, DiPaula, Miller, and Ascential have profited and continue to profit from use of Compass's trade secret, proprietary, and confidential information. In particular, Flywheel, DiPaula, and Miller have received as much as $400 million from Ascential as a direct result of their unauthorized and unlawful use of Compass's trade secret, proprietary, and confidential information.

303.    Flywheel, DiPaula, Miller, and Ascential have willfully and maliciously misappropriated Compass's trade secret, proprietary, and confidential information. Ascential knew or was informed no later than May 2021 that it was profiting from Compass's trade secret, proprietary, and confidential information, chose to take no action despite its knowledge that it is unlawfully benefitting from Compass's intellectual property, and continues to enjoy the financial benefits from the actionable misconduct of Flywheel, DiPaula, and Miller.

304.    As a consequence of the unlawful acquisition, use, and/or disclosure of Compass's trade secret, proprietary, and confidential information by Flywheel, DiPaula, Miller, and Ascential, Compass has suffered an impoverishment.

305.    Defendants' enrichment and Compass's impoverishment were without justification or cause.

306.    It is inequitable for Flywheel, DiPaula, Miller, and Ascential to profit and continue to profit from Compass's stolen trade secret, proprietary, and confidential information. Should Compass have no other remedy in law against Flywheel, DiPaula, Miller, and Ascential for their various tortious misconduct, each defendant is bound to compensate Compass in an amount equal to their respective unjust enrichment.

**COUNT X – FRAUDULENT CONCEALMENT/FRAUD**
**(All Defendants)**

307. Compass incorporates the prior paragraphs as if fully set forth herein.

308. All defendants have committed countless wrongful acts and misrepresentations in order to conceal and further perpetuate the schemes detailed above, including misappropriation of Compass's trade secret, proprietary, and confidential information and racketeering schemes.

309. Specifically, DiPaula, Miller, and Flywheel worked in concert to conceal the misappropriation of Compass's trade secrets to found and operate Flywheel as a competing eCommerce entity. Michael and Daniel White worked in concert to support Flywheel by issuing checks that involved Compass funds to Chip DiPaula that he used to fund and operate the Flywheel business. George White engaged in the alleged IT misconduct to interfere with Compass's business in competition with Flywheel, among other things. Ascential, through its acquisition of and post-acquisition support of Flywheel's business, has worked to continually conceal the past and continued misappropriation of Compass's trade secrets and proprietary business information and know how.

310. Michael and Daniel White owed a duty to Compass to disclose their financial decisions and conflicting financial interests as Compass officers, yet worked tirelessly to actively conceal and misrepresent their actions, as pleaded above and which included:

a. Fraudulently representing their ownership interests in Compass;

b. Stealing money from Compass for fraudulent severance payments to DiPaula and Miller used to operate Flywheel in competition with Compass;

c. Creating unauthorized bank accounts to funnel Compass revenue to themselves in their personal capacity and through doing so committing money laundering (18 U.S.C. § 1956), mail fraud (18 U.S.C. § 1314), wire fraud (18 U.S.C. § 1343), and financial institution fraud (18 U.S.C. § 1314);

    d. Giving corporate compensation and pension benefits to Debra, Kelly, and Emile White who were not Compass employees and in doing so committing embezzlement of a pension fund 18 U.S.C. § 664);

e. Issuing themselves unwarranted "tax checks" for personal financial gain and in doing so committing embezzlement;

f. Fraudulently claiming that they issued loans to the company and writing reimbursement checks to themselves from the Compass bank account for fake principal and interest payments in Maryland from June 7, 2015 to February 12, 2019; and

g. Filing lawsuits (December 2, 2019) and federal agency grievances (October 2019 with the U.S. Department of Labor) with knowingly false statements for the purpose of causing Compass financial harm and reputational damage.

311. Compass justifiably relied upon Michael and Daniel's deceitful actions, including by declining to pursue legal action against DiPaula, Miller, Flywheel, and former Flywheel employees due to Daniel's conflicted legal advice that resulted from his undisclosed financial interest in Flywheel.

312. As a result of Defendants' fraud and concealment, Compass was unable to uncover the misappropriation of its trade secret, proprietary, and confidential information and, as a result, suffered actual damages including, but not limited to, loss of economic value of its trade secret, proprietary, and confidential information, loss of clients, revenues, economic opportunities, investments, and employees. As a further result of Defendants' actions, Compass has suffered actual damages from years of embezzlement and fraud and legal fees from unwarranted lawsuits intended to conceal Defendants' actions.

**COUNT XI – CONSPIRACY TO MISAPPROPRIATE TRADE SECRETS**
**(All Defendants)**

313. Compass incorporates the prior paragraphs as if fully set forth herein.

314. Defendants agreed to work together and in concert to benefit Flywheel and cause financial harm and reputational damage to Compass, as evidenced by the coordinated actions of Defendants to:

a. Steal Compass trade secrets, and proprietary information;

b. Provide Flywheel with access to the stolen Compass trade secrets, and proprietary information; and

c. Financially support Flywheel, through unwarranted payments to Chip DiPaula, as Flywheel continuously misappropriates Compass trade secrets, and proprietary information.

315. As a result of Defendants' coordinated effort to benefit Flywheel and cause financial harm and reputational damage to Compass, Compass suffered and continues to suffer actual damages.

**COUNT XII – CONSPIRACY TO BREACH CONTRACT**
**(DiPaula & Miller)**

316. Compass incorporates the prior paragraphs as if fully set forth herein.

317. Defendants DiPaula and Miller agreed to work together and in concert to breach their "Agreement[s] Relating to Employment and Post Employment" to benefit Flywheel and for personal financial gain, as evidenced by the coordinated actions of Defendants to:

a. Use Compass trade secrets, and confidential and proprietary information to found and operate their business at Flywheel;

b. Solicit Compass employees Alex McCord, Dayna Acevedo, Justin Liu, Mike Menefee and Mike O'Donnell who ultimately resigned from Compass and joined Flywheel; and

c. Solicit Compass potential eCommerce client Proctor and Gamble ("P&G") causing it to terminate negotiations, and Compass clients including Allergan, Amplify Snacks Brands, Colgate, Ferrero, J&J, Mars, McCormick, Old Wisconsin, and 5 Hour Energy which ultimately terminated their service contracts with Compass and hired Flywheel.

318. As a result of Defendants' coordinated effort to benefit Flywheel and secure personal financial gain, Compass suffered and continues to suffer actual damages.

**COUNT XIII – CONSPIRACY TO TORTIOUSLY INTERFERE WITH CONTRACTS**
**(DiPaula, Miller, and Flywheel)**

319. Compass incorporates the prior paragraphs as if fully set forth herein.

320. Defendants DiPaula, Miller, and Flywheel agreed to work together and in concert to intentionally interfere with Compass client contracts as is evidenced by the coordinated actions of Defendants to cause Allergan, Amplify Snacks Brands, Colgate, Ferrero, J&J, Mars, McCormick, Old Wisconsin, and 5 Hour Energy to terminate their contracts with Compass and hire Flywheel to provide the same eCommerce marketing services.

321. As a result of Defendants' coordinated effort to benefit Flywheel and secure personal financial gain, Compass suffered and continues to suffer actual damages.

**COUNT XIV – CONSPIRACY TO TORTIOUSLY INTERFERE WITH PROSPECTIVE ADVANTAGE**
**(DiPaula, Miller, and Flywheel)**

322. Compass incorporates the prior paragraphs as if fully set forth herein.

323. Defendants DiPaula, Miller, and Flywheel agreed to work together and in concert to prevent Compass from obtaining an eCommerce contract with Proctor & Gamble ("P&G") as evidenced by the coordinated actions of Defendants to intentionally and maliciously lie and tell P&G corporate representatives that Compass was getting out of the eCommerce business.

324. As a result of Defendants' coordinated effort to end the Compass and P&G relationship so Flywheel could attempt to retain P&G as a client, Compass has suffered and continues to suffer actual damages.

**COUNT XV – CONSPIRACY TO UNFAIRLY COMPETE**
**(All Defendants)**

325. Compass incorporates the prior paragraphs as if fully set forth herein.

326. Defendants agreed to work together and in concert to damage and destroy Compass's business and ultimately steal Compass's eCommerce customers as evidenced by the coordinated actions of Defendants to:

a. Steal Compass trade secrets and other proprietary and confidential information;

b. Use such information to found Flywheel; and

c. Continue to use Compass trade secrets and other proprietary and confidential information to poach clients and Compass employees.

327. As a result of Defendants' coordinated effort to benefit Flywheel and secure personal financial gain, Compass suffered and continues to suffer actual damages.

**COUNT XVI – CONSPIRACY TO COMMIT FRAUDULENT CONCEALMENT/FRAUD**
**(All Defendants)**

328. Compass incorporates the prior paragraphs as if fully set forth herein.

329. Defendants agreed to work together and in concert to conceal their schemes to benefit from Compass's trade secrets and confidential and proprietary information and otherwise profit from Compass unlawfully, as evidenced by the coordinated actions of Defendants:

a. Fraudulently representing their ownership interests in Compass;

b. Stealing money from Compass for fraudulent severance payments to DiPaula and Miller used to operate Flywheel in competition with Compass;

c. Creating unauthorized bank accounts to funnel Compass revenue to themselves in their personal capacity and through doing so committing money laundering (18 U.S.C. § 1956), mail fraud (18 U.S.C. § 1314), wire fraud (18 U.S.C. § 1343), and financial institution fraud (18 U.S.C. § 1314);

d. Giving corporate compensation and pension benefits to Debra, Kelly, and Emile White who were not Compass employees and in doing so committing embezzlement of a pension fund 18 U.S.C. § 664);

e. Issuing themselves unwarranted "tax checks" for personal financial gain and in doing so committing embezzlement;

f. Fraudulently claiming that they issued loans to the company and writing reimbursement checks to themselves from the Compass bank account for fake

principal and interest payments in Maryland from June 7, 2015 to February 12, 2019; and

g. Filing lawsuits (December 2, 2019) and federal agency grievances (October 2019 with the U.S. Department of Labor) with knowingly false statements for the purpose of causing Compass financial harm and reputational damage.

330. As a result of Defendants' coordinated effort to benefit Flywheel and secure personal financial gain, Compass suffered and continues to suffer actual damages.

**COUNT XVII – AIDING AND ABETTING MISAPPROPRIATION OF TRADE SECRETS**
**(DiPaula, Miller, and Flywheel)**

331. Compass incorporates the prior paragraphs as if fully set forth herein.

332. DiPaula, Miller, Flywheel substantially assisted and encouraged one another to use Compass's trade secrets, proprietary business know how, and confidential information in order to compete with Compass in the eCommerce industry.

333. As a result, Compass suffered and continues to suffer actual damages.

**COUNT XVIII – AIDING AND ABETTING TORTIOUS INTERFERENCE WITH CONTRACTS**
**(DiPaula, Miller, and Flywheel)**

334. Compass incorporates the prior paragraphs as if fully set forth herein.

335. Defendants DiPaula, Miller, and Flywheel substantially assisted and encouraged one another to intentionally interfere with Compass contracts as is evidenced by the coordinated actions of Defendants to cause Allergan, Amplify Snacks Brands, Colgate, Ferrero, J&J, Mars, McCormick, Old Wisconsin, and 5 Hour Energy to terminate their contracts with Compass and hire Flywheel to provide the same eCommerce marketing services.

336. As a result, Compass suffered and continues to suffer actual damages.

**COUNT XIX – AIDING AND ABETTING TORTIOUS INTERFERENCE WITH PROSPECTIVE ADVANTAGE**
**(DiPaula, Miller, and Flywheel)**

337. Compass incorporates the prior paragraphs as if fully set forth herein.

338. Defendants DiPaula, Miller, and Flywheel substantially assisted and encouraged one another to prevent Compass from obtaining an eCommerce contract with Proctor & Gamble ("P&G") as evidenced by the coordinated actions of Defendants to intentionally and maliciously lie and tell P&G corporate representatives that Compass was getting out of the eCommerce business.

339. As a result, Compass suffered and continues to suffer actual damages.

**COUNT XX – AIDING AND ABETTING UNFAIR COMPETITION**
**(DiPaula, Miller, and Flywheel)**

340. Compass incorporates the prior paragraphs as if fully set forth herein.

341. DiPaula, Miller, Flywheel substantially assisted and encouraged one another to commit a coordinated series of unfair and deceptive acts intended to damage and destroy Compass's business and ultimately steal Compass's eCommerce customers.

342. As a result, Compass suffered and continues to suffer actual damages.

**COUNT XXI – AIDING AND ABETTING FRAUDULENT CONCEALMENT/FRAUD**
**(All Defendants)**

343. Compass incorporates the prior paragraphs as if fully set forth herein.

344. Defendants substantially assisted and encouraged one another to conceal their schemes to benefit from Compass's trade secrets and confidential and proprietary information and otherwise profit from Compass unlawfully, as evidenced by the coordinated actions of Defendants:

a. Fraudulently representing their ownership interests in Compass;

b. Stealing money from Compass for fraudulent severance payments to DiPaula and Miller used to operate Flywheel in competition with Compass;

    c. Creating unauthorized bank accounts to funnel Compass revenue to themselves in their personal capacity and through doing so committing money laundering (18 U.S.C. § 1956), mail fraud (18 U.S.C. § 1314), wire fraud (18 U.S.C. § 1343), and financial institution fraud (18 U.S.C. § 1314);

d. Giving corporate compensation and pension benefits to Debra, Kelly, and Emile White who were not Compass employees and in doing so committing embezzlement of a pension fund 18 U.S.C. § 664);

e. Issuing themselves unwarranted "tax checks" for personal financial gain and in doing so committing embezzlement;

f. Fraudulently claiming that they issued loans to the company and writing reimbursement checks to themselves from the Compass bank account for fake principal and interest payments in Maryland from June 7, 2015 to February 12, 2019; and

g. Filing lawsuits (December 2, 2019) and federal agency grievances (October 2019 with the U.S. Department of Labor) with knowingly false statements for the purpose of causing Compass financial harm and reputational damage.

345. As a result of Defendants' coordinated effort to benefit Flywheel and secure personal financial gain, Compass suffered and continues to suffer actual damages.

**COUNT XXII – CONVERSION**
**(Michael and George White)**

346. Compass incorporates the prior paragraphs as if fully set forth herein.

347. Michael and George White intentionally and wrongful exercised dominion and control over Compass's personal property, as alleged above and including by George White's acts to intentionally and maliciously cut off Compass access to employee email accounts with the compassmarketinginc.com domain, Microsoft, QuickBooks, and other business records and accounts.

348. Consequently, Compass was not able to communicate by email with clients or otherwise access the records required to do business. Compass had to rebuild its IT infrastructure and establish a new compassmarketinginc.net domain at significant expense.

349. Compass expended significant effort, time, and money to create new accounts and business records. Compass employees engaged in the time-consuming task of reaching out to clients and leads to address problems arising from missing records and provide new contact information.

350. Michael and George White continue to intentionally and wrongfully exercise dominion and control over Compass's network, and, on information and belief will continue to do so unless enjoined.

351. As a result of Defendants' conversion of Compass's network, Compass suffered and continues to suffer actual damages.

**COUNT XXIII – BREACH OF FIDUCIARY DUTY**

**(Daniel White and Michael White)**

352. Compass incorporates the prior paragraphs as if fully set forth herein.

353. As directors and officers of Compass, Daniel White and Michael White owed fiduciary duties of care, loyalty, and good faith to Compass. Daniel White and Michael White's fiduciary duties included an obligation to exercise good business judgment, to act prudently in the operation of Compass' business, to discharge their actions in good faith, to act in the best interest of Compass and its shareholders, and to put the interests of Compass before their own.

354. Daniel White and Michael White breached their fiduciary duty of care by, among other things:

a. Using Compass funds to issue fraudulent severance payments to DiPaula to operate Flywheel; and

b. Assisting Flywheel with its misappropriation of Compass' trade secrets and proprietary know how;

c. Helping Flywheel succeed to Compass' detriment.

355. Daniel White and Michael White breached their fiduciary duty of loyalty and good faith by, among other things:

d. Opening secret bank accounts in Compass' name to take corporate funds from Compass for their personal benefit;

e. Hiring ghost employees to benefit themselves and their families to Compass' detriment;

f. Engaging in the Tax Check Scheme to drain funds from Compass for their personal benefit;

g. Engaging in the Shareholder Loan Scheme to drain funds from Compass for their personal benefit; and

h. Charging personal expenses to their Compass corporate credit cards and having Compass pay the expenses.

356. Daniel White and Michael White intentionally and maliciously breached their fiduciary duties to Compass to benefit themselves and others, and to cause harm to Compass.

357. Daniel White and Michael White's breaches caused substantial financial harm and reputational damage to Compass that continues to this day.

**JURY DEMAND**

358. Pursuant to Federal Rule of Civil Procedure 38(b), Compass demands a trial by jury as to all issues so triable in this action.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Compass prays for the following relief:

359. Enter judgment in Compass's favor on of the Counts identified herein;

360. Enter judgment against the named Defendants, jointly and severally, as identified in each of the above-referenced Counts;

361. Compensatory damages for all losses caused by Defendants' wrongful conduct, including actual damages due to Defendants' wrongful conduct pursuant to 18 U.S.C. § 1836(b)(3)(B)(i) and Md. Code Com. Law § 11-1202;

362.    Treble damages pursuant to 18 U.S.C. § 1964(c);

363.    Equitable relief pursuant to 18 U.S.C. § 1836(b)(3)(B)(i) and Md. Code Com. Law § 11-1202;

364.    Punitive and exemplary damages for Defendants' willful and malicious conduct pursuant to 18 U.S.C. § 1836(b)(3)(C) and Md. Code Com. Law § 11-1203;

365.    Reasonable attorneys' fees and costs incurred in connection with this lawsuit pursuant to 18 U.S.C. § 1836(b)(3)(D), 18 U.S.C. § 1964(c), and Md. Code Com. Law § 11-1204;

366.    Damages for conversion of Compass's personal property in an amount no less than fair market value of Compass's network and the information thereon, including trade secret information;

367.    Injunctive relief barring Defendants from using or disclosing Compass's trade secrets, proprietary business know how, and confidential information and ordering Defendants to return to Compass all documents and materials containing Compass's trade secret, proprietary, and confidential information;

368.    Injunctive relief barring Defendants from directly or indirectly soliciting, inducting or encouraging any entity or person who is a client of Compass, or otherwise tortiously interfering with Compass's contracts or prospective advantage;

369.    Injunctive relief barring Defendants from accessing or controlling Compass's networks;

370.    An order returning control of Compass's network to Compass;

371.    An award of prejudgment interest and costs of suit to the extent permitted by law; and

372.    Any such other relief as the Court may deem just and proper.

Dated: February 14, 2022

Respectfully submitted,

*/s/ Steven A. Luxton, Esq.*

Steven A. Luxton, Esq. (MD Bar No. 9812160173)
Natalie A. Bennett, Esq. (*pro hac vice forthcoming*)
**Morgan, Lewis & Bockius LLP**
1111 Pennsylvania Avenue
7th Floor
Washington, DC 20004-2541
steven.luxton@morganlewis.com
natalie.bennett@morganlewis.com
T. (202) 739-5559
F. (202) 739-3001

Troy S. Brown, Esq. (*pro hac vice forthcoming*)
Rachel A. Ward, Esq. (*pro hac vice forthcoming*)
**Morgan, Lewis & Bockius LLP**
1701 Market Street
Philadelphia PA 19103
troy.brown@morganlewis.com
rachel.ward@morganlewis.com
T. (215) 963-5000
F (215) 963-5001

James J. Kritsas (*pro hac vice forthcoming*)
**Morgan, Lewis & Bockius LLP**
110 North Wacker Drive
Chicago, IL 60606
james.kritsas@morganlewis.com
T. (312) 324-1000
F. (312) 324-1001

Susan K. Stradley (*pro hac vice forthcoming*)
**Morgan, Lewis & Bockius LLP**
1000 Louisiana Street
Suite 4000
Houston, TX 77002
susan.stradley@morganlewis.com
T. (713) 890-5000
F. (713) 890-5001
*Counsel for Plaintiff Compass Marketing, Inc.*

JS 44 (Rev. 08/16) Case 1:22-cv-00379-GLR Document 1-1 Filed 02/14/22 Page 1 of 2

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Compass Marketing, Inc.

**(b)** County of Residence of First Listed Plaintiff: Anne Arundel County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See attachment

## DEFENDANTS

Flywheel Digital LLC, James Columbus "Chip" DiPaula, Jr., Patrick Miller, Daniel White, Michael White, George White, Ascential PLC

County of Residence of First Listed Defendant: Anne Arundel County
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

N/A

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

1 U.S. Government Plaintiff
X 3 Federal Question *(U.S. Government Not a Party)*
2 U.S. Government Defendant
4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*

*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated *or* Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated *and* Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
110 Insurance
120 Marine
130 Miller Act
140 Negotiable Instrument
150 Recovery of Overpayment & Enforcement of Judgment
151 Medicare Act
152 Recovery of Defaulted Student Loans (Excludes Veterans)
153 Recovery of Overpayment of Veteran's Benefits
160 Stockholders' Suits
190 Other Contract
195 Contract Product Liability
196 Franchise

**REAL PROPERTY**
210 Land Condemnation
220 Foreclosure
230 Rent Lease & Ejectment
240 Torts to Land
245 Tort Product Liability
290 All Other Real Property

**TORTS**

**PERSONAL INJURY**
310 Airplane
315 Airplane Product Liability
320 Assault, Libel & Slander
330 Federal Employers' Liability
340 Marine
345 Marine Product Liability
350 Motor Vehicle
355 Motor Vehicle Product Liability
360 Other Personal Injury
362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
365 Personal Injury - Product Liability
367 Health Care/ Pharmaceutical Personal Injury Product Liability
368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
370 Other Fraud
371 Truth in Lending
380 Other Personal Property Damage
385 Property Damage Product Liability

**CIVIL RIGHTS**
440 Other Civil Rights
441 Voting
442 Employment
443 Housing/ Accommodations
445 Amer. w/Disabilities - Employment
446 Amer. w/Disabilities - Other
448 Education

**PRISONER PETITIONS**
**Habeas Corpus:**
463 Alien Detainee
510 Motions to Vacate Sentence
530 General
535 Death Penalty
**Other:**
540 Mandamus & Other
550 Civil Rights
555 Prison Condition
560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
625 Drug Related Seizure of Property 21 USC 881
690 Other

**LABOR**
710 Fair Labor Standards Act
720 Labor/Management Relations
740 Railway Labor Act
751 Family and Medical Leave Act
790 Other Labor Litigation
791 Employee Retirement Income Security Act

**IMMIGRATION**
462 Naturalization Application
465 Other Immigration Actions

**BANKRUPTCY**
422 Appeal 28 USC 158
423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
820 Copyrights
830 Patent
840 Trademark

**SOCIAL SECURITY**
861 HIA (1395ff)
862 Black Lung (923)
863 DIWC/DIWW (405(g))
864 SSID Title XVI
865 RSI (405(g))

**FEDERAL TAX SUITS**
870 Taxes (U.S. Plaintiff or Defendant)
871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
375 False Claims Act
376 Qui Tam (31 USC 3729(a))
400 State Reapportionment
410 Antitrust
430 Banks and Banking
450 Commerce
460 Deportation
X 470 Racketeer Influenced and Corrupt Organizations
480 Consumer Credit
490 Cable/Sat TV
850 Securities/Commodities/ Exchange
890 Other Statutory Actions
891 Agricultural Acts
893 Environmental Matters
895 Freedom of Information Act
896 Arbitration
899 Administrative Procedure Act/Review or Appeal of Agency Decision
950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

X 1 Original Proceeding
2 Removed from State Court
3 Remanded from Appellate Court
4 Reinstated or Reopened
5 Transferred from Another District *(specify)*
6 Multidistrict Litigation - Transfer
8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing ***(Do not cite jurisdictional statutes unless diversity)***:
18 U.S.C. § 1965 Racketeer Influenced and Corrupt Organizations ("RICO") Act

Brief description of cause:
Diversion of money and trade secrets from Compass Marketing to competitor Flywheel

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** X Yes No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE ____________ DOCKET NUMBER ____________

DATE: 02/14/2022

SIGNATURE OF ATTORNEY OF RECORD: Steven A. Luxton, Esq.

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

# Attachment

Attorneys for Plaintiff Compass Marketing, Inc.

Steven A. Luxton, Esq. (MD Bar No. 9812160173)
Natalie A. Bennett, Esq. (*pro hac vice forthcoming*)
**Morgan, Lewis & Bockius LLP**
1111 Pennsylvania Avenue
7th Floor
Washington, DC 20004-2541
steven.luxton@morganlewis.com
natalie.bennett@morganlewis.com
T. (202) 739-5559
F. (202) 739-3001

Troy S. Brown, Esq. (*pro hac vice forthcoming*)
Rachel A. Ward, Esq. (*pro hac vice forthcoming*)
**Morgan, Lewis & Bockius LLP**
1701 Market Street
Philadelphia PA 19103
troy.brown@morganlewis.com
rachel.ward@morganlewis.com
T. (215) 963-5000
F (215) 963-5001

James J. Kritsas (*pro hac vice forthcoming*)
**Morgan, Lewis & Bockius LLP**
110 North Wacker Drive
Chicago, IL 60606
james.kritsas@morganlewis.com
T. (312) 324-1000
F. (312) 324-1001

Susan K. Stradley (*pro hac vice forthcoming*)
**Morgan, Lewis & Bockius LLP**
1000 Louisiana Street
Suite 4000
Houston, TX 77002
susan.stradley@morganlewis.com
T. (713) 890-5000
F. (713) 890-5001

# EXHIBIT A

Compass MARKETING INCORPORATED

# COMPASS MARKETING 101

Bausch & Lomb

HELPING GREAT COMPANIES DO GREAT THINGS

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com



USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 104 of 306

## JOHN WHITE

CHAIRMAN & CEO

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

- Chairman & CEO Compass Marketing Inc., 13 years
- MBA Marketing & Management, University of Baltimore
- Director at Acosta before founding Compass in 1999
- President of the International Foundation for Research & Education of Depression, a 501(c)3 healthcare non-profit
- Board Member of the United Way of Maryland Campaign Committee

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com

JA100

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 105 of 306

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

# STRATEGIC ADVISORS TO AMERICA'S TOP CONSUMER PRODUCT MANUFACTURERS.

HELPING GREAT COMPANIES DO GREAT THINGS

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com 3

JA101

COMPASS STRENGTHS

RESOURCES & EXPERIENCE

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 107 of 306

# COMPASS ADVANTAGE

## NATIONAL SALES FORCE

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

WASHINGTON
OREGON
IDAHO
MONTANA
NORTH DAKOTA
SOUTH DAKOTA
WYOMING
NEVADA
CALIFORNIA
UTAH
COLORADO
NEBRASKA
KANSAS
MINNESOTA
WISCONSIN
IOWA
MISSOURI
ILLINOIS
INDIANA
MICHIGAN
ARIZONA
NEW MEXICO
OKLAHOMA
TEXAS
ARKANSAS
LOUISIANA
MISSISSIPPI
TENNESSEE
KENTUCKY
ALABAMA
GEORGIA
FLORIDA
SOUTH CAROLINA
NORTH CAROLINA
VIRGINIA
WEST VIRGINIA
DC
PENNSYLVANIA
NEW YORK
NEW JERSEY
DELAWARE
MARYLAND
CONN
RI
MASS
NH
VT
MAINE
ALASKA
HAWAII
HEADQUARTERS
ANNAPOLIS, MD
CONN: CONNECTICUT
MASS: MASSACHUSETTS
NH: NEW HAMPSHIRE
RI: RHODE ISLAND
VT: VERMONT

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com 5

JA103

# OUR CLIENTS

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS













































OUR BRANDS
Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS
Palmolive
Lipton
5-hour ENERGY
nutella
Softsoap
Splenda
GOETZE'S
Special K
BUMBLE BEE FOODS, LLC
m&m's
Emergen-C
Bull Frog
Tide
pop-tarts
FERRERO ROCHER
MURPHY OIL SOAP
McCormick GOURMET
DURACELL
Nutri-Grain
SNICKERS
OLD BAY
tic tac
Colgate
Darrell Lea
Raffaello
nectresse
R.W. KNUDSEN FAMILY
ChapStick
ThermaCare
TYLENOL
Reynolds
Benecol
Advil
POP-SECRET
BEAR NAKED
ICY HOT
Slim-Fast
Speed Stick
ZYRTEC
EMERALD PREMIUM SNACKS
combos
AJAX
Simply Asia
CHEEZ-IT
Crest
Dove
Balance bar
Irish Spring
Febreze
Famous Amos
Gillette
Robitussin
Twix
DIAMOND
3 Musketeers
McCormick
Keebler
Centrum
Pampers
Santa Cruz ORGANIC
Mr. Clean
RICE KRISPIES TREATS
MET-Rx Shaping Every Body.
Vaseline
McCormick Grill Mates
KETTLE BRAND POTATO CHIPS
Refresh Tears
OLD WISCONSIN
Blistex
ZATARAIN'S
FERRERO Rondnoir
YumEarth
Pringles
Dimetapp
PURE PROTEIN
BAND-AID
MilkyWay
GoGo squeeZ
GOLD BOND
THAI KITCHEN
Motrin We feel your pain.
Kashi
JACK LINK'S BEEF JERKY
Ricola
PREPARATION H
Neutrogena
NEOSPORIN
VICKS
COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com
7

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 110 of 306

## CHANGING LIFESTYLES

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

- Single family income is a thing of the past, both parents work.
- Less time is spent in the home.
- More products being consumed away from the home.
- Home meal replacement increases.
- Commercial and non-commercial visits are up.

EATING on the RUN
EVELYN TRIBOLE, MS, RD

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com
JA106



USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 111 of 306

## CHANGING DISTRIBUTION

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

- Non-traditional channels of distribution.
- Products sold in outlets other than retail.
- Focus on increasing points of distribution.
- Identifying truly incremental sales and consumption.

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com

JA107

Compass ADVANTAGE
SCOPE OF SERVICES
Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS
Sales
Analytics
Marketing
Logistics
COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com
10

COMPASS ADVANTAGE
SCOPE OF SERVICES
Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS
E-Commerce
International
Club
Strategic Channels
Analytics
Compass MARKETING INCORPORATED
Consulting
Marketing/ Creative Services
B2B
Foodservice

## COMPASS ADVANTAGE

### SCOPE OF SERVICES

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

Compass Marketing is the leader in opening strategic opportunities and guiding top brands in sales and marketing. Our company is comprised of an experienced, dedicated team that is focused on maximizing revenue with a reputation for getting results.

We specialize in pioneering brands in alternate & specialty channels, E-commerce, B2B and Foodservice. Support includes a full service marketing and creative services department, analytics, consulting and strategic services.

Our relentless pursuit of our clients' goals and interests is why we are the strategic advisor to world's leading Consumer Products manufacturers.

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 115 of 306

COMPASS MARKETING

OVERVIEW

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

- Headquarters in Annapolis, MD USA
- 60+ employees in 15 offices in United States, India and Brazil
- Divisions: Sales, Marketing and Creative Services, Inside Sales, Strategic Services/ Business Development, Consulting, B2B, Foodservice, Analytics, E-Commerce

Compass MARKETING

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com 13

JA111

## Alternate Channels

### CLASSES OF TRADE

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

- Airports/ Airlines/ Duty Free
- Travel Plazas
- Sporting Goods
- Office Supply Outlets
- College Book Stores
- Home Improvement
- Hardware
- Farm & Fleet
- E-commerce
- Foodservice National Accts.
- Safety Supply
- B2B

- Arts & Crafts
- Auto Retailers
- Hospital Gift Shops
- Oil & Gas Exploration
- Home Improvement
- Direct to Consumer Catalogs
- Independent Dollar
- Hunting Supply/ Fishing Supply
- Electronic/ Entertainment Retailers
- Home Goods
- Record, Music and Video

Alternate channels
KEY CUSTOMERS
Compass MARKETING
INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS
amazon.com
MENARDS
Advance Auto Parts
follett
BEST BUY
ACE
The helpful place.
OfficeMax
UNITED STATIONERS
DICK'S SPORTING GOODS
Hudson News
WHO BUT W.B.MASON
STAPLES
that was easy.
BARNES&NOBLE BOOKSELLERS
Burlington
HMS HOST
LOWE'S
Let's Build Something Together
TRACTOR SUPPLY CO
THE HOME DEPOT
Office DEPOT
Travel Traders
THE PARADIES SHOPS
S.P.RICHARDS CO
AutoZone
Academy SPORTS+OUTDOORS
FedEx Office.
BIG 5 SPORTING GOODS
SPORTS AUTHORITY
BLOCKBUSTER

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 118 of 306

## Alternate Channels

### KEY DISTRIBUTORS

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

VISTAR

Academy Sports
Dick's Sporting Goods
Hancock Fabrics
Office Max
FedEx Office
Shoe Carnival
W B Mason
Staples Online
Lowe's

LIBERTY DISTRIBUTION
COMPANY, LLC

A C Moore
ACE Hardware
Auto Zone
Advanced Auto
Big 5 Sporting Goods
Burlington Coat Factory
Best Buy
Cabela's
Garden Ridge
Home Depot
Lowe's
Office Depot
Old Navy
Pep Boys
Tractor Supply
Tiger Direct

Blockbuster Video
Staples - Retail
Family Video
True Value
Orgill
National Amusement
Marvin's
Wheatbelt
United Hardware
Quill

CSD

PHOENIX

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com 16

JA114

Compass Advantage

ANALYTICS SERVICES

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

- Client, Customer, Industry and Country Research and Monitoring
- Analysis of retail environments, POS data
- Website content auditing and adjacency recommendations
- Marketing and advertising planning and execution
- Sales support
- Customer Profile Database

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 120 of 306

Compass advantage
FOODSERVICE

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

## Meals, snacks and beverages <u>prepared away from home</u>

- Unique channel characteristics:
- – High fragmentation
- – High segmentation
- – Broadly Separated into
  - Commercial
  - Non-Commercial- "On-Site" Feeding- Colleges, Hospitals, Hotels
- – Lack of trade information
  - Little data available; no tracking of product sales
- – Decision makers
  - Distributors attempt to influence, but…
  - The restaurant operator, not the consumer, calls the shots

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com 18

JA116

- Structure & Size
  - Food Service follows a very linear supply chain

Manufacturer → Distributor → Operator → Consumer

  - US Foodservice Market Size

| Manufacturer Shipments/ Distributor Purchases | Operator Purchases | Consumer Purchases/ Retail Sales Equivalent |
|---|---|---|
| $144 B | $166 B | $500 B |

This is roughly equal to retail food sales

Technomic, Inc 2009

B2b

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

## CHANNEL OVERVIEW

- Unique channel characteristics:
  - Business Categories
    - Business that consume products or Services
    - Government Agencies
    - Institutions
    - Resellers
  - Types of Sellers
    - Big Box – Combination of Retail and B2B Redistributors
    - Independent Dealers
  - Lack of trade information
    - Little category data available
    - Dealers protective of sales information
  - Competition
    - Almost all types of businesses purchases something through the Re-Distributors
    - All independent dealers purchase through both Re-distributors but designate first & second call
    - Dealers purchasing from Club and Warehouse are becoming more prevalent
  - Dealer purchasing categories Include:
    - Jan/ San
    - Cleaning & Breakroom
    - Technology
    - Environmental
  - Sales may comprise:
    - Contract business
    - E-commerce and web
    - Catalog sales
  - Vertical Markets Include:
    - Hospitality
    - Education
    - Healthcare
    - State & Local Government
    - Contractors
    - Military
  - Sales Strategy
    - Solution selling
    - Account programs

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 123 of 306

OFFICE/ B2B

## CUSTOMER ENGAGEMENT

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

- Annual Sales Meetings
- National, Regional And Account Show Support
- Various Catalogs And Flyers
- Email Blasts
- Distribution Kits
- Social Media
- Integrated Marketing Campaigns
- Virtual Trade Shows
- Key Supplier Meetings

- HQ Management
- Promotional Programs
- Region, District, Account Manager And End-user Meetings
- Training
- Incentive Programs
- New Item Introductions
- Inside Sales Team Support

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com 21

JA119

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 124 of 306

Compass advantage

CREATIVE SERVICES

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

## Advertising

Introducing
febreze SPORT
WORKS OUT THE ODOR AFTER THE WORKOUT

DON'T FORGET THE BATTERIES THIS SEASON!
SAVE 20% INSTANTLY ON DURACELL
AA/AAA 24 PACK BATTERIES
Offer exclusive online only. Valid on SKUs 867473 & 867474
Order now

Print, Television, Radio, Web, Billboards, Mobile

NEW!
Cure a case of the Mondays!
Get these low catalog prices online at staples.com/orderbyitem

KEEPING IT ALL CLEAN HAS NEVER BEEN EASIER

## Corporate Identity

SPECIALTY MARKETS TEAM
MARS chocolate north america

GONZALES

PATRICK GONZALES PRESIDENT
GONZALES RESEARCH & MARKETING STRATEGIES, INC.

AGAPÉ
Children's Connection
Families Giving + Children Living

Brand Development, Logo Design, Business Card & Letterhead Design, Identity Guidelines

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com 22

JA120

Compass advantage

CREATIVE SERVICES

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

## Web Design & Development

## Email Marketing

Content Development, Navigational Strategy,
Flash Design, Database Programming,
E-commerce, Ongoing site maintenance

## Compass advantage

### CREATIVE SERVICES

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

### Marketing Collateral

Brochures, Sell Sheets, Signs, Posters,
Self-Promotion, Catalogs, Forms,
Invites & Announcements, Flyers & Inserts

### Direct Mail

Merry Christmas with M&M's® Brand Chocolate Candies

ACE Hardware

Win a $200 AMEX gift card to fund an in-store PIZZA PARTY!

Merry Christmas with M&M'S® Brand Chocolate Candies

Win a $200 AMEX gift card to fund an in-store PIZZA PARTY!

Postcards, Sales Letters,
Dimensional Mailers,
Interactive Presentations

Compass advantage

CREATIVE SERVICES

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

## Point-of-Purchase

DEPEND ON TRUSTED POWER

INTERSTATE DURACELL 10% OFF

In-Store Concepts, Product Signage/ Flyers, Tear-away Rebates

## Package/ Display Design

womens TRAVEL PAK Colgate

mens TRAVEL PAK Colgate

Compass advantage

CREATIVE SERVICES

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

## Tradeshows

Stage Design, Collateral, Sales Meetings, Networking Events, Product Launches

## Event Marketing

Sell Sheets, Deal Sheets, Order Forms, Signage/ Banners, Video, Booth Design, Swag

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 129 of 306

Compass advantage

CREATIVE SERVICES

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

## Product Photography

Digital High Resolution Images

## Video / Audio Production

PARTNERS
kindle store

DURACELL

Corporate Presentations, Training, Image Videos, Commercials

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com 27

JA125

Compass advantage

CREATIVE SERVICES

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

## Marketing Strategy

Identifying Target Audience,
Market Research, Competitor Analysis,
Business Naming and Tagline Development

## Merchandising Services

Planograms, Product Assortment,
Category Placement, Shelf & Back Tags

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 131 of 306

Compass MARKETING
INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

## Compass advantage

CREATIVE SERVICES

### Interactive Media

DURACELL BATTERY FINDER
Which M&M's Character Are You?
Take the quiz and get a free bag of NEW Mint Chocolate M&Ms!
Congratulations!
You are Ms. Brown in the Office.
You are a hard working professional, always able to get the job done.
You have a no-nonsense attitude and always have your mind on the task at hand.
Click Here!
Post your results on facebook to receive your FREE BAG of Mint Chocolate M&Ms and be entered to win your lifesize Ms. Brown character display!
your life.
your campus.
your essentials.
test drive the freshness of febreze CAR
NEW!
breathe happy
febreze CAR vent clips

Training Programs, Product Launches, Interactive Catalogs, Corporate Presentations, Social Media

### Brand Development, Positioning and Consulting

Identifying Core Values, Creating Positive Emotional Attachment, Maintaining consistent message across all mediums, etc.

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com 29

JA127

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 132 of 306

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

Compass MARKETING INCORPORATED

# Leveraging the best of Sales, Marketing and Insights to accelerate results in Alternate and Specialty Channels.

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com 30

JA128



We never forget
that half of a
Terminals 2 3 5
Concourses B E F
Gates C1-C19 C
Baggage Claim
Ground Transport
Gate C20
Gates C18,C18a
Customer Service
Center
Compass MARKETING
INCORPORATED
TRANSPORTATION CLASS OF TRADE
(5,732 outlets)
Delaware North Companies
ONSITE NEWS
Hudson News
HDS Retail
North America
HMS
HOST
TRAVEL TRADERS, LLC
THE PARADIES SHOPS
PING GREAT COMPANIES
DO GREAT THINGS

# TRANSPORTATION CLASS OF TRADE

## PROFILE: HUDSON NEWS

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

- Hudson manages a variety stores that anticipate and fulfill the needs of travelers while complementing the design and culture of the areas in which they are located.
- Headquarters:
  - East Rutherford, NJ
- Size:
  - Over 550 newsstands, bookstores, cafes and specialty in 69 airports and transportation terminals throughout the United States and Canada.
- Sales: 201.7M (North America 2008)
- Promotions:
  - Quarterly Dump Bin
  - Cash Wrap Program
  - Sampling
  - Rolling Cart Displays in 150 Stores-Items featured on shelves and 2 side banners
  - Ads on shopping bags-usually periodicals
  - Plasma screen ads.
  - Marquis and Vertical Banner Program
    - Marquis – 42" W x 11" H – 150 locations nationally
    - Vertical – 11" W x 42" – 35 locations nationally
  - Agreements last 3 years
  - Shippers/Clip Strips Trade Show Tie-in
  - In-store scanning
  - Yearly Tradeshow

Hudson News

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 135 of 306

# TRANSPORTATION CLASS OF TRADE

## PROFILE: FABER, COE & GREGG, INC

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

FABER
News - Gifts - Books - Cafés
Since 1848

- News dealers and newsstands
- Headquarters:
  - Secaucus, NJ
- Size:
  - 57 locations in the Northeast and South U.S. including airports, train stations, Hotels, and Office Buildings
- Sales: 28.2M
- Brands:
  - Faber News Now
  - Dunkin Donuts
  - Hugo Boss
  - Taxco Sterling
  - Rosetta Stone
- Distribution
  - Century Distributors
  - Allen Brothers
  - Silverman
  - Auburn Distributors

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com

JA131

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

THE PARADIES SHOPS

Paradies Profile

- Headquarters:
- Atlanta, Georgia
- Size:
- Currently at 450 locations
- Serves more than a half billion customers each year
- Over 24 different store banners

- Primary Location Sites:
- Airports and Hotels

- Promotional Programs:
- Press Express
- Self Serve Essentials (Water & Paper)
- Pink Promotion - October Breast Cancer Month
- Cash Wrap Program

- Miscellaneous:
- Snack POG - Fall 2009
- 32 New stores opening in 2009

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

- HMS Host Profile
- Headquarters: Bethesda, Maryland
- Size:
- Currently @250 store locations and purchasing for another 350 locations within travel plazas that are under their Food & Beverage division
- Z Markets – larger convenience store format – they will have 12 locations by the end of '08
- Volume @ $25,000,000.
- Travel Plazas and Airports
- Cost of new items:
- $100.00 per sku
- Promotional Programs:
- There are 13 Promotional Periods per year
- Cash Wrap at register = $17,000 for a 30 day period – lift is between 250/ 400%
- Candy Wall – cost same as above with lift being between 175/ 350%
- Snack Wall – cost same as above with lift being between 175/ 350%
- HBC Fixture – cost same as above with lift being between 125/ 150%
- Travel Information Network (TIN) – cost is $28,000 for 30 day period on 68 screens for 180,000 GRP's using 15 second spots
- Misc:
- Clips Strips – not used by HOST but will buy them if there isan accompanying promotional allowance – will remove from clip strips and merchandise as needed
- In Store Scanning – currently@75%of their locations are scanning with a target of 100%by end of 2009
- SAP – currently implementing this program
- Data – will consider selling or sharing category data on an individual basis with a manufacturer – with signed confidentiality agreement



Compass MARKETING INCORPORATED

# COLLEGE BOOKSTORE CLASS OF TRADE

(10,589 outlets)

BOOKS·A·MILLION

BARNES & NOBLE
COLLEGE BOOKSELLERS

Nebraska
Book Company

follett
HIGHER EDUCATION GROUP

HELPING **GREAT COMPANIES**
DO **GREAT THINGS**

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com

## BOOKSTORE CLASS OF TRADE

### PROFILE: BARNES & NOBLE COLLEGE BOOKSELLERS

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

Barnes & Noble College Bookstores is the scholastic sister company of Barnes & Noble (B&N), the US's largest bookseller.

- Headquarters:
  - Basking Ridge, NJ
  - 635 Locations in 44 states (500 contain convenience products)
  - Average 10,000 – 20,000 Square feet
- Target Demographic: 4.3 Million students (primarily live on campus), and staff/ family
- 35 years managing on campus college bookstores
- Promotions:
  - Value endcap program
  - Shipper program – Seasonal/ promotional program in 150 stores (400 – 500 stores during "rush") various merchandising and promotional activities
  - Cash Wrap – "on the go" and impulse items merchandised next to store check outs. Cost of program is $8,000 per item in 400 stores for 12 months.
  - Sampling programs – On campus samples of new and priority items
  - Marketing Opportunities – Barnes and Noble Partnership Marketing group can reach students with your message an[illegible] – Steve Schubert
  - Yearly tradeshow

BARNES & NOBLE COLLEGE BOOKSELLERS

## BOOKSTORE CLASS OF TRADE

## PROFILE: FOLLETT

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

follett® HIGHER EDUCATION GROUP

- Headquarters:
  - Oak Brook, IL
  - Manages over 800 college bookstores in North America
- Promotions:
  - fully-integrated online and in-store marketing program
  - supported by advertising and visual merchandising
  - promotional programs tailored to alumni groups
  - Period promotions tied to start of classes, homecoming, holidays etc.
  - Cultural promotions tied to African-American History Month, Women's History Month, etc.



USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 141 of 306

Compass MARKETING
INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

- Nebraska Books Profile

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com 39

JA137

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 142 of 306

Compass MARKETING INCORPORATED

# HOME IMPROVEMENT/ INDEPENDENT HARDWARE FARM AND FLEET CLASS OF TRADE

(37,413 Outlets)

LOWE'S
Let's Build Something Together

THE HOME DEPOT

ACE
The helpful place.

MENARDS
84 LUMBER
True Value
TSC TRACTOR SUPPLY CO

Do it Best

HELPING **GREAT COMPANIES**
DO **GREAT THINGS**

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com 40

JA138

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 143 of 306

INDEPENDENT HARDWARE/ HOME IMPROVEMENT/ FARM AND FLEET CLASS OF TRADE

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

## PROFILE: THE HOME DEPOT

THE
HOME
DEPOT

THE
HOME DEPOT

- Headquarters:
  - Atlanta, GA
- Size:
  - 2,233 worldwide, 1,971 U.S.
- Sales: $71,288.0M (2009)
- Promotions:
  - Circular
  - Free How-To Clinics and Reference Books
  - Do-It-Herself Workshops
  - Kids Workshops
  - Special Services for Professional Customers
  - Commercial credit accounts

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com
41
JA139

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 144 of 306

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

MENARDS

- Headquarters:
  - Eau Claire, WI
- Size:
  - 100 stores throughout 9 states on the east coast
- Sales: $7,800.0M (Estimated) (2008)
- Promotions:
  - Sales Fliers available in electronic and print form
  - Menards is a NASCAR sponsor
  - Menards is EDLP, all promotions are funded by Menards.

MENARDS

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com 42

JA140





USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 145 of 306

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

LOWE'S
Let's Build Something Together

- Headquarters:
- Mooresville, NC
- Size:
- 1,638 U.S. Stores
- Sales: $48,230.0M (2009)
- Promotions:
- Lowe's Credit Cards
- Free email newsletters
- Weekly local ads
- LowesCreativeIdeas.com, how-to video resource
- Targeted direct mail efforts

LOWE'S

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com 43

JA141

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 146 of 306

NAPA
AUTO

PEPBOYS
AUTO
Parts, Service and So Much More
Advance Auto Parts
We're ready in Advance.

Compass MARKETING INCORPORATED

Federated
Auto Parts
PROFESSIONALS

# AUTOMOTIVE CLASS OF TRADE

(16,650 Outlets)

CARQUEST

O'Reilly AUTO PARTS
PROFESSIONAL PARTS PEOPLE
CSK AUTO

AutoZone

HELPING **GREAT COMPANIES**
DO **GREAT THINGS**

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com 44

JA142

## AUTOMOTIVE CLASS OF TRADE
### AUTOZONE

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

AutoZone®

Headquarters
- Memphis, TN

Size
- #1 auto parts retailer in America
- 4,813 Stores (4,534 in U.S, 279 in Mexico)
- Stores typically range from 6,500 – 8,000 sq. ft.
- Over 6 million customers per week
- 70,000 employees

Sales
- $8.60B (2012)

Customer Demographics
- 66% Male, 34% Female
- 34% (18 to 34), 30% (35 to 49)

Promotions
- Clip Strip Program
- Tie-in Promotions
- In-store Circular

## AUTOMOTIVE CLASS OF TRADE

### ADVANCE AUTO PARTS

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

Advance Auto Parts

Headquarters
- Roanoke, VA

Size
- 3,662 Stores (39 States, Puerto Rico, Virgin Islands)
- 55,000 Employees

Sales
- $6.21B (2012)

Promotions
- Weekly Ad (By Location)
- Advance Auto Parts Newsletter
- Advertising plan built around television and radio
- supported by print and in-store signage
- TV advertising is a combination of national and regional media in both sports and entertainment programming.
- Radio advertising airs during peak drive times.
- Sponsor sporting events, racing teams and other events at all levels in a grass-roots effort to positively impact individual communities, including Hispanic and other ethnic communities, to create awareness and drive traffic for our stores.

## AUTOMOTIVE CLASS OF TRADE

PEP BOYS

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

PEPBOYS AUTO

- Headquarters
  - Philadelphia, PA
- Size
  - 738 Stores (35 States and Puerto Rico)
  - 19,123 Employees
- Sales
  - $2.06B (2012)
- Promotions

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 150 of 306

EASTON
Louisville Slugger
TPX

EVERY SEASON STARTS AT DICK'S SPORTING GOODS

REI www.rei.com

Compass MARKETING INCORPORATED

Bass Pro Shops

Academy SPORTS+OUTDOORS

MC SPORTS mcsports.com

'FORE' SUPPLY CO.

# SPORTING GOODS CLASS OF TRADE

HIBBETT SPORTS
SPORTS AUTHORITY
Golfsmith GOLF & TENNIS

Cabela's
WORLD'S FOREMOST OUTFITTER

(21,378 Outlets)

Duffy's
TRI-C CLUB SUPPLY INC.

MODELL'S
SPORTING GOODS
Cotta Co To Mo's

BIG 5 SPORTING GOODS

HELPING GREAT COMPANIES DO GREAT THINGS

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com 48

JA146



## SPORTING GOODS CLASS OF TRADE

### PROFILE: DICK'S SPORTING GOODS

- Headquarters:
  - Pittsburgh, PA
- Size:
  - 384 Stores in 39 states
  - 27,600 employees (2009)
  - Locate stores in primary retail centers with an emphasis on co-tenants including major discount retailers or specialty retailers from other categories
  - Primary prototype store is approximately 50,000 square feet
- Sales: $4.13 Billion (2009)
- Customer Demographics:
  - 53% Male Age: 12-17 (20%), 18-34 (25%), 35-49 (27%), 50+ (17%)
- Promotions:
  - Game-On Circular
  - Email Alerts
  - Catalogs
  - Interactive Store Events

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 152 of 306

## SPORTING GOODS CLASS OF TRADE

### PROFILE: BIG 5 SPORTING GOODS

Compass MARKETING
INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

BIG 5 SPORTING GOODS

- Headquarters:
  - El Segundo, California
- Size:
  - 384 stores mostly in the western U.S.
- Sales: $ 896.81M (2010)
- Promotions:
  - Run Ads every week (sometimes 2x per week)
  - Circulars up to 2x per week.
  - Email marketing, exclusive coupons

BIG 5 SPORTING GOODS

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com

50

JA148







USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 153 of 306

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

Academy
SPORTS+OUTDOORS

- Headquarters:
  - Katy, TX
- Size:
  - 121 stores throughout 11 southern states
- Sales: $$1,840 million (2006)
- Promotions:
  - Weekly Ad by location
  - In store catalogs
  - Academy Sports credit card

Academy
SPORTS+OUTDOORS

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com 51

JA149





USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 154 of 306

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

THE
SPORTS
AUTHORITY

- Headquarters:
- Englewood, CO
- Size:
- Over 450 nationwide
- Sales: $2,980.0M (2008)
- Promotions:
- Coaches Club, savings and special offers for teams

SPORTS
AUTHORITY

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com 52

JA150



USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 155 of 306

Compass MARKETING
INCORPORATED
E-COMMERCE CLASS OF TRADE
amazon.com
drugstore.com
the uncommon drugstore
HELPING GREAT COMPANIES
DO GREAT THINGS

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com 53

JA151

## E-COMMERCE CLASS OF TRADE

## PROFILE: AMAZON.COM

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

amazon.com

- World's biggest online retailer
- 42 product categories
- #1 in customer service
- Most trusted brand in U.S.
- Sales: 2010 Web Sales $32.2B (40% revenue growth in 2010)
- Web Statistics
  - 114M active customers worldwide
  - Largest online retail customer base and growing quickly
  - Average Ticket $185
  - 75 Million monthly unique visitors
  - #5 most visited site in the U.S.
- Target Demographic
  - Site attracts 48% ages 25-44,
  - More educated crowd. 46% Male / 54% Female
- Entire selection of products including all pack sizes
- Integrated sales and marketing solutions with Adzinia in house ad agency and network
- Amazon customers are driven to purchase based on price, selection and convenience
- Top 5 E-Commerce Sites:
  1. Amazon.com
  2. Staples.com
  3. Dell.com
  4. Apple.com
  5. OfficeDepot.com

E-COMMERCE CLASS OF TRADE

PROFILE: DRUGSTORE.COM

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

- Drugstore.com, inc. is a leading online retailer of health, beauty, clinical skincare, vision, and pharmacy products.
- Sales: 2010 web sales $456.51M
- Web Statistics
  - 9 Million monthly visits
  - 5 Million unique visitors
  - Average ticket $66
- Target Demographic:
  - Male – 36%/ Female – 64% 25% ages 35-44
- Promotions:
  - Monthly email campaigns
  - Coupon Availability
  - Certified by the National Association of Boards of Pharmacy (NABP) as a Verified Internet Pharmacy Practice Site (VIPPS)
- Walgreens Acquisition
  - In early 2011, Walgreens agreed to purchase drugstore.com for $429M
  - Acquisition makes drugstore.com a part of the US largest drug retailer
  - Signals Walgreens interest to take a leadership position in e-commerce
  - Walgreens expects the deal to be closed by mid-2011

drugstore.com the uncommon drugstore

E-COMMERCE
CHANNEL GROWTH
Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS
184 Million Online Shoppers
10% of US retails sales are now online
The number of consumers researching or shopping online is steadily growing and will surpass 200 million by 2015
U.S. consumers shopping online, 2009-2015
250
200
150
100
50
0
163.1
172.2
178.5
184.3
189.6
195.4
201.1
85.0%
87.1%
87.5%
88.1%
88.7%
89.4%
90.1%
2009
2010
2011
2012
2013
2014
2015
Number of Shoppers in millions and % of internet users
Source: eMarketer, March 2011



E-COMMERCE

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

- Online interactions and research influences more than half of total U.S. retail sales

Source: Forrester Research: "US Online Retail Forecast, 2010-2015," November 2010

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 160 of 306

## E-COMMERCE

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

- Internet will influence 50% of retail sales in 2012
- 29% increase on in-store sales when consumers are exposed to online advertising
- Internet advertising has surpassed newspaper ad revenues
  - Google brings in more ad revenue than all US print combined

"Every dollar spent online influences $5.77 spent in the store over the next 10 days"

Peter Sachse, CMO of Macy's and CEO of macys.com

Source: Forrester Research, comScore, Statista

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com Multichannel Impact 58

JA156



E-COMMERCE
Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS
CPG Purchases Online
• 2012 online CPG purchases: $17 billion
• 60% used the internet for grocery shopping research
• 49% of internet users have purchased groceries online
U.S. Online CPG Sales ($ Billions)
2006 -2010 CAGR: 20%- 25%
2011 -2014 CAGR: 25%- 30%
$5
$8
$12
$17
$25
2006
2008
2010
2012
2014
Source: comScore: State of the US Online Retail Economy in Q1 2011, Nielsen 8/12
COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com
Cpg sales 59



# THREE CORE DRIVERS FOR ONLINE PURCHASING

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

## Reasons for Shopping Online

(Factors that Are "Very Important" – ShopperScape, July 2011)

**Pricing critical, but shoppers are looking to save both time & money by shopping online**

Source: Kantar Retail analysis, Kantar Retail ShopperScape®, July 2011, Compete – Fall 2011

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

# Average Transaction Size

## Food & Beverage

~$80 Online

~$30 Offline

## HBA

~$30 Online

~$10 Offline

Source: Nielsen

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 164 of 306

## E-COMMERCE
### CHANNEL POTENTIAL

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

Walmart
Save money. Live better.

" In global e-commerce, we will not just be competing. We will play to win."

" With our stores and low prices, we can really take advantage of mobile technology and this era of price transparency. We can combine our stores, our systems, and our logistics expertise into one continuous channel to drive growth and serve the Next Generation Customer around the world."

Mike Duke
President & CEO - Walmart Stores Inc.
June 3, 2011 Annual Shareholders Meeting

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com 62

JA160

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 165 of 306

E-COMMERCE
CHANNEL POTENTIAL

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

P&G

"We do about a half billion dollars a year on the internet today, and we think the growth of the business can be multiples of 10, not index points"

Bob McDonald
Chairman, President & CEO
Procter & Gamble

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com 63

JA161

## UNIQUE CHANNEL ATTRIBUTES

- Shopper Communication
  - Unparalleled convergence of sales, marketing and advertising
  - Ability to target consumers demographically and behaviorally
  - Ability to communicate with shoppers at all points along path to purchase
    - Create interruption points to drive impulse
  - Substantial ability to show detailed product description, attributes, images and video, etc.
  - Recommendation engines deliver highly relevant content that consumers want to receive
  - Going beyond opt in—permission based marketing
- Logistics
  - Open 24/7
  - Unlimited selection
  - No slotting fees
  - No display rack and shipper expense
  - Free Shipping (nearly 50% purchases)
  - Instantaneous (one click) check-out
  - Hassel free checkout—no lines and stored credit information
  - Branded packaging opportunities--unboxing moments
  - Pre-purchase commitments

## E-COMMERCE

### UNIQUE CHANNEL ATTRIBUTES

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

- Dual Marketing and Sales Environment
  - New Amazon audience extension program
    Buy now advertising across 40,000 sites
    - Ability to achieve brand goals and drive instant sales
  - Adjacent reviews impacting purchasing decisions
    - Amazon allows brands to comment on reviews and engage in dialog
    - Vine program allows reviews to populate before product launch
  - Fast growing- 15% YOY (3x traditional); 25% for CPG
  - Essential stop on path to purchase influencing 50% all retail sales
  - Multichannel partnerships w/ FDM customers- Walmart, Sam's, Costco, etc.
  - Structural and long-term advantages to those that invest early
  - Real-time market basket, category sales, shopper insights and consumer data
  - Dynamic merchandizing providing optimal consumer benefit

E-COMMERCE

TARGETS

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS
































Compass MARKETING
INCORPORATED
amazon.com | E-RETAILER PROFILE
HELPING GREAT COMPANIES
DO GREAT THINGS

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 170 of 306

E-RETAILER PROFILE

amazon.com

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

# "If it has a UPC code, Amazon will beat you."

~Anonymous competitor

Source: Chris Dixon's Blog

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com 68

JA166

E-RETAILER PROFILE
amazon.com
Compass MARKETING
INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS
The Amazon Virtuous Cycle
LOWER COST STRUCTURE
LOWER PRICES
Selection
CUSTOMER EXPERIENCE
GROWTH
SELLERS
TRAFFIC
COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com
69



## E-RETAILER PROFILE

amazon.com

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

- World's top e-tailer
  - $61B Revenue (2012)
    - 7x bigger than #2 ecommerce site Staples.com
  - 27% revenue growth in 2012
  - Fortune #56 in 2012
  - Worldwide active customer accounts exceeded 200 million +22% YoY
- 4% conversion rate
  - 91.6 million unique daily shoppers in US
- World's top product research hub
  - 30% of all product searches start at Amazon in US
- Amazon derives 33% of listings from 2,000,000 affiliate marketing reps called "Amazon Associates" and third-party sellers

Source: Internet Retailer, Amazon.com Investor Relations, Millward Brown, comscore, Compete, Kantar Retail

## THIRD PARTIES

### WHAT IS A THIRD PARTY AND WHY DOES IT MATTER?

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

Shipped and Sold by Amazon.com:

Shipped and Sold by 3rd Party Seller:

Snickers Minis - 50 oz
by Snickers
Be the first to review this item | Like (0)
List Price: ~~$29.99~~
Price: $17.99 ($0.36 / oz)
You Save: $12.00 (40%)
In Stock.
Ships from and sold by The Natural Health Shoppe.

?

4 of 4 people found the following review helpful:
★☆☆☆☆ **Crushed peanuts**, June 23, 2011
By **retailgirlchang** - See all my reviews
Amazon Verified Purchase (What's this?)
This review is from: **M & M's Peanut 56 Ounce Bag (Misc.)**
I love peanut M&M's and buy it all the time. I thought that I could just buy a big bag so I didn't run out but it was not worth it. It's more expensive (and I don't have to pay for shipping b/c I'm Prime), which is okay with b/c it's hard for me to get to the store and I wanted it fast. The 1 star rating is b/c 25% of the candy came crushed and left a mess when I opened the bag. I think that there were melting issues and with the weight, some pieces just cracked. I will not buy again.
Help other customers find the most helpful reviews | Report abuse | Permalink
Was this review helpful to you? Yes No | Comment

Negative reviews and poor product page leads to negative brand impression



# E-RETAILER PROFILE amazon.com

## GROWTH IN CONSUMABLES AT AMAZON

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

Number of Amazon shoppers in consumables has grown
82% YOY
2%
September, 2010
3.6%
March, 2011
4%
September 2011
10%
December 2012
CPG Customer % By Product Group
Health & Personal Care
Beauty
Grocery
Baby
39%
30%
16%
15%

Source: Amazon Internal Data, US only – customers who made at least one purchase in Personal & Health Care, Beauty or Baby (CPG). US only – customers who made at least one purchase

E-RETAILER PROFILE I amazon.com
EARLY INVESTMENT DRIVES LONG TERM ADVANTAGES
Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS
Additional subsequent sales
amazon
Improved
Sales rank & positioning
Direct
Sales & customer reviews
Boost
Traffic & Searches
Increase
Product- & Brandawareness
Start Advertising
Source: Amazon Internal Data
COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com

WINNING PROFILE I amazon.com

DESIGNING FOR THE ONLINE SHELF

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

Online Shelf

- Convergence of sales and marketing – earned media
- Rich content, A+ content – can by dynamic across multiple retailers
- Unlimited shelf space, but instead of slotting fees there are structural costs— recommendation engines, product placements, search engines
  - 6% of revenue back into marketing and rec engines

A+ Detail Pages

Product Placement on the Virtual Shelf

Source: Amazon Internal Data

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 177 of 306

WINNING PROFILE I amazon.com

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

## LEVERAGING DUAL MERCHANDIZING AND MARKETING ENVIRONMENT

Multi-Disciplined Approach to Success

- Targeting based on behavior, not just demographics
- Engage consumers when they are in-market
- Off-line impact of online effort
- Ability to take consumer out of decision making process--SNS
- Amazon Media Group Advertising Network
- SEO and paid search

Why Keep Running Out?
Back-to-School Sweepstakes
Extra 25% Off
Frosted Mini-Wheats
Subscribe & Save
Vendor Coupons
Recommendation Engines

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com

JA173

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 178 of 306

WINNING PROFILE I amazon.com
COMPETING IN A NEW RETAIL CHANNEL

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

## Subscribe & Save attracts Amazon's best customers

- SnS customers are some of Amazon's most **valuable** customers
- SnS customers are some of Amazon's most **frequent** shoppers

- 7 X spending of an average Amazon.com customer
- 40 X consumables spending of an average Amazon.com customer

- 5 X frequency of an average Amazon.com customer

4/12/2012 Amazon.com Confidential 4

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com

JA174

# WINNING PROFILE | amazon.com

## COMPETING IN A NEW RETAIL CHANNEL

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

WINNING PROFILE | amazon.com

COMPETING IN A NEW RETAIL CHANNEL

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

Best Practices

- Structural and long term advantages to those that invest early
- Appropriately fund unique opportunities
- Leverage investments to influence sales offline
- Merchandising Matters: 13% lift in COGS post merch implementation

***"Gluten Free" is second most searched term in Amazon Grocery. Added SEO terms to Kettle and participated in Gluten Free Month promotion. Sales are 3x per month higher today than when Compass was first engaged 10 months ago.***

COMPASS ADVANTAGE

PROTECTING THE BRAND

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

Before:

After:

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 182 of 306

WINNING PROFILE I amazon.com

ADD-ON PROGRAM

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

Add-on Program

- Compass partnered with Amazon to launch Add-on Store
- 30% of top 50 SKUs were Compass
- First successful movement of eaches on the web
- Increased velocity and right sizing

amazon Prime
Patrick's Amazon.com | Today's Deals | Gift Cards | Help
Search Snacks
Go
Hello, Patrick Your Account
Cart
Wish List
Amazon Gift Cards for Dad
Grocery & Gourmet Food Best Sellers Breakfast Foods Beverages International Foods Snacks & Candy Gifts & Flowers Natural & Organic Special Offers Wine & Spirits
Grocery & Gourmet Food › Snack Food › Advanced Search
Showing 1 - 24 of 91 Results
Sort by Popularity
Department
Snack Food
Chips (2)
Crackers (14)
Fruit Leather (4)
Party Mix (61)
Popcorn (3)
Puffed Snacks (3)
Trail Mix (1)
Specialty
Gluten-Free (24)
Low-Fat (1)
Natural (3)
Organic (4)
Sugar-Free (1)
Amazon Prime
Brand
Happy Munchies (1)
Happy Times (1)
Flavor Ice (1)
Diamond (18)
See more...
Avg. Customer Review
Happy Munchies Apple and Kale Puffed Corn Snacks, 1.4-Ounce
$3.45 Add-on Item
Add it to a qualifying order within 8 hours to get it by Monday, Jun 18
Show only Happy Munchies items
Happy Times Crazy Crunchies, Freeze-Dried Carrot Apple Bits, 1.1-Ounce Package
$5.23 Add-on Item
Add it to a qualifying order within 7 hours to get it by Monday, Jun 18
Show only Happy Times items
Flavor Ice Tropical Flavors, 100-Count
$9.84 $7.57 Add-on Item
Add it to a qualifying order within 4 hours to get it by Monday, Jun 18
Show only Flavor Ice items
Pop-Secret Fat Free Kettle Popcorn
Add it to a qualifying order within 7 hours to get it by Monday, Jun 18
Show only Pop Secret items
Diamond Sliced Almonds, 10-Ounce
Add it to a qualifying order within 7 hours to get it by Monday, Jun 18
Show only Diamond items
$6.65 $3.42 Add-on Item
Add it to a qualifying order within 7 hours to get it by Monday, Jun 18
Show only Diamond items

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com

JA178

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 183 of 306

WINNING PROFILE | amazon.com

BUILDING BRANDS

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

## Nectresse Product Launch

- Vine preload
- AMG Campaign to drive awareness
  - 30% of AMG clicks read all reviews Combat Google problem, target right people
  - Same CTR as NYNY and 1.6x CPG average
- Cannibalization analysis
  - No overlap in alt purchase/item view pre purchase

amazon
Off to College
TEXTBOOKS
The Kindle Family
Kindle $79
Kindle Touch $99
Kindle Fire $199
nectresse
NEW!
100% Natural
Zero Calories Per Serving
The Rich, Sweet Taste of Sugar
Made From Monk Fruit
SAVE 30%
Shop Now
DENIM SHOP
Introducing Nest
UP TO 25% OFF
LEVI'S
More Items to Consider

Compass Creative Services created the Nectresse display advertising to launch the brand online, pageviews have increased 4x.

Source: Amazon Internal Data

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com

JA179



USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 184 of 306

# WINNING PROFILE I amazon.com

## BUILDING BRAND AWARENESS THROUGH ADJACENCY

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

Hero Quick Promo 18 Months Ago
Item Detail Page Today
Sugar In The Raw Single Serve Packets (Pack of 400)
List Price: $15.99
Price: $12.72
You Save: $3.27 (20%)
In Stock.
Extra 30% Off Splenda Sweetener
Product Features
Pack of four hundred, 0.16-ounce per unit(a total of 64 ounces)
Never bleached or over processed
Allowing the golden crystals to retain their natural molasses
Brings out the extra flavor and richness that nature intended
Frequently Bought Together
Customers Who Bought This Item Also Bought
Important Information

***Targeted display ads, derived by analyzing market basket data, have resulted in 6x lift in the number of Splenda 400ct purchasers who have viewed Sugar in the Raw page and residual impact has resulted in Splenda branding on Sugar item detail page***

Source: Amazon Internal Data

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com

JA180

WINNING PROFILE I amazon.com

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

## ANALYST TEAM TO DRIVE SALES AND PROVIDE INSIGHTS

- Compass Analysts maintain personas on slickdeals.net and other sites to drive organic traffic to J&J brands
- Recently built Visual Basic program to expedite gap analysis and replenishment status challenges

E-COMMERCE

LONG TAIL OF SUBSCRIPTION PROMOTIONS

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

- By driving SNS participation, promotions have a long-term impact on sales
- The base is often reset higher
- Sales up 3.5x in fewer than two years

Splenda COGS

Dec-10
Jan-11
Feb-11
Mar-11
Apr-11
May-11
Jun-11
Jul-11
Aug-11
Sep-11
Oct-11
Nov-11
Dec-11
Jan-12
Feb-12
Mar-12
Apr-12
May-12
Jun-12
Jul-12
Aug-12
Sep-12
Oct-12

Source: Compass Research, Amazon Internal Data

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 187 of 306

WINNING PROFILE I amazon.com

OPTIMIZING FOR CONSUMER DIRECT SUPPLY CHAIN

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

Internet Packaging

- Cost savings to manufacturer, customer and retailer
- Better customer experience leads to better reviews
- More sales
- Stronger partnership with Amazon--Merchandizing

| K-Cup Example | Traditional Package | Frustration-Free Package | Savings / Change |
|---|---|---|---|
| Package Weight | .55 | .45 | 17% |
| Number of Pack. Pieces | 4 | 1 | 75% |
| Shippable Packaging | No | Yes | Overbox |

Costs of Prep

- Bagging $.44
- Bubble Wrap $.70
- Boxing $1.20
- Stickering $.24

Source: Amazon Internal Data

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com

JA183

WINNING PROFILE I amazon.com
OPTIMIZING FOR CONSUMER DIRECT SUPPLY CHAIN
Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS
amazon.com
IN THE UNITED STATES
AMAZON CORPORATE HEADQUARTERS
AMAZON FRESH HQ & FULFILLMENT CENTER
AMAZON FULFILLMENT CENTERS
FUTURE FULFILLMENT CENTERS
FULFILLMENT CENTERS WITH GROCERY
FULFILLMENT CENTER OPENINGS BY YEAR
1997: 2
1999: 6
2000: 1
2003: 1
2005: 3
2006: 1
2007: 3
2008: 5
2010: 3
2011: 9
2012: 7
2013: 2 (PLANNED AS OF JULY 2012)
* TOTAL # OF OPENINGS DOES NOT MATCH NUMBER OF LOCATIONS ON MAP DUE TO CLOSINGS
SOURCES: FULFILLMENT CENTER ADDRESS LIST (AMAZON VENDOR CENTRAL), MWPVL INTERNATIONAL INC. (HTTP://WWW.MWPVL.COM/HTML/AMAZON_COM.HTML), BUSINESSWIRE ARTICLES ABOUT FUTURE OPENINGS
COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 189 of 306

WINNING PROFILE I amazon.com

LEVERAGING ANALYTICS

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

- Market Basket
- Page Views
- Conversion
- Trends vs Category
- Trends vs Competitors
- Category Share
- Geographic Sales
- Real-time Sales
- Item View Pre-purchase
- Search Terms
- Alternate Purchase

Pageviews up 230%

Uniques up 375%

Sales up 45%

Conversion percentile 93%

Trailing 30 Days Traffic and Sales
Ordered Amount, Shipped Amount
Page Views Index, Unique Visitors Index
Activity Day
Page Views Index
Unique Visitors Index
Ordered Amount
Shipped Amount

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com

JA185

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 190 of 306

E-COMMERCE

## THANKSGIVING WEEK

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

- Thanksgiving Day
  - Online sales increased 32% to 633 million
- Black Friday
  - Online sales increased 26% to $1.024 billion
- Cyber Monday
  - 17% increase in online sales to $1.98 billion
  - Sales from mobile devices, including tablets, is now 30% (17% in 2011)
  - 52% increase in Amazon sales

Sources: comScore, Bloomberg, CNBC, TechCrunch, Reuters, Adobe, Channel Advisor

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com 88

JA186

Compass MARKETING
INCORPORATED
amazon.com
| WHAT'S NEXT
HELPING GREAT COMPANIES
DO GREAT THINGS
COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 192 of 306

## WHAT'S NEXT | MOBILE

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

- US Mobile Commerce sales grew 91% to $6.7 billion in 2011
- 80% of smartphone users shopped with their phone in July 2012
  - Amazon accounted for 50% of the traffic

Price Check for iPhone and Android

Is that deal really a deal? Take Price Check by Amazon with you to make sure.

Get extra savings on December 10

Get a 5% discount (up to $5) on select items in electronics, toys, sports, music, and DVDs, just by checking a price. Redeem this offer up to (3) times - a savings of up to $15. Just look for the "Get deal" button on qualifying products.

Check prices instantly: Scan It, Snap It, Say It or Type It

Use barcode scanning, camera, speech or text search to find the lowest prices from Amazon.com and our merchants.

Share in-store prices

With every in-store price you share, you help ensure our prices remain competitive for our customers.

Download the free Price Check app to get started

If you're already a Price Check user, simply download the latest version.

Available on the iPhone
App Store

amazon
apps

Download from the Amazon Appstore for Android

Search for "Price Check by Amazon" in the Android Market

Source: eMarketer, Dec 2011; Amazon, Internet Retailer

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com 90

JA188

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 193 of 306

WHAT'S NEXT I amazon.com

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

## Amazon Grocery

- Recipes
- Triggers on grills, cooking items
- B2B/ Food Service
- Targeted, opt-in sampling
- Basket building for holidays—virtual bundles
- Rich content, html and videos
- Targeting key demos, ie Moms, students

Amazon Grocery Coupons
Grocery & Gourmet Food
Browse our selection of beverages, breakfast foods, coffee, snacks and more.
Spice Collections
Buy 6 select McCormick spices and save 15%
Subscribe & Save: up to 15%
Coupons for You
New to Grocery
Coffee, Tea, Beverages, Coconut Water, Snack Foods
Baking Products, Breakfast Foods, Breakfast & Cereal Bars, Chocolate, Candy & Gum
Gourmet Gifts, Baby Food, Pasta, Boxed Meals, Herbs, Spices & Seasonings

Source: Amazon Internal Data

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com

JA189

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 194 of 306

WHAT'S NEXT | amazon fresh

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

Amazon Fresh

- Full line home grocery service to 1.5mm Seattle residents
- Own fleet of Amazon trucks
- Convenience Driven—pre dawn is most popular delivery option.
- 14% of orders are via mobile
  - 40 second goal
- 40 software developers on staff and plan to double this year
- Aggressive expansion planned

Source: Amazon Internal Data

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com

JA190

WHAT'S NEXT | amazon fresh
Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS
Amazon Fresh Recipe Initiative
• Custom to the user
• Basket building
• Quick meals
• Instant adds to the cart
Shop
Past Purchases
Seattle Spotlight
Your Lists
Deals
Automatic Delivery
Summer Fettucine
Ingredients
12 ounces fettuccine (3/4 box)
1 tablespoon olive oil
2 leeks (white and light green parts)
4 cloves garlic, thinly sliced
kosher salt and black pepper*
1 cup corn kernels (from 1 to 2 ears, or frozen)
3/4 cup Organic Valley Heavy Whipping Cream, 1 Pint
2 cups baby arugula (1 1/2 ounces)
1/4 cup Organic Valley, Shredded Parmesan Cheese
9 of 10 ingredients available below
Add All Available Items to Cart
Related Items
Proceed to Checkout
Subtotal $75.10
(24 items)
Source: Amazon Internal Data
COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 196 of 306

WHAT'S NEXT | amazonsupply beta

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

Amazon Supply

- Aimed at business, scientific, food service, and commercial customers
- More than 500,000 items, same shipping terms as .com, offers lines of credit
- Will be implementing SNS, product accessibility by customer, contract pricing
- Fastest growing category in Amazon, contractual pricing by end of year, EDI punch out done by this year.

Source: Amazon Internal Data

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com

JA192

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 197 of 306

WHAT'S NEXT I amazonmarketingservices

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

## Amazon Marketing Services

- Brand stores just launched
- Compass was pre-launch partner and provided recommendations to product manager
- Convergence of sales and marketing
- Couponing and ad platforms still to launch

amazonmarketingservices FAQ Register Your Brand Sign In

**Grow Your Brand with Amazon.com**

Amazon Marketing Services is a suite of self-service tools that enhance your ability to meet your marketing objectives. Encourage customers to learn about your brand and buy your products with free, customizable Amazon Pages. Use Amazon Posts to deliver social content to current and potential customers. Measure your impact and learn about your audience with Amazon Analytics.

Register your brand

Registration is free. We review all applications to help ensure access by authorized representatives only.

**Amazon Pages**

Reach Amazon.com customers on your dedicated landing page.

Learn more

**Amazon Posts**

Engage your audience on Amazon and Facebook using enhanced social messaging tools.

Learn more

**Amazon Analytics**

Deliver marketing that works. Measure your impact and refine your efforts to drive results.

Learn more

Source: Amazon Internal Data

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com

JA193

## GROWTH POTENTIALI

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

### Amazon US Growth Potential

$120,000,000
$100,000,000
$80,000,000
$60,000,000
$40,000,000
$20,000,000
$-
2009 2010 2011 2012 2013 2014 2015 2016 2017 2018 2019 2020 2021 2022 2023 2024
$106,998,432
$84,459,876
$66,763,627
$52,852,046
$40,655,420
$31,273,400
$24,056,461
$18,018,785
$13,513,328
$10,146,814
$7,094,167
$3,520,194
$596,078
$138,945
$139,361
$77,821
Total Domestic
Fresh
Amazon.com

Source: Amazon Internal Data

# E-COMMERCE SERVICES

## BEST IN CLASS PROCESS MANAGEMENT

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

### Product Placement

- ID Key Retailers
- HQ Buyer Assessment
- Category Assessment(s)
- Product Registration
  - Dimensions
  - Descriptions
  - Images
  - Unique Attributes
  - ID Potential MSRP--Bundling
- Merchandising
  - Category Placement
  - Information Architecture
  - SEO
  - Adjacency
- Develop Digital Planogram

### Promotion

- Category Analysis
- Demographic Assessment
- Calendar Alignment
- Targeting Options
  - Behavioral
  - Demographic
  - Search
  - Retargeting
  - Geography
  - E-mail Follow-Up
  - Market basket
  - Browse History
- A/B Test & Learn
- Purchase Subscription
- Seed Reviews (Vine)
- Social Media Tie-in
- Mobile Media Opportunities

### Analytics

- Market Basket
- Search Terms
- Alternate Purchases
- Pre Purchase Views
- Compare to FDM
- Page Views
- Conversions
- Geographic
- Inventory projections
- Index Sales and Conversions to Category
- Competitor Comparisons

### Customer Service

- Inventory Management
- PO Management
- Fulfillment Management
- Invoice Reconciliation
- Implement Price Increases
- Co-op Agreements
- Deduction Reconciliation
- Invoicing Support
- ASN Support
- Shipping Logistics
- Vendor Scorecard Management
- Supply Chain Logistics



Compass MARKETING
INCORPORATED
CLIENT SUCCESSES
HELPING GREAT COMPANIES
DO GREAT THINGS
COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 201 of 306

CLIENT SUCCESSES

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

CLIENT CHALLENGE

- Open new and create new points of distribution for new trial & travel products from Tide, Pringles, Crest, Scope and Gillette.

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com

JA197

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 202 of 306

CLIENT SUCCESSES

ACCOMPLISHMENTS

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

## 84,142 New Doors

- Pringles
  - Number of Doors – 20,07
- Tide to Go
  - Number of Doors – 7,773
- Duracell
  - Number of Doors – 16,257
- Trial Size/ HBC
  - Number of Doors – 40,040

Pringles
Febreze TO GO
DURACELL
COPPERTOP
Tide to Go
Professional
SCOPE
Gillette
Foam
Regular
Crest
cavity protection

**_42% Growth in Number of Doors!_**

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com

JA198



USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 203 of 306

CLIENT SUCCESSES

CUSTOMER CHALLENGE

LOWE'S
Let's Build Something Together

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

# Convince Lowe's to add Consumer Products.

Paint
NICKELODEON

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com

JA199

# CLIENT SUCCESSES

## LOWES

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

- 1,710 Locations

**HBA POG**

2 Locations by 2 high velocity registers

(shelf image may not be correct)

| POG from Left to Right | Description | Manufacturer Name |
|---|---|---|
| 1 | ADVIL VIAL 10PC PEG 12CT-015110 | PFIZER |
| 2 | TYLENOL ES GO PACK 6PC 6CT-044406 | JOHNSON AND JOHNSON |
| 3 | ALEVE TABLET 10PC VIAL PEG 6CT-53935 | BAYER HEALTHCARE |
| 4 | CLARITIN ALLERGY 10MG 5PC 6CT-80317 | MERCK |
| 5 | ZYRTEC ALLERGY 24HR 3PC- 6CT 020443 | JOHNSON AND JOHNSON |
| 6 | ALKA SELTZER PLS COUGH COLD LIQ GEL 10CT-54264 | BAYER HEALTHCARE |
| 7 | HALLS STICK CHERRY 9PC 20CT-6247600 | CADBURY ADAMS |
| 8 | PEPTO BISMOL ORIG CHEWABLE 12PC 8CT-32040 | PROCTER AND GAMBLE |
| 9 | TUMS ULTRA ASSRT BERRY ROLL 12CT-074670 | GLAXOSMITHKLINE |
| 10 | J&J FIRST AIDE TRAVEL KIT 6CT-008295 | JOHNSON AND JOHNSON |
| 11 | NEOSPORIN OTG .5OZ - 6CT 23740 | JOHNSON AND JOHNSON |
| 12 | BLISTEX MEDICATED LIP SPF15 CARD .15OZ 24CT-83120 | BLISTEX |
| 13 | VISINE OTG ADVANCE RELIEF .28OZ - 6CT 08146 | JOHNSON AND JOHNSON |

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 205 of 306

## CLIENT SUCCESSES

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

- Pro-Contractor Set located at checkout (Mars 15 items, Kellogg's 9 items, J&J 1 item, Diamond Foods 1 item, P&G 1 item)

THE HOME DEPOT
Slim Jim
Lay's
Doritos
Fritos
Cheetos
Combos
BIGS
18 / 8343 16
18 / 8343 16
Skittles
Twizzlers
SNICKERS
Twix
Reese's
Pop-Tarts
CLIF

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com

JA201





USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 206 of 306

Compass MARKETING
MERCHANDISING SERVICES

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

- Space Management Services
  - Maintain all 3 POG software systems
    - SpaceMan, SpacePlan-JDA, Apollo
  - Output in all 3 Formats

SEG 2 ROW 10 COL 2
New!
Gillette for Women
Venus
8
VENUS CARTRIDGES V8 CT EAS 4008
047400141308 48274711 11/03
9

- Image Merchandising Solutions
  - Pre-printed shelf strips/peg tags displaying product images and/or price stickers.
  - Help maintain POG compliance by visually displaying proper shelf spacing and placement.

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com

JA202

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 207 of 306

Compass MARKETING
MERCHANDISING SERVICES
HELPING GREAT COMPANIES DO GREAT THINGS
Image Merchandising Solutions
The turn-key solution that delivers the value of images in the store.
SEG 1 ROW 1 COLUMN 1
M&M PEANUT 5 OZ PEG BAG
040000017325 455725 05/09
2
SEG 2 ROW 10 COL 2
New!
Gillette for Women
Venus
VENUS CARTRIDGES V8 CT EAS 4008
047400141308 48274711 11/03
9

$0.99
REGULAR 3½
$1.99
ICE BREAKERS MINTS
COOL MINT
3400000774 183046
04/04
79¢
TIC TAC MINTS
ORANGE
980000003 060269
04/04
79¢
MENTOS CINNAMON
7339000157 526186
04/04
79¢
MENTOS MINT
7339000153 235531
04/04

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com

JA203

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 208 of 306

COMPASS MERCHANDISING SERVICES

CATEGORY CAPTAIN

Compass MARKETING INCORPORATED

HELPING GREAT COMPANIES DO GREAT THINGS

BARNES & NOBLE COLLEGE BOOKSELLERS

From: Lisa Shapiro [mailto:lsshpr@yahoo.com]
Sent: Tuesday, February 02, 2010 9:18 AM
To: John Adams
Subject:

John:

Compass Marketing is the Category Captain of the Health and Beauty section for Barnes & Noble College Booksellers.
Thank you for all your support!!

Lisa M. Shapiro
Merchandise Manager, Food and Beverage

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com

JA204

BARNES & NOBLE
COLLEGE BOOKSELLERS

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS



WHY THE COMPASS TEAM?

# BECAUSE WE . . .

Compass MARKETING INCORPORATED
HELPING GREAT COMPANIES DO GREAT THINGS

- Have over 300 years of combined Consumer Product Goods industry experience.
- Have and seek out relationships with our customer's senior management (i.e. Staples, QVC, OfficeMax, Hudson News).
- Are often designated as category captains for Consumer Product Goods by our customers.
- Have a full-service marketing department.
- Are uniquely positioned to leverage each customer's business units because of our many clients and customer knowledge and expertise.
- Understand the complexity of our customers and develop unique logistical solutions.

  We know the ins/outs of our customer's routing guides, ordering processes, distribution processes, hierarchy, labeling requirements, special pack sizes, promotions, unique payment terms, credit applications.
- Represent a growing and diverse bag of key CPG Brands that our customers know and respect and need.
- Call on our customers every month and often host Vendor Days at Compass.



USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 211 of 306

Compass MARKETING INCORPORATED

# THANK YOU!

HELPING **GREAT COMPANIES** DO **GREAT THINGS**

COMPASS MARKETING, INC. / 222 SEVERN AVE. SUITE 200 / ANNAPOLIS, MD 21403 / 410.268.0030 / www.compassmarketinginc.com 110

JA207

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **COMPASS MARKETING, INC.** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Case Number: 1:22-cv-00379-JKB** |
| **FLYWHEEL DIGITAL LLC, *et al.*** | * | |
| **Defendants.** | * | |

* * * * * * * * * * * * *

**DECLARATION OF G. STEWART WEBB, JR.**

G. STEWART WEBB, JR. declares under penalty of perjury pursuant to 28 U.S.C. § 1746 as follows:

1. I am a member of the law firm of Venable LLP, which represents defendants James C. DiPaula, Jr., Patrick Miller, Flywheel Digital LLC, and Ascential PLC in the above-captioned matter. As such, I am familiar with the facts and circumstances of this proceeding. I respectfully submit this declaration in support of the above mentioned Defendants' motion to dismiss the complaint (the "Complaint") filed by plaintiff Compass Marketing, Inc. ("Compass") in this matter.

2. Attached as Exhibit 1 is a true and correct copy of the "Agreement Relating to Employment and Post Employment" between Mr. DiPaula and Compass, dated February 24, 2010.

3. Attached as Exhibit 2 is a true and correct copy of the PowerPoint presentation referenced in paragraph 186 of the Complaint and available electronically at:

https://www.digitalgrocerysummit.com/presentations.

4. Attached as Exhibit 3 is a true and correct copy of an article published by Patrick Miller entitled "The Future of Amazon Fresh?" on August 25, 2015, which is referenced in paragraph 184 of the Complaint and available electronically at: https://www.profitero.com/2015/08/the-future-of-amazon-fresh/

5. Attached as Exhibit 4 is a true and correct copy of an email titled "E-commerce spin-off follow-up," sent by Mr. DiPaula to John White on October 1, 2014, as referenced in paragraphs 78 and 79 of the complaint.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 4, 2022.

/s/ G. Stewart Webb, Jr.

VENABLE LLP
G. Stewart Webb, Jr. (Bar No. 00828)
750 East Pratt Street, Suite 900
Baltimore, Maryland 21202-3142
Telephone: (410) 244-7400
Fax: (410) 244-7742
gswebb@venable.com

# EXHIBIT 1

# COMPASS MARKETING, INC

# AGREEMENT RELATING TO EMPLOYMENT AND POST EMPLOYMENT

This Agreement is between James Chip DiPaula, the undersigned individual ("Employee") and COMPASS MARKETING, INC ("COMPASS").

## RECITALS

WHEREAS, COMPASS is a leading provider of consumer products and more specifically, the marketing, distribution and sales services to retailers and non-traditional or alternative distributors in the following categories: food, consumer products, health-beauty care, over the counter medicine and pet care.

WHEREAS, COMPASS has a proprietary interest in its business and financial plans and systems, methods of operation and other secret and confidential information, knowledge and data ("Proprietary Information") which includes, but is not limited to, all confidential, proprietary or non-public information, ideas and concepts, client names and contact information, annual and strategic business plans; financial plans, reports and systems including, profit and loss statements, sales, accounting forms and procedures and other information regarding costs, pricing and the financial condition of COMPASS and its business segments and groups; management development reviews, including information regarding the capabilities and experience of COMPASS employees; intellectual property including research and development, reports, protocols, computer software and databases: information regarding COMPASS's relationships with its clients, customers, and suppliers and prospective clients, partners, customers and suppliers, policy and procedure manuals, information regarding materials and documents in any form or medium (including oral, written, tangible. intangible, or electronic) concerning any of the above, or any past, current or future business activities of COMPASS that is not publicly available; compensation, recruiting and training, and human resource policies and procedures; and data compilations, research, reports, structures, compounds, techniques, methods, processes, and know-how.

WHEREAS, all such Proprietary Information is developed at great expense to COMPASS and is considered by COMPASS to be confidential trade secrets;

WHEREAS, Employee will have access to COMPASS's Proprietary Information, directly in the course of Employee's employment, and indirectly through interaction with and presentations by other COMPASS employees;

WHEREAS, COMPASS will introduce Employee to COMPASS clients, customers, suppliers and others and potential clients, customers, suppliers and others, and will encourage, and provide resources for, Employee to develop personal relationships with COMPASS's clients, customers, suppliers and others and potential clients, customers, suppliers and others;

WHEREAS, COMPASS will provide specialized training and skills to Employee in connection with the performance of Employee's duties at COMPASS which training involves the disclosure by COMPASS to Employee of Proprietary Information;

NOW, THEREFORE, in consideration of a one time payment of $1,000.00 (one thousand U.S. dollars) and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, whether or not, if paid by check, said check is cashed by Employee, Employee agrees to enter into this Agreement with COMPASS. Intending to be legally bound, the parties agree as follows:

**ARTICLE 1. NON-DISCLOSURE AND NON-DISPARAGEMENT:** Employee shall not, during or after termination of employment, directly or indirectly, in any manner utilize or disclose to any person, firm, corporation, association or other entity, except where required by law, any Proprietary Information which is not generally known to the public, or has not otherwise been disclosed or recognized as standard practice in the industries in which COMPASS is engaged. Employee shall, during and after termination of employment, refrain from making any statements or comments of a defamatory or disparaging nature to any third party regarding COMPASS, or any of COMPASS's officers, directors, personnel, employees, contractors, clients, customers, supplier, vendors, policies or products, other than to comply with law.

Date: 2/24/10

Initial: JCD

**ARTICLE 2. NON-SOLICITATION:**

A. During the period of Employee's employment with COMPASS and for a period of two years following the termination of Employee's employment, regardless of the reason for termination, Employee shall not, directly or indirectly: (i) induce or encourage any employee of COMPASS to leave the employ of COMPASS, (ii) hire any individual who is or was an employee of COMPASS as of the date of Employee's termination of employment or within a one year period prior to such date, or (iii) induce or encourage any customer, client, potential customer, potential client and / or other business relation of COMPASS to not do business or cease or reduce doing business with COMPASS or in any way interfere with the relationship between any such customer, client, potential client, supplier or other business relation and COMPASS.

B. A "client" of COMPASS" shall be defined to mean the supplier of product lines to COMPASS, which product lines are sold by COMPASS to its customers.

C. A "customer" of COMPASS" shall be defined to mean the entities or businesses to whom COMPASS sells the product lines of its clients.

D. A "potential client" of COMPASS" shall be defined to mean as any entity that COMPASS is actively negotiating with to represent as a future COMPASS client, during the last twelve month period of Employee's employment.

E. A "potential customer" of COMPASS" shall be defined to mean as any entity that COMPASS is actively negotiating with to represent as a future COMPASS customer, during the last twelve month period of Employee's employment.

**ARTICLE 3. DISCOVERIES' AND WORKS:** Employee hereby irrevocably assigns, transfers, and conveys to COMPASS to the maximum extent permitted by applicable law Employee's right, title and interest now or hereinafter acquired, in and to all Discoveries and Works (as defined below) created, invented, designed, developed, improved or contributed to by Employee, either alone or jointly with others, while employed by COMPASS and within the scope of Employee's employment and/or with the use of COMPASS's resources. The terms "Discoveries and Works" include all works of authorship, inventions, intellectual property, materials, documents. or other work product (including, without limitation, Proprietary Information, patents and patent applications, patentable inventions, research, reports, software, code, databases, systems, applications, presentations, textual works, graphics and audiovisual materials). Employee shall have the burden of proving that any materials or works created, invented, designed, developed, contributed to or improved by Employee that are implicated by or relevant to employment by COMPASS are not implicated by this provision. Employee agrees to (i) keep accurate records and promptly notify, make full disclosure to, and execute and deliver any documents and to take any further actions requested by COMPASS to assist it in validating, effectuating, maintaining, protecting, enforcing, perfecting, recording, patenting or registering any of its rights hereunder, and (ii) renounce any and all claims, including, without limitation, claims of ownership and royalty, with respect to all Discoveries and Works and all other property owned or licensed by COMPASS. Employee acknowledges that, to the fullest extent permitted by law, all Discoveries and Works shall be deemed "works made for hire" under the Copyright Act of 1976, as amended, 17 U.S.C. Section 101. Employee hereby grants COMPASS a perpetual, nonexclusive, royalty-free, worldwide, assignable, sublicensable license under all rights and intellectual property rights (including patent, industrial property, copyright, trademark, trade secret, unfair competition and related laws) in any Works and Discoveries, for all purposes in connection with COMPASS's current and future business, that Employee has created, invented, designed, developed, improved or contributed to prior to Employee's employment with COMPASS that are relevant to or implicated by such employment ("Prior Works"). Any Prior Works are disclosed by Employee in Schedule 1.

**ARTICLE 4. REMEDIES:** Employee acknowledges that in the event of any violation by Employee of the provisions set forth in Articles 1, 2 or 3 above, COMPASS will sustain serious, irreparable and substantial harm to its business, the extent of which will be difficult to determine and impossible to fully remedy by an action at law for money damages. Accordingly, Employee agrees that, in the event of such violation or threatened violation by Employee, COMPASS shall be entitled to an injunction before trial before any court of competent jurisdiction as a matter of course upon the posting of not more than a nominal bond, in addition to all such other legal and equitable remedies as may be available to COMPASS Employee further agrees that, in the event any of the provisions of this Agreement are determined by a court at competent jurisdiction to be invalid, illegal, or for any reason unenforceable as written, such court shall substitute a valid provision which most closely approximates the intent and purpose of the invalid provision and which would be enforceable to the maximum extent permitted by law.

**Date:** 2/24/10

**Initial:** JW

**ARTICLE 5. TERM OF EMPLOYMENT:** Employee acknowledges that COMPASS has the right to terminate Employee's employment at any time for any reason whatsoever.

**ARTICLE 6. MISCELLANEOUS:**

A. As used throughout this Agreement, COMPASS includes COMPASS MARKETING, Inc. and its subsidiaries and affiliates or any corporation, joint venture, or other entity in which COMPASS MARKETING, Inc. or its subsidiaries or affiliates has an equity interest in excess of ten percent (10%).

B. This Agreement shall supersede and substitute for any previous employment or post-employment agreements between Employee and COMPASS.

C. If Employee's employment with COMPASS terminates solely by reason of a transfer of stock or assets of, or a merger or other disposition of, a subsidiary of COMPASS (whether direct or indirect), such termination shall not be deemed a termination of employment by COMPASS for purposes of this Agreement, provided that COMPASS requires the subsequent employer, by agreement, to expressly assume and agree to perform this Agreement in the same manner and to the same extent that COMPASS would be required to perform it if no such transaction had taken place.

D. Removed.

E. In the event any one or more of the provisions of this Agreement shall be or become invalid, illegal or unenforceable in any respect, the validity legality and enforceability of the remaining provisions of this Agreement shall not be affected thereby.

F. The terms of this Agreement shall be governed by the laws of the State of Maryland, without regard to conflicts of laws principles thereof. For purposes of any action or proceeding, Employee irrevocably submits to the non-exclusive jurisdiction of the courts of Maryland and the courts of the United States of America located in Maryland for the purpose of any judicial proceeding arising out of or relating to this Agreement, and acknowledges that the designated forum has a reasonable relation to the Agreement and to the parties' relationship with one another. Notwithstanding the provisions of this Article 8.F COMPASS may, in its discretion, bring an action or special proceeding in any court of competent jurisdiction for the purpose of seeking temporary or preliminary relief pending resolution of a dispute.
G.

I. Notwithstanding any other provision of this Agreement, COMPASS may, to the extent required by law, withhold applicable federal, state and local income and other taxes from any payments due to Employee hereunder.

J. At any time during the validity of this Agreement, Employee agrees that COMPASS may notify third parties about Employee's rights and obligations under this Agreement.

K. Employee affirms that Employee has read this Agreement and has asked questions needed to understand the terms, consequences and binding effect of this Agreement and fully understands them.

L. Employee affirms that Employee has sought the advice of an attorney of his/her choice before signing this Agreement.

**IN WITNESS WHEREOF**, and intending to he legally bound, the parties hereto have caused this Agreement to be signed:

by COMPASS MARKETING, INC.

Date: 2/24/2010

/s/ [signature]

John D. White, CEO

by EMPLOYEE

Date: 2/24/2010

/s/ [signature]

**Date:** 2/24/10

**Initial:** [initials]

**Schedule 1**

**Prior Works***

---

* if no Prior Works are listed, Employee certifies that there are none.

**Date:** 2/24/16

**Initial:** [initials]

# EXHIBIT 2

Case 1:22-cv-00379-GLR Document 23-4 Filed 04/04/22 Page 2 of 29

flywheel



# AMAZON AS A SEARCH, SOCIAL, AND DISPLAY PLATFORM

flywheel

# WHERE DO SHOPPERS START PRODUCT SEARCH?

Other Retailers, 21%
Amazon, 44%
Search Engines like Google or Bing, 34%

source: Bloomreach Oct 2015

flywheel

# WHERE DO SHOPPERS VIEW PRODUCTS?

- Amazon is now a top Five publisher
- Amazon uniques are growing 8x the pace of the total internet audience

| | UV's (000) | | YoY % Change |
|---|---|---|---|
| | January 2011 | January 2013 | |
| **Total Internet Audience** | **211,621** | **222,108** | **5%** |
| **Google Sites** | **178,516** | **190,753** | **7%** |
| **Yahoo! Sites** | **178,864** | **186,599** | **4%** |
| **Microsoft Sites** | **176,770** | **169,722** | **-4%** |
| **Facebook** | **153,020** | **145,580** | **-5%** |
| **Amazon sites** | **82,608** | **115,631** | **40%** |
| *Amazon.com* | *69,183* | *97,088* | *40%* |
| *IMDb.com* | *23,040* | *42,247* | *84%* |
| **AOL,Inc.** | **110,996** | **111,264** | **0%** |

flywheel

- Source: comScore, MediaMetrix, January 2013

# WHERE DO SHOPPERS TALK ABOUT PRODUCTS?

- 11% of the US population is (35 million) are writing reviews on Amazon
- 74% of shoppers find review Very Important or Important
- Reviews are the world's largest unacknowledged social network

flywheel

How important are online product reviews for your buying decision?
very important 31%
important 43%
very important
important
neutral
rather unimportant
not important

Source: Advances in Economics and Business 1(1): 1-5, 2013

# HOW TO POSITION YOUR BRAND TO WIN?

**SEARCH** **VIEW** **SOCIAL**

flywheel

# YOUR BRAND DOES NOT EXIST, YOUR ASINS EXIST

B00WIPMD32 B00ZV2D9UU
B00I9L4LIO B00ZV2D81K
B00FB59O1A B00PCH5CSQ
B00DFFT5IU
B00TB73LR2 B00DDMIUAO B00I9L44BI
B00TB73LKE B00DDMIMUW B00DDMJ8OG B00ZV2DQ8K
B00DDMIWYI
B00FE8BG60 B0094DJ3XO B00DDMIRWU B00ZV2D9ZA
B005U9Y3MW B00DDMIMXE B00ZIHRU8A
B00DFFT6IO B005U9Y3AY B00BH0NOE6
B005U9Y2ZK B00DDMIMP2
B00ZV2DO7I B005U9Y2YG
B00TB73LKO B005DLCJX2 B00FB59Z64
B00DDMIWIO B005U9Y3A4 B00DFFT6YS
B00DFFT8Y6 B000PEDE8Q B00ZV2DQ1W
B005U9Y2XM B00DDMIR8Y
B005U9Y2Y6 B005U9Y3LS B00FB59230
B00DGN23UI B0062V8PPI B005U9Y37M B00DFFT76U
B00DDMIRKC B005U9Y3MM B00ZV2DCUC
B00DDMITLO B007KXO9AM
B00DDMITQ4 B0094GA0LA
B00DFFT5HG B00DDMIRCK B00HZ6V1LO
B00I9L4J9K B00DDMJ4EU B00IGHYKLE
B00IGHYL3Q B00DDMJ6RA B00IGHYMZI
B00DHDY8AU B00I9L46BQ
B00TB73LJA B00I9L4BOS
B00IGHYLMW B0132ZNH4A
B00ZV2D86K

= Your Brand

flywheel

# SEARCH FROM SHOPPER PERSPECTIVE

flywheel

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 228 of 306

# SEARCH FOR SHAMPOO: RESULTS

amazon
shampoo
Holiday Toy List Daily Deals
Shop by Department
Patrick's Amazon.com Today's Deals Gift Cards Sell Help
Hello, Patrick Your Account
Try Prime
Wish List
Cart
1-16 of 279,221 results for "shampoo"
Choose a Department to sort
Show results for
Beauty
Hair Shampoo
Shampoo & Conditioner Sets
Hair Shampoos Plus Conditioner
Daily Hair Shampoo
Hair & Scalp Treatments
See more
See All 34 Departments
Refine by
Amazon Prime
Eligible for Free Shipping
Free Shipping by Amazon
Beauty Product Attributes
Organic
Hypoallergenic
Natural
Cruelty Free
Paraben Free
See more
Brand
Garnier
Dove
Head & Shoulders
L'Oreal Paris
Suave
Pantene
Herbal Essences
TRESemme
Maple Holistics
Paul Mitchell
Pura d'or
Mane 'n Tail
Pureology
Organix
Gender
Men's
Women's
Unisex
Hair Shampoo Pack Size
Under 8 Ounces
8 to 8.9 Ounces
9 to 11.9 Ounces
12 to 12.9 Ounces
13 to 15.9 Ounces
16 to 31.9 Ounces
32 Ounces & Above
SUAVE
Discover Suave's Range Of Shampoo Products
Shop now
Related Searches: body wash, organic shampoo, shampoo and conditioner.
Argan Oil Shampoo, Sulfate Free, 8 oz. - With Argan, Jojoba, Avocado, Almond, Peach Kernel, Camellia Seed, and...
by Maple Holistics
$11.97
Get it by Tuesday, Oct 27
More Buying Choices
$11.97 new (3 offers)
#1 Best Seller in Hair Perms & Straighteners
FREE Shipping on orders over $35
Product Features
Health & Personal Care: See all 109,769 items
Categories related to "shampoo"
Hair Shampoo
Hair Relaxers & Texturizers
Hair Perms & Straighteners
Hair & Scalp Care Products
Hair Loss Products
Dove Men+Care Fresh Clean 2 in 1 Shampoo + Conditioner 12 Ounce
by Dove
$8.49 new (10 offers)
Pantene Daily Moisture Renewal Shampoo, 25.4 Fl Oz
by Pantene
$5.48 ($0.22/Fl Oz) Subscribe & Save
$5.77 ($0.23/Fl Oz)
Add-on Item
More Buying Choices
$5.77 new (7 offers)
Suave Professionals Almond + Shea Butter Shampoo, 28 Fl oz
by Suave
$2.74 ($0.10/Ounce)
Exclusively for Prime Members
Prime Pantry: See all items
Sponsored
Ultrax Labs Hair Solace Caffein...
$39.99
Royal Skin Reviving Shampoo, ...
$19.99
Hair Rescue GOLD Plus Shamp...
$24.99
Color Safe Shampoo by eSalon ...
$15.00

flywheel

JA224

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 229 of 306

# SEARCH FOR SHAMPOO: ORGANIC RESULTS

amazon
shampoo
Holiday Toy List Daily Deals
Shop by Department
Patrick's Amazon.com Today's Deals Gift Cards Sell Help
Hello, Patrick Your Account
Try Prime
Wish List
Cart
1-16 of 279,221 results for "shampoo"
Choose a Department to sort
Show results for
Refine by
Related Searches: body wash, organic shampoo, shampoo and conditioner.
3P
Argan Oil Shampoo, Sulfate Free, 8 oz. - With Argan, Jojoba, Avocado, Almond, Peach Kernel, Camellia Seed, and...
3P
Dove Men+Care Fresh Clean 2 in 1 Shampoo + Conditioner 12 Ounce
1P
Pantene Daily Moisture Renewal Shampoo, 25.4 Fl Oz
1P
Suave Professionals Almond + Shea Butter Shampoo, 28 Fl oz

Organic Search Results
1p
50%
3p
50%

flywheel

JA225

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 230 of 306

# SEARCH FOR SHAMPOO: PAID RESULTS

amazon
shampoo
Holiday Toy List Daily Deals
Shop by Department
Patrick's Amazon.com Today's Deals Gift Cards Sell Help
Hello, Patrick Your Account
Try Prime
Wish List
Cart
1-16 of 279,221 results for "shampoo"
Choose a Department to sort
Show results for
Beauty
Hair Shampoo
Shampoo & Conditioner Sets
Hair Shampoos Plus Conditioner
Daily Hair Shampoo
Hair & Scalp Treatments
See more
See All 34 Departments
SUAVE
Discover Suave's Range Of Shampoo Products
Shop now
1P
Sponsored
3P
Ultrax Labs Hair Solace Caffein...
$39.99
3P
Royal Skin Reviving Shampoo, ...
$19.99
3P
Hair Rescue GOLD Plus Shamp...
$24.99
3P
Color Safe Shampoo by eSalon ...
$15.00
Refine by
Amazon Prime
Eligible for Free Shipping
Free Shipping by Amazon
Beauty Product Attributes
Organic
Hypoallergenic
Natural
Cruelty Free
Paraben Free
See more
Brand
Garnier
Dove
Head & Shoulders
L'Oreal Paris
Suave
Pantene
Herbal Essences
TRESemme
Maple Holistics
Paul Mitchell
Pura d'or
Mane 'n Tail
Pureology
Organix
Gender
Men's
Women's
Unisex
Hair Shampoo Pack Size
Under 8 Ounces
8 to 8.9 Ounces
9 to 11.9 Ounces
12 to 12.9 Ounces
13 to 15.9 Ounces
16 to 31.9 Ounces
32 Ounces & Above

Paid Search Results
1p
20%
3p
80%

flywheel

JA226

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 231 of 306

# WHAT DOES YOUR SHOPPER SEE?

amazon
shampoo
Holiday Toy List Daily Deals
Shop by Department
Patrick's Amazon.com
Today's Deals
Gift Cards
Sell
Help
Hello, Patrick Your Account
Try Prime
Wish List
Cart
1-16 of 279,221 results for "shampoo"
Choose a Department to sort
Show results for
Beauty
Hair Shampoo
Shampoo & Conditioner Sets
Hair Shampoos Plus Conditioner
Daily Hair Shampoo
Hair & Scalp Treatments
See more
See All 34 Departments
Refine by
Amazon Prime
Eligible for Free Shipping
Free Shipping by Amazon
Beauty Product Attributes
Organic
Hypoallergenic
Natural
Cruelty Free
Paraben Free
See more
Brand
Garnier
Dove
Head & Shoulders
L'Oreal Paris
Suave
Pantene
Herbal Essences
TRESemme
Maple Holistics
Paul Mitchell
Pura d'or
Mane 'n Tail
Pureology
Organix
Gender
Men's
Women's
Unisex
Hair Shampoo Pack Size
Under 8 Ounces
8 to 8.9 Ounces
9 to 11.9 Ounces
12 to 12.9 Ounces
13 to 15.9 Ounces
16 to 31.9 Ounces
32 Ounces & Above
Search Results
1p
33%
3p
67%

flywheel

JA227

# SEM SOLUTION: AMAZON MARKETING SERVICES

flywheel

# AMS UNITS

**Sponsored Products**

Target by keyword,
appear below search results

**Headline Search Ads**

Target by keyword,
appear above search results

**Product Display Ads**

Target by product or interest,
appear on related product detail pages



# AMS UNITS—HEADLINE SEARCH

- One placement per search
- Broad or exact keyword targeting
- Has to drive to brand store or at least three ASINs
  - Can no longer filter results
- Only open to 1P
- Need to add image + up to 50 characters
- Amz recently added brand name

# AMS UNITS—SPONSORED PRODUCTS

- Above the Fold, at least four placements
- Lower CPC than Headline
- No need for landing page
- Main image is the creative
- Open to 3Ps + 1Ps
  - 3Ps can do negative keywords
- Only broad keyword targeting

# VIEW SOLUTION: AMS + AMAZON MEDIA GROUP

flywheel

# AMS UNITS—PRODUCT DISPLAY ADS

- Can target on detail page or by in-market/lifestyle
- Broad targeting works best with VPC
- Less granular targeting than AMG, but much lower CPM

# AMS UNITS—PRODUCT DISPLAY ADS

- New Product Display Ad Placement
- Vendors can't opt into it
- Amazon use a relevance filter to determine which ads can compete for the placement

# AMS REPORTING

| Type | Budget | Spend | Impressions | Clicks | Average CPC | Detail Page View | Total Sales | ACoS |
|---|---|---|---|---|---|---|---|---|
| Headline Search | 1,000 | $ 779 | 88,922 | 1,499 | $ 0.52 | 2,075 | $ 6,403 | 12.16% |
| Sponsored Products | 20 | $ 1,166 | 2,768,719 | 3,647 | $ 0.32 | - | $ 4,522 | 25.78% |
| Sponsored Products | 20 | $ 1,270 | 2,706,452 | 4,828 | $ 0.26 | - | $ 12,541 | 10.13% |
| Sponsored Products | 10 | $ 214 | 387,772 | 696 | $ 0.31 | - | $ 1,093 | 19.53% |
| Headline Search | 500 | $ 210 | 54,843 | 620 | $ 0.34 | 402 | $ 370 | 56.73% |
| Product Display | 600 | $ 600 | 1,225,978 | 746 | $ 0.80 | 930 | $ 767 | 78.23% |

- Two week last click attribution for sales data and includes sales to entire brand.
- Dedupes against other AMS campaigns you are running and may impact AMG results
- Sales report includes 3P data and is retail $, not pcogs

flywheel

# AMS HEADACHES

- Have to manually pull data to get trends

- ~~Can't duplicate campaigns~~

- For now the costs are going on a credit card

- 3P data distorts ROI

- Headline has to drive to 3+ ASINs and can no longer filter results

flywheel

# WHAT'S NEXT: AMS/AMG CPM PLATFORM

- Ability to build CPM advertising on and off Amazon
- No minimum spend
- Can remarket off of pixel

amazonmarketingservices | Flywheel: US | Manage | Report | Patrick

Advertisers

Line item : **Narrow Focused IM - Teething (160x600 only)**

Inactive | Status: Creatives not running | Start: Oct 05, 2015 12:00 AM EDT | End: Nov 04, 2015 11:59 PM EST

Budget: $10,000.00 | Agency fee: Not applied | Delivery rate: 0.0% | Budget cap: — | Total cost: — | CPM bid: $— | Impressions: —

Creatives | Edit | New creative

| | |
|---|---|
| Line item type | Standard display |
| Name | Narrow Focused IM - Teething (160x600 only) |
| Line item ID | 3814861762896 |
| External ID or PO (optional) | |
| Created | Sep 15, 2015 |
| Flight dates and time | Oct 05, 2015 12:00 AM EDT to Nov 04, 2015 11:59 PM EST — *Note: start date has already passed* |
| Comments (optional) | |

CLASSIFICATION

Product categories

- Health
- Holiday, Events
- Home & Garden
- Interests
- Jobs
- Media
- Military
- Other
- Pets
- Public Services
- Public Utilities
- Real Estate

# SOCIAL SOLUTION: COMMENT ON REVIEWS

flywheel

# POSTS MOVE OUT OF VIEW OVER TIME







# REVIEWS MOVE INTO VIEW OVER TIME

- Review visibility is inverse
- Reviews move up as shoppers find the reviews helpful

**#1 Beauty ASIN, #1 Review:**

**Posted nearly three years ago**

See all 2,288 customer reviews ›

**Most Helpful Customer Reviews**

375 of 405 people found the following review helpful

**For the price, its pretty nice...**

By Otto Correct TOP 1000 REVIEWER VINE VOICE on February 8, 2013

**Vine Customer Review of Free Product** ( What's this? )

For the price on this guy, its pretty good stuff. Here's a breakdown of my experience, spaghetti western style:

THE GOOD:

-The ear and nose trimmer works very well, which was my main concern in getting this in the first place.
-The trimmer length attachments also work well, as long as you start longer than you think you'll need. I cleaned up
effectively with the trimmer and its length attachment. My previous method of doing so was to use a tiny scissors anc
-The cord you charge it with also powers the unit. The thing with these cheaper groomers (same goes for cheaper el
that high quality and will eventually stop holding a charge. Depending on how they're made, the cord you plug it in wi
adapter or only a battery charger. If its only a battery charger, you now have a useless trimmer. If its like an AC adap
trimmer even after the battery goes bad, you just have to keep it plugged in and it'll work fine. Thankfully, this particu
even when the cheap recharagable battery goes to pot, I can still use it!
-Its cheap! Its less than twenty bucks! So if it busts or whatever, big deal, go buy another!

THE BAD:

-No bag to put the accessories in. This thing has 5 heads and 2 trimmer guards, so its a lot of small things to keep tra
case or bag to house the unit and attachments. I put mine in a quart size ziploc bag, which works well, but it wouldn't
include a cheap cotton sack with a drawstring to house it all in.

THE UGLY:

-Be vary careful when using this on anything besides your face. Read more ›

7 Comments | Was this review helpful to you? Yes No Report abuse

flywheel

# COMMENTING ON REVIEWS

- Brands can comment and engage shoppers
- Bazaar Voice study shows 187% increase in Purchase Intent when brands provide helpful product use advise

The manufacturer commented on the review below

3 of 3 people found the following review helpful

**These are a nice quick bite and everyone liked them as well**

By Maryberger on September 13, 2015

Verified Purchase

I have been eating Hemp Hearts for quite some time and have all my friends into them as well. The health food stores cannot keep them in stock. These are a nice quick bite and everyone liked them as well. Will have to see if any local stores carry them.

1 Comment | Was this review helpful to you? Yes No Report abuse

**The manufacturer commented on this review** (What's this?)

Manitoba Harvest Hemp Foods says — October 21, 2015

Thanks for your review Mary and for also loving Hemp Hearts too! We do have a store locator feature on our website that you can use to put in your zip code to find store locations near you that carry the product. But of course, you can always get them straight to your door from Amazon. :) Have a great day!

Report abuse

flywheel

# IN SUMMARY

- Love your ASINs as they are your brand
- Your shoppers are on Amazon, Brands need to find ways to converse with shoppers where the shoppers are
- Amazon is increasingly Hands off the Wheel—Brands need to grab the wheel



flywheel



# EXHIBIT 3

# The Future of Amazon Fresh?

August 25, 2015

SHARE

Patrick Miller

WRITTEN BY
Patrick Miller

by Patrick Miller, Flywheel Digital

Last winter Amazon opened an FC a few miles from my house, near the port of Baltimore. I figured we would soon be the next location for Amazon Fresh to roll out, but Fresh has yet to arrive.

Perhaps even better, Prime Now came to Baltimore and it's saved me a from a bunch of trips to local big box stores.

*Quick glossary:*

- Amazon Fresh is Amazon's home grocery delivery service. Green trucks delivering everything from veggies to higher velocity .com ASINs with an emphasis on locally-sourced fresh foods.
- Amazon Prime Now is an app and app only if you didn't think Amazon is serious about mobile that allows shoppers to buy items from a local FC and have delivered for free if you can wait two hours or $7.99 for sub one hour delivery.

Instead of geeking out over the new product I went for a mountain bike ride. But, 45 mins into the ride, when I was up on a ridge, knew I had cell coverage, and unable to resist, I decided to give it a try. Once I clicked on the fresh food tile in the email I was brought to the traditional Prime Now interface.

Since this so early for Prime Now ASINs, the "Customers also bought" is weighted heavily to the early adopters and first movers of the vendor community (yes the ASIN could have been an old Fresh ASIN, but Fresh doesn't have the automation & personalization of .com). I found the interface clean and fast and adding items to my cart was easy. However, because I was scrolling down a list, outside of the better together recommendations, it was hard to discover new items. There are no aisles to walk down if you will.

An example of the first mover advantage below. I purchased both the Sambazon Smoothie and the Pom Juice. Today they are already showing up on the same page together.

How eComm ready is your brand? See how you stack up against industry benchmarks Take the assessment x

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 250 of 306

2/17/22, 1:17 PM The Future of Amazon Fresh?

Also of interest, if I drop the Sambazon ASIN into .com search bar I get:

And into Fresh (also of note, same price on Fresh as on Prime Now; price on.com is a 3P so irrelevant):

So same ASIN and same content across all three platforms and the chance for 3Ps to compete on the .com ASIN. For Vendors this means Amazon is one step closer to creating a universal ASIN + integrating Fresh into VC. This will make everyone's lives easier.

Back to user experience. After doing my shopping, I was able to get the 4-6 delivery slot, when I was ordering at 2:02 pm. Of note, the app said the carrier could not leave the package at my door, Fresh + wine (though there is no shoppable alcohol on the site today there is a note re alcohol) have to be dropped off to a person. With Maryland's archaic alcohol laws, beer delivery might be a while, but we can hope for legislative competence one of these days. Seattle's Prime Now, which just launched allows alcohol to be delivered. I tapped through and continued on my ride.

At a few minutes to six, Amazon called to let me know the driver was on his/her way, but was going to be a few minutes late because of traffic. No big deal and the call was a nice touch. The driver showed up carrying what looked like Amazon Fresh totes (insulated and reusable), but instead of green, they were brown.

He pulled out to two brown bags, said thank you and was on his way. I made sure to order frozen and

x
How eComm ready is your brand? See how you stack up against industry benchmarks
Take the assessment

https://www.profitero.com/blog/2015/08/the-future-of-amazon-fresh 2/5

JA246

chilled for a couple of hours, my smoothie had a few ice chunks in it. Not perfect, but I'm still in awe I just got fresh food delivered to my door a couple of hours after ordering from my phone on the side of a trail and the delivery was free (less $5 tip to the driver).

There are not yet fruits + veggies or butchered meats + fish offered, but for day one selection, I was happy and I'd prefer to get my veggies at the farmer's market anyway.

Going back to the app today, there was no list building application or previously purchased page, so I'd be starting from scratch again. Having a weekly list would be great and would help increase frequency by decreasing the amount of time it would take me to shop. Additionally, why not do a weekly Subscribe and Save offer?

Where I did my grocery shopping this week:

Self serve advice for vendors in how to best take advantage of Prime Now:

- Waive your minimums, increase your confirmation and fill rates. Amazon is taking a risk in entering these new markets; show your commitment by getting your supply chain right. Amazon is not going to pull your items in if it thinks you won't fill an order.
- Small screen = mobile first content. Make sure your hero images are shoppable from a small screen. Do a double check on your content to ensure your bullets + descriptions are correct—even better if you have access to a scraping tool that can comb the ASINs—with the same ASIN being on Now as on .com, it will be easier to check the .com ASIN.
- Even if these are Now/Fresh only ASINs, variate them on .com so the reviews will aggregate on Now.

***Patrick Miller, Co-Founder, Flywheel Digital has spent the last four years deconstructing eCommerce sites and helping American manufacturers figure out Amazon from a brand, search, social, customer service, supply chain, pricing and sales perspective.***

← PREVIOUS POST VIEW ALL POSTS NEXT POST →

## Recommended reading

How eComm ready is your brand? See how you stack up against industry benchmarks Take the assessment x

## How Walmart's site merger — aka 'Project Glass' — impacts brands

By Sandy Skrovan / September 27, 2021

## Private label wins search; The case for DTC; Pandemic spending ups & downs — Profitero press highlights

By Sandy Skrovan / May 27, 2021

## Retail media's rise, eComm profitability pressure, and more — Profitero press highlights

By Sandy Skrovan / January 28, 2021

See why the world's leading brands use

How eComm ready is your brand? See how you stack up against industry benchmarks

Take the assessment

x

Request a demo

Profitero

Login

Request a demo

PLATFORM

Diagnose

Measure

Act

WHO WE HELP

Our clients

Success stories

Open Commerce Ecosystem

Ecosystem Directory

Become a partner

IN THE NEWS

Press

RESOURCES

Research & reports

Webinars & events

Blog

Video gallery

Podcasts

eCommerce glossary

ABOUT US

Company overview

Leadership

Careers — WE'RE HIRING!

Contact us

© 2022 Profitero, Inc. All Rights Reserved. Terms of Service & Privacy Policy.

x

**How eComm ready is your brand?** See how you stack up against industry benchmarks

**Take the assessment**

# EXHIBIT 4

**Chip DiPaula <cdipaula@gmail.com>**

# Fwd: E-commerce spin-off follow-up

1 message

**Chip DiPaula** <cdipaula@compassmarketinginc.com> Wed, Oct 1, 2014 at 4:39 PM
To: "James C. DiPaula, Jr." <cdipaula@gmail.com>

James C. "Chip" DiPaula, Jr.
Executive Vice President
Compass Marketing, Inc.
222 Severn Avenue
Suite 200
Annapolis, MD 21403

Cell (410) 279-8564

---------- Forwarded message ----------
From: **Chip DiPaula** <cdipaula@compassmarketinginc.com>
Date: Wed, Oct 1, 2014 at 2:40 PM
Subject: E-commerce spin-off follow-up
To: John D White <jwhite@compassmarketinginc.com>

JW,

I wanted to follow-up on our discussions for e-commerce division spin-off and transition. Tomorrow will be one month since Patrick and I tendered our resignations, and it has more than two weeks since you committed to sharing your asking price for the Compass e-commerce business. As you requested, we have agreed to a temporary 'transition plan' to defer effective date of our resignations which was to have been two weeks ago tomorrow.

Patrick and I remain interested in the spin-off concept, as we feel vested in our colleagues we recruited and trained, and the clients we have nurtured these past few years. We also know the spin-off offers a base for moving forward, and would provide Compass and us a strong basis for alignment on future business referrals for both companies. That said, since I have heard nothing from you concerning an offering price, we are concerned we may be far apart in expectations. If this is true, we should surface that now, as it would be of no benefit to either of us for delay.

As discussed, we anticipated this to be our break-even year for the division, and after further review that is on

target. I have created a P&L utilizing estimates for direct and indirect expenses and by my account, we will have revenues of ~$1,320,000, expenses of ~$1,310,000, and an NOI, or EBITDA of ~$10,000. While any of the revenue or expense items could fluctuate, the bottom line should be very close. As I've considered this, I think the greatest value is perhaps with the potential new clients White Wave and Blue Buffalo, with whom we are currently negotiating.

With the quickly changing dynamics of e-commerce, further delay will likely prevent both of us from capturing opportunities, an outcome we should avoid. We appreciate the support you have offered, and are hopeful we can soon reach agreement for the spin-off, structured transition plan, and a joint referral program for both companies moving forward.

Please share your proposal, and transition plans by this Friday afternoon.

Thanks,

Chip

James C. "Chip" DiPaula, Jr.

Executive Vice President

Compass Marketing, Inc.

222 Severn Avenue

Suite 200

Annapolis, MD 21403

Cell (410) 279-8564

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

COMPASS MARKETING, INC.
105 Eastern Avenue
Annapolis, Maryland 21403
(Anne Arundel County),

*Plaintiff*,

v.

FLYWHEEL DIGITAL LLC
1801 Porter Street Suite 300
Baltimore, Maryland 21230
(Anne Arundel County),

JAMES COLUMBUS "CHIP" DIPAULA, JR.
11 Devon Hill Road, Unit 4B
Baltimore, Maryland 21210
(Baltimore County),

PATRICK MILLER
743 Bywater Road
Gibson Island, Maryland 20008
(Anne Arundel County),

DANIEL WHITE
21900 Fairway Drive
Leonardtown, Maryland 20659
(St. Mary's County),

MICHAEL WHITE
39650 Hiawatha Circle
Mechanicsville, Maryland 20659
(St. Mary's County),

GEORGE WHITE
15125 Woodville Road
Waldorf, Maryland 20601
(Charles County), and

ASCENTIAL PLC,
The Prow, 1 Wilder Walk
London, England W1B 5AP.

*Defendants*.

1:22-cv-00379-JKB

**DECLARATION OF LOUISE MEADS**

**DECLARATION OF LOUISE MEADS**

I, Louise Meads, make the following declaration under penalty of perjury pursuant to 28 U.S.C. § 1746 and declare that the following is true and correct:

1. I am over the age of 18, am not a party to this action, am under no legal disability, and make this declaration based upon my personal knowledge and on information and belief.

2. I am the Company Secretary of Ascential PLC ("Ascential"), a defendant in this action. I make this Declaration in support of the accompanying motion to dismiss the complaint against Ascential in this action.

3. Ascential is a publicly-traded company registered in and incorporated under the laws of England and Wales, with its principal place of business in London, England.

4. Ascential does not conduct, transact, or solicit any business in the State of Maryland. Ascential is not qualified or licensed to do business in Maryland.

5. Ascential does not maintain an agent for service of process in the State of Maryland.

6. Ascential does not maintain any offices, any telephone listings, or any mailing addresses in the State of Maryland.

7. Ascential does not have any employees or agents in Maryland.

8. Since 2018, Ascential has been the indirect shareholder and ultimate parent company of Flywheel Digital LLC ("Flywheel"), a subsidiary of Ascential incorporated under the laws of the State of Maryland.

9. Ascential owns Flywheel through a series of subsidiaries of Ascential. Ascential does not conduct, transact, or solicit any business in the State of Maryland. So too Ascential is not qualified or licensed to do business in Maryland. Ascential does not have an agent for service of

process in Maryland. Ascential does not maintain any offices, or have any telephone listings or mailing addresses, or have any employees or agents in the State of Maryland.

10. Flywheel is a separate and distinct corporate entity from Ascential with its own officers and directors. Two officers of Ascential, Chief Executive Officer Duncan Painter and Chief Financial Officer Mandy Gradden, sit on the Board of Directors of Flywheel. In connection with their roles on the Flywheel Board of Directors, Mr. Painter has taken approximately eleven trips to Maryland, and Ms. Gradden has taken approximately two trips to Maryland.

11. Aside from this presence of Mr. Painter and Ms. Gradden on the Flywheel Board of Directors, there is no other transfer, interchange, or commonality of personnel between Ascential and Flywheel. Ascential's corporate officers (including Mr. Painter and Ms. Gradden) have no involvement in the day-to-day operations of Flywheel. Flywheel employs its own personnel to conduct business in Maryland. Employees of Flywheel are not employees of Ascential.

12. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: 1 April 2022

LMeads

Louise Meads

28887016

There are likewise many examples of Compass's due diligence. Compass sought legal advice when DiPaula and Miller left and its employees quit to join Flywheel. Compl. ¶¶ 81, 89. The Compass Board of Directors replaced Defendants Daniel White and Michael White when it determined that they were not upholding their fiduciary duties and acting in the best interest of the company. *Id.* ¶ 95. Compass hired criminal investigator Ron Bateman and certified forensic fraud examiner Luis Fernandez to perform an internal investigation after Defendants Daniel White and Michael White were removed from the Board. *Id.* ¶ 96. During the investigation, Fernandez discovered the Profitero article and the Digital Grocers Summit Power Point Presentation that led to Compass's discovery of the trade secret theft. *Id.* ¶¶ 184, 186. For purposes of the motion-to-dismiss analysis, the Court should interpret these facts in a light most favorable to Compass. The pleadings sufficiently establish that Compass acted with due diligence and, despite that, the Defendants were able to fraudulently conceal their misconduct and omissions. As a result of the extensive efforts to conceal the misconduct, the statute of limitations should be tolled until Compass discovered the fraud through its own ordinary diligence.

* * *

The Flywheel Defendants' timeliness challenge cannot succeed at this stage because Compass first discovered the White Defendants' misconduct after February 2019 and the trade secret theft in January 2020. The Complaint establishes both Compass's diligence in uncovering the actionable conduct, and that, for the trade secret, racketeering, and other state law claims, the Defendants actively concealed the underlying events from Compass. The claims are also timely through application of the continuing violation doctrine and the adverse domination doctrine.

## CONCLUSION

For all the reasons stated herein, the Flywheel Defendants' Motion to Dismiss should be denied in its entirety. In the alternative, Compass requests leave to amend its Complaint.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **COMPASS MARKETING, INC., Plaintiff,** | § | |
| **v.** | § | |
| **FLYWHEEL DIGITAL LLC, *et al.*, Defendants.** | § | **Case Number: 1:22-cv-00379-GLR** |

**DECLARATION OF RACHEL A. WARD, ESQUIRE**

I, Rachel A. Ward, Esq., pursuant to the provisions of 28 U.S.C. § 1746, declare as follows:

1. I am an attorney with the law firm of Morgan, Lewis & Bockius, attorneys for Plaintiff Compass Marketing, Inc. and have been admitted pro hac vice to represent the Plaintiff in connection with this matter.

2. I have personal knowledge of the facts contained herein, and if called upon as a witness, I could and would competently testify thereto. I am over 18 years of age, of sound mind, and otherwise competent to make this Declaration.

3. I submit this Declaration in support of Plaintiff's Opposition in Response to Defendants Flywheel Digital, LLC, Ascential PLC, James Columbus "Chip" DiPaula, Jr., and Patrick Miller's Motion to Dismiss.

4. Attached hereto as Exhibit A is a true and correct copy of pages one and one hundred thirty-five (135) from the 2021 Ascential Annual Report.

5. Attached hereto as Exhibit B is a true and correct copy of a Bay Net News Article entitled *Weeks After Being Named in A Federal Lawsuit, DiPaula Resigns from UMMS Board.*

6.      Attached hereto as Exhibit C is a true and correct copy of a Sky News Article

entitled *Cannes Lions Owner Ascential Plots £1.5bn Transatlantic Break-Up*.

I declare under penalty of perjury that the foregoing is true and correct. Executed on May

4, 2022, in Philadelphia, Pennsylvania.


                                       */s/ Rachel. A. Ward, Esq.*
                                       Rachel A. Ward, Esq.

Exhibit A



ASCENTIAL
Accelerating our strategy. Focusing on growth.
Annual Report 2021
Act today, win tomorrow.

## 6. Fraud and breaches of laws and regulations – ability to detect

**Identifying and responding to risks of material misstatement due to fraud**

To identify risks of material misstatement due to fraud ('fraud risks') we assessed events or conditions that could indicate an incentive or pressure to commit fraud or provide an opportunity to commit fraud. Our risk assessment procedures included:

- enquiring of Directors, the Audit Committee, internal audit and the Group's in-house legal counsel, and inspection of policy documentation as to the Group's high-level policies and procedures to prevent and detect fraud, including the internal audit function, and the Group's channel for "whistleblowing", as well as whether they have knowledge of any actual, suspected or alleged fraud;
- reading Board, audit committee and nomination committee minutes;
- considering remuneration incentive schemes and performance targets for management, directors and sales staff including the adjusted earnings per share target for management remuneration;
- using analytical procedures to identify any unusual or unexpected relationships.

We communicated identified fraud risks throughout the audit team and remained alert to any indications of fraud throughout the audit.

As required by auditing standards, and taking into account possible pressures to meet profit targets, we perform procedures to address the risk of management override of controls and the risk of fraudulent revenue recognition, in particular the risk that Flywheel Digital revenue is recorded in an inappropriate financial year and the risk that Group and component management may be in a position to make inappropriate accounting entries and the risk of bias in accounting estimates and judgements such as the related accrued revenue.

We also identified a fraud risk related to contingent consideration in response to possible pressures to understate contingent consideration liabilities.

Further detail in respect of the valuation contingent consideration for in-year acquisitions is set of out in the key audit matter disclosures in section 2 of this report.

We also performed procedures including:

- identifying journal entries to test for all full scope components based on risk criteria and comparing the identified entries to supporting documentation. These included those posted to unusual accounts;
- for Flywheel digital revenue, we selected a sample of sales invoices during the period to assess whether revenue has been recognised in the correct financial period, by comparing the date, amount, description and quantity to relevant documentation such as contract, proof of payment or over third-party acknowledgement of receipt;
- for contingent consideration liabilities, we evaluated the track record of the historical assumptions used by comparing to the actual results achieved.
- assessing significant and unusual transactions for bias;
- assessing significant accounting estimates for bias.

**Identifying and responding to risks of material misstatement related to compliance with laws and regulations**

We identified areas of laws and regulations that could reasonably be expected to have a material effect on the financial statements from our general commercial and sector experience and through discussions with the directors and other management (as required by auditing standards), and discussed with the directors and other management the policies and procedures regarding compliance with laws and regulations.

As the Group is regulated, our assessment of risks involved gaining an understanding of the control environment including the entity's procedures for complying with regulatory requirements.

We communicated identified laws and regulations throughout our team and remained alert to any indications of non-compliance throughout the audit.

The potential effect of these laws and regulations on the financial statements varies considerably.

Firstly, the Group is subject to laws and regulations that directly affect the financial statements including financial reporting legislation (including related companies legislation), distributable profits legislation and taxation legislation, and we assessed the extent of compliance with these laws and regulations as part of our procedures on the related financial statement items.

Secondly, the Group is subject to many other laws and regulations where the consequences of non-compliance could have a material effect on amounts or disclosures in the financial statements, for instance through the imposition of fines or litigation. We identified the following areas as those most likely to have such an effect: health and safety, anti-bribery, employment law, data protection and certain aspects of company legislation recognising the nature of the Group's activities. Auditing standards limit the required audit procedures to identify non-compliance with these laws and regulations to enquiry of the directors and other management and inspection of regulatory and legal correspondence, if any. Therefore, if a breach of operational regulations is not disclosed to us or evident from relevant correspondence, an audit will not detect that breach.

**Context of the ability of the audit to detect fraud or breaches of law or regulation**

Owing to the inherent limitations of an audit, there is an unavoidable risk that we may not have detected some material misstatements in the financial statements, even though we have properly planned and performed our audit in accordance with auditing standards. For example, the further removed non-compliance with laws and regulations is from the events and transactions reflected in the financial statements, the less likely the inherently limited procedures required by auditing standards would identify it.

In addition, as with any audit, there remained a higher risk of non-detection of fraud, as these may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal controls. Our audit procedures are designed to detect material misstatement. We are not responsible for preventing non-compliance or fraud and cannot be expected to detect non-compliance with all laws and regulations.

# Exhibit B



CRIME & COURTS, GOVERNMENT & POLITICS, HEALTH & WELLNESS

# Weeks After Being Named In Federal Lawsuit, DiPaula Resigns From UMMS Board

by **ZACH HILL**
MARCH 9, 2022 Updated MARCH 10, 2022

James “Chip” DiPaula

**ANNAPOLIS, Md. –** In a letter to Governor Larry Hogan on March 9, James “Chip” DiPaula announced that he is resigning as Chairman of

the University of Maryland Medical System (UMMS) Board of Directors.

DiPaula, who served as former Maryland Governor Robert Ehrlich's Chief of Staff, announced that his three-year tenure at UMMS which was arguably plagued with troubles will be concluding immediately. Some notable problems he faced included the "Healthy Holly" book scandal involving former Baltimore Mayor Catherine Pugh, along with helping navigate UMMS throughout the pandemic.

He noted the change comes as he prepares to move his permanent residency to another state while taking on an "expanded role" at Flywheel Digital, an eCommerce company he co-founded.

"Serving UMMS has been one of the great privileges of my career," DiPaula explained. "Since 2019, with your support, we have overseen crucial and comprehensive governance, management, and operations reforms, adopted extensive new structural governance reforms, 17 board policies, revitalized board committee charters, and led a successful national search for a new Chief Executive."

Some may recall TheBayNet.com's report last month on a lawsuit which named Flywheel Digital, DiPaula, and five other defendants in federal court. One of the named defendants was Ascential, a United Kingdom-based global marketing firm that acquired Flywheel in 2018 for approximately $400 million.

**RELATED: Embezzling Millions, Extortion, Tax Fraud, Stealing Trade Secrets: SOMD Officials Named In Federal Complaint**

DiPaula now serves as the President of Digital Commerce for Ascential, which includes the oversight of Flywheel and several other brands owned by the conglomerate.

"Like many during the course of the pandemic, I have worked from a variety of locations and made the decision to permanently change my residency to another state," DiPaula stated in his letter. "As such, Maryland is no longer my primary domicile. Further, I have taken an expanded role at my company which requires extensive travel to manage 10 global businesses."

That suit, which alleges embezzlement, trade secret theft, extortion, and several other charges, is being brought by the Annapolis-based Compass Marketing. The company is seeking a total of $1.2 billion in alleged damages.

"The allegations have no merit and will be vigorously defended. There will be no further comment on pending litigation," a spokesperson for Ascential told TheBayNet.com.

In the meantime, before DiPaula's position is filled by the Maryland General Assembly and Hogan, UMMS Vice Chair Alexander Williams Jr. will act as the interim board chair.

A response to the complaint is due to the U.S. District Court in April. Compass Marketing is seeking a trial by jury in their suit.

***Read the full complaint below:***

Case 1:22-cv-00379-JKB Document 1 Filed 02/14/22 Page 1 of 85

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

COMPASS MARKETING, INC.
105 Eastern Avenue
Annapolis, Maryland 21403
(Anne Arundel County),

*Plaintiff*,

v.

FLYWHEEL DIGITAL LLC
1801 Porter Street Suite 300
Baltimore, Maryland 21230

Case Number: _______________

# Exhibit C

USCA4 Appeal: 23-1324 Doc: 31 Filed: 06/23/2023 Pg: 273 of 306

5/4/22, 10:38 AM Cannes Lions owner Ascential plots £1.5bn transatlantic break-up | Business News | Sky News

Watch Live 

# Cannes Lions owner Ascential plots £1.5bn transatlantic break-up

The London-listed events and analytics company is exploring a radical split that would see its digital operations demerged and listed in New York, Sky News can reveal.

**Mark Kleinman**
City editor @MarkKleinmanSky

Saturday 9 April 2022 13:24, UK

Owner of Cannes Lions festival plots break up

https://news.sky.com/story/cannes-lions-owner-ascential-plots-1-5bn-transatlantic-break-up-12585917#:~:text=The owner of the Cannes,the Atlantic to… 1/9

JA269



Why you can trust Sky News >

**The owner of the Cannes Lions global advertising festival is plotting a £1.5bn break-up that would see part of the company shift its stock market listing across the Atlantic to New York.**

Sky News has learnt that Ascential, which has a market capitalisation of £1.49bn, is working with investment bankers on plans to demerge its digital operations and list them separately in the US.

Sponsored link

Recommended by

[Photos] The Happiest Moment Of This Elephant's Life Was With A Dog

Last Night On

Under the plans, which have yet to be given formal board approval, the remaining events operations - which include the Cannes Lions and World Retail Congress - would remain listed in London.

Banking sources said the move was being driven by Duncan Painter, Ascential's chief executive, in an attempt to accelerate the creation of value for shareholders.

One insider said a formal announcement was likely later this year if the split is signed off by the company's board, which is chaired by Scott Forbes.

Advertisement

Advertisement

Further details of the break-up were unclear this weekend.

Ascential describes itself as a "specialist information, analytics and e-commerce optimisation company".

## MORE FROM BUSINESS

Ukraine war: EU plans Russian oil ban by the end of the year in new package of sanctions

Chelsea FC sale: Clearlake stake in Blues to be reduced in

restructured deal

EU oil embargo on Russia will be painful for both - but will reduce Putin's ability to wage war

Through brands such as Flywheel, it provides services to retailers and technology companies including Instacart, Kroger and Walmart.

Its other subsidiaries include Edge, a data insights company used by the likes of Apple and Coca-Cola, and OneSpace, which supplies "digital shelf experts" to optimise online sales.

Ascential also stages events such as Money20/20, for which it recently had a takeover approach from rival Hyve, and RetailWeek-branded conferences.

Investors pointed to two trends that were likely to be driving Ascential's move towards a formal break-up of the business.

Digital marketing and insight providers tend to be more highly valued by US equity markets, meaning that transferring the listing to New York is likely to achieve a substantial rerating of that part of Ascential's business.

One shareholder also pointed to the surge in activism forcing boards to evaluate radical options to create value for investors.

Mr Painter and the Ascential board are not, however, exploring a break-up under any pressure from activists or other shareholders, according to one person close to the business.

Given the significance of the plans being considered by the company, it may come under pressure to clarify its plans in a stock exchange announcement on Monday.

Last month, Ascential announced full-year results that showed revenue and profit ahead of market forecasts.

Earnings soared nearly fourfold, although the comparison was distorted by the prior year being particularly adversely affected by the impact of lockdowns on physical events.

"[The company's] formula has helped shape our strong performance in 2021, driven by market-leading products, structural digital growth trends and strong operational execution," Mr Painter said.

"The pandemic has stress-tested many companies' business models and I am delighted to see how well all ours have performed."

Shares in Ascential closed on Friday at 331p, having fallen by about 4pc over the last year.

Goldman Sachs and JP Morgan are advising Ascential on the proposed break-up.

An Ascential spokesman declined to comment on Saturday.

Sponsored Links

BALENCIAGA

Mytheresa

Mytheresa

Norton 360 with LifeLock

Feel like you have no choice but to

Norton

Hugo 5-Pocket Pant

We went all in on these new 5-

JOHNNIE-O

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| COMPASS MARKETING, INC., | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. GLR-22-379 |
| FLYWHEEL DIGITAL, LLC, et al., | * | |
| Defendants. | * | |

***

**MEMORANDUM OPINION**

THIS MATTER is before the Court on Defendants Flywheel Digital, LLC ("Flywheel"), James Columbus DiPaula, Jr., Patrick Miller, and Ascential, PLC's (collectively, "Flywheel Defendants") Motion to Dismiss (ECF No. 23), Defendants Michael White and George White's Motion to Dismiss (ECF No. 41), and Defendant Daniel White's Motion to Dismiss (ECF No. 42). The Motions are ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2021). For the reasons set forth below, the Court will grant the Motions.

## I. BACKGROUND[1]

### A. Factual Background

Plaintiff Compass Marketing, Inc. ("Compass") is a successful marketing company led by John White that helps large retail companies market consumer products online.

[1] Unless otherwise noted, the Court takes the following facts from the Complaint (ECF No. 1) and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007).

(Compl. ¶¶ 2, 18, 32, ECF No.1). Compass brings this sprawling lawsuit against Daniel and Michael White, John's brothers, George White, John's nephew, DiPaula and Miller, former Compass employees, and Flywheel and Ascential, PLC, Compass' competitors. (See generally id.). The eighty-page Complaint covers a host of claims, but primarily alleges that Flywheel Defendants stole Compass' trade secrets or otherwise benefitted from their use, and Daniel, Michael, and George engaged in widespread fraud. Specifically, Compass claims that Daniel and Michael engaged in fourteen years of "substantial mail and wire fraud, money laundering, embezzlement, and attempted extortion" so that they could "finance a life of luxury for themselves and their immediate family members." (Id. ¶¶ 97–98). Further, Compass alleges that George locked its IT systems in an extortion attempt. (Id. ¶ 256).

**1. Trade Secret Allegations against Flywheel Defendants**

Since its formation in 1998, Compass has built a robust eCommerce department "that served the biggest [consumer product] manufacturers in the world," such as Amazon, Staples, and Office Depot. (Id. ¶ 3). Compass has expended significant resources to create the proprietary business methods and strategies that have led it to success. (Id. ¶ 4). In 2010 and 2011, Compass hired DiPaula and Miller to run its eCommerce department. (Id. ¶ 5). DiPaula and Miller did not have prior eCommerce experience, so Compass trained them extensively on its proprietary methods. (Id. ¶¶ 5, 51). Eventually, DiPaula and Miller became "trusted senior executives" running "the fastest growing part of Compass." (Id. ¶ 5).

But DiPaula and Miller sent John their resignations on September 4, 2014. (Id. ¶¶ 15, 75). In his message, Miller thanked John for the opportunity and told him, "Like you, I've long wanted to own my own company. To do so, I'm . . . resigning from Compass." (Id. ¶ 75). DiPaula and Miller formed Flywheel, "a rival eCommerce company," the day before they resigned. (Id. ¶¶ 76–77).

Compass alleges that in 2014, DiPaula, Miller, and Flywheel stole "virtually all of Compass's trade secrets." (Id. ¶ 76). Further, Compass claims that its opportunities "changed drastically" when Flywheel was founded, as "Flywheel offered and continues to offer identical services as Compass." (Id. ¶ 61). On October 1, 2014, less than a month after their resignations, DiPaula emailed John to ask whether he and Miller could buy Compass' eCommerce wing, stating, "Patrick and I remain interested in the spin-off concept, as we feel vested in our colleagues we recruited and trained, and the clients we have nurtured these past few years." (Id. ¶ 78 (emphasis in original)). On October 8th, DiPaula emailed John again and emphasized "the urgency of completing an agreement quickly," and repeating their interest in buying Compass' eCommerce business. (Id. ¶ 80). That sale does not appear to have taken place, and Compass alleges that "unbeknownst" to the Company or John, DiPaula and Miller had already stolen Compass' proprietary information. (Id.).

Daniel served as Compass' General Counsel at the time. (Id. ¶ 18). Compass alleges that John showed the DiPaula and Miller emails to Daniel "and sought legal advice regarding how [Compass] should proceed." (Id. ¶ 81). According to Compass, Daniel advised against pursuing legal action against the Flywheel Defendants "and should instead

compete with Flywheel in the marketplace." (Id.). Compass claims that it had "no corresponding knowledge or suspicion that DiPaula and Miller had stolen Compass's trade secrets." (Id.).

In October 2016, Compass alleges that DiPaula and Miller poached six prominent Compass eCommerce employees for Flywheel's benefit: Justin Liu, eCommerce Account Manager; Andrew Fox, another eCommerce Account Manager; Mike O'Donnell, eCommerce Strategist; Alex McCord, Vice President and Accounts Manager of eCommerce; Dayna Acevedo, Chief of Staff; and Mike Menefee, eCommerce Account Executive (the "eCommerce Team"). (Id. ¶ 83). When they left, the eCommerce Team took with them a decade of specialized training, and perhaps even more significantly, "electronic or hard copy files that memorialized Compass's trade secret, proprietary, and confidential information regarding maximizing sales on Amazon." (Id. ¶ 85). The eCommerce Team continues to work at Flywheel. (Id. ¶ 83).

On January 20, 2020, a Compass employee discovered an August 25, 2015 Profitero article written by Miller titled, "The Future of Amazon Fresh?" (Id. at 42 n.1). The last line of the article stated, "Patrick Miller, Co-Founder, Flywheel Digital spent the last four years deconstructing eCommerce sites and helping American manufacturers figure out Amazon from a brand, search, social, customer service, supply chain, pricing and sales perspective." (Id. ¶ 184). After discovering the article, Compass engaged in "further research" and found a Flywheel power point presentation online that Miller gave at a conference on November 5, 2015. (Id. ¶ 186). Compass learned that Miller had included a review of several Compass clients or former clients in his presentation. (Id.). In any event, Compass claims that it was

not until January 2020 upon discovering the 2015 article that Compass "investigated whether any of the clients that left Compass since 2014 subsequently engaged Flywheel." (Id. ¶ 192). Indeed, it learned belatedly, Flywheel poached "a long list of Compass eCommerce clients," including Proctor & Gamble, Colgate, Johnson & Johnson, and McCormick. (Id. ¶ 193).

**2. Claims of Widespread Fraud against the Whites**

Compass alleges that Daniel, Michael, and George (collectively, the "Whites") engaged in several fraud schemes to steal millions from Compass. As explained above, Daniel served as Compass' General Counsel from 1998 to November 23, 2018. (Id. ¶ 18). Michael, Daniel and John's brother, was Vice President of Operations and Comptroller of Compass from 2011 to November 23, 2018. (Id. ¶ 19). Finally, George, Michael's son, worked at Compass "managing Compass's IT systems" from 2004 until April 29, 2019. (Id. ¶ 20).

On November 1, 2018, Ascential, PLC bought Flywheel for $400 million. (Id. ¶ 21). Within a few days of the sale, "a storm began brewing inside [Compass] that involved Michael and Daniel White." (Id. ¶ 91). Compass alleges that a few days before the sale, Michael sent out a company-wide email "disparaging" John. (Id. ¶ 94). Compass does not explain how exactly Michael disparaged John or what caused the "storm" to brew. (See generally id.). Regardless, Compass unceremoniously explains that John fired Daniel and Michael on November 23, 2018. (Id. ¶ 94). After the firing, Compass hired a criminal investigator to look into Daniel and Michael's conduct at the company and discovered extensive unlawful activity. (Id. ¶ 97).

Compass claims that the Whites engaged in sweeping fraudulent schemes, which the Court condenses below:

Regarding the "Secret Compass Bank Account Scheme":

- On December 1, 2008, Michael and Daniel opened a checking account at the Community Bank of the Chesapeake and on June 15, 2009, Michael opened a separate savings account there, (id. ¶¶ 99–100);
- "From 2008 to 2020, Michael and Daniel White used these Secret Bank Accounts to financially benefit themselves" and their families, including by paying for their life insurance policies, an "unrelated gambling business," and a $200,000 transfer to the Washington Commanders football team, (id. ¶¶ 104–05);
- "[D]isbursements from the Secret Bank Accounts show that more than $3.4 million was disbursed to Michael, and more than $632,000 was disbursed to Daniel," (id. ¶ 106);

Regarding the "Ghost Employee Scheme":

- In 1998, Daniel and Michael added Michael's wife to Compass' payroll and "[p]rior to April 1, 2010," although Compass does not specify when exactly, Daniel and Michael added Daniel's wife to the payroll, (id. ¶¶ 109–10);
- In 2017, Daniel and Michael added Daniel's daughter to the Compass payroll, (id. ¶ 111);
- "In or around 2015," Daniel and Michael added one of Daniel's "colleague[s]" to Compass' payroll, (id. ¶ 112);
- Those individuals received payroll deposits from Compass, (id. ¶ 115);
- From 1998 to 2019, Michael covered up these "ghost employees" by creating false spreadsheets, (id. ¶ 118);

Regarding the "IRS Tax Check Scheme":

- "Michael created a tax check scheme that allowed him and Daniel to have money embezzled from Compass be

rebated back from and through the Internal Revenue Service," (id. ¶ 119);

- Michael issued himself additional electronic payroll payments as 100% tax withholding, "and would go to the IRS and to the state of Maryland," (id. ¶ 120);
- Michael "exclusively controlled" the payments and Michael and Daniel "embezzle[ed] millions of dollars from Compass," (id. ¶ 125);

Regarding the "Shareholder Loan Scheme":

- Michael "caused Compass" to send himself and Daniel "reimbursement for personal loans that were never made to the company," (id. ¶ 126);
- Michael caused Compass to issue payments to himself and to Daniel "purporting to be principal and interest payments against the fake loans," (id.);
- From 2015 to 2019, Michael and Daniel received checks from Compass with "LTC" written in the memo line, which Compass claims stands for "loan to company," (id. ¶ 127);
- Compass claims that it "recently discovered" an email from August 21, 2017, in which Daniel wrote Michael that anything his daughter made could "Come out of [his] BS loan," (id. ¶ 142);

Regarding the "Information Technology Lockout of Compass Business Records":

- On April 29, 2019, after Daniel and Michael were removed from the Board, "George had reason to believe that his removal was also imminent," and tried to "leverage his control over the Compass IT systems to extort additional payments for himself prior to his departure," (id. ¶ 146);
- George "demanded" a promotion with a $100,000 signing bonus, a new title, a base salary of $225,000, and a severance package, (id.);
- When Compass refused this "demand," George resigned, (id. ¶ 147);
- Then, at an unspecified time "after April 30, 2019," George maliciously cut off Compass access to employee email accounts using the

compassmarketinginc.com domain, as well as access to basic business software like "Microsoft," QuickBooks, and "other business records and accounts," (id. ¶ 149), which Compass curiously calls "the July Extortion Attempt";

- Compass claims that it "remains locked out" from its email and "had no choice but to start over" with a new IT infrastructure at "significant," but unspecified, expense, (id. ¶ 151);

Regarding the "Sham Legal Campaign:

- Finally, Compass claims that Michael and Daniel "attempted to cover up their illicit conduct" by filing a regulatory complaint against Compass with the Department of Labor, (id. ¶¶ 158–59); and
- The Department of Labor is still investigating Compass for violations of labor laws, which it claims has led it to incur "substantial legal fees," (id. ¶ 161).

## B. Procedural History

On February 14, 2022, Compass filed its Complaint premised upon federal question jurisdiction. (ECF No. 1). Compass alleges a litany of claims: violation of the Defend Trade Secrets Act of 2016 ("DTSA") against Flywheel Defendants (Count I); violation of the Maryland Uniform Trade Secrets Act ("MUTSA") against Flywheel Defendants (Count II); civil RICO under 18 U.S.C. § 1962(c) against all Defendants (Count III); civil RICO conspiracy under 18 U.S.C. § 1962(d) against all Defendants (Count IV); breach of contract against DiPaula and Miller (Count V); tortious interference with contract against DiPaula, Miller, and Flywheel (Count VI); tortious interference with prospective advantage against DiPaula, Miller, and Flywheel (Count VII); unfair competition against Flywheel Defendants (Count VIII); unjust enrichment against Flywheel Defendants (Count IX); fraudulent concealment/fraud against all Defendants (Count X); conspiracy to

misappropriate trade secrets against all Defendants (Count XI); conspiracy to breach contract against DiPaula and Miller (Count XII); conspiracy to tortiously interfere with contracts against DiPaula, Miller, and Flywheel (Count XIII); conspiracy to tortiously interfere with prospective advantage against DiPaula, Miller, and Flywheel (Count XIV); conspiracy to unfairly compete against all Defendants (Count XV); conspiracy to commit fraudulent concealment/fraud against all Defendants (Count XVI); aiding and abetting misappropriation of trade secrets against DiPaula, Miller, and Flywheel (Count XVII); aiding and abetting tortious interference with contracts against DiPaula, Miller, and Flywheel (Count XVIII); aiding and abetting tortious interference with prospective advantage against DiPaula, Miller, and Flywheel (Count XIX); aiding and abetting unfair competition against DiPaula, Miller, and Flywheel (Count XX); aiding and abetting fraudulent concealment/fraud against all Defendants (Count XXI); conversion against Michael and George White (Count XXII); and finally breach of fiduciary duty against Daniel and Michael White (Count XXIII).

Flywheel Defendants filed a Motion to Dismiss on April 4, 2022. (ECF No. 23). Compass filed an Opposition on May 4, 2022 (ECF No. 44), and Flywheel Defendants filed a Reply on May 25, 2022 (ECF No. 48).

On April 25, 2022, George filed an Answer to Count XXII, conversion (ECF No. 40). That same day, Michael and George filed a Motion to Dismiss all other claims. (ECF No. 41). Compass filed an Opposition on May 16, 2022 (ECF No. 47), and Michael and George filed a Reply on May 31, 2022 (ECF No. 49).

Finally, Daniel filed a Motion to Dismiss on April 24, 2022 (ECF No. 42). On May 4, 2022, Compass filed an Opposition (ECF No. 47). Daniel filed a Reply on May 31, 2022 (ECF No. 50).

## II. DISCUSSION

### A. Standard of Review

#### 1. Rule 12(b)(6)

The purpose of a Rule 12(b)(6) motion is to "test[] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. Though the plaintiff does not have to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of Am., N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, accept the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. See Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs of Davidson Cnty., 407 F.3d 266, 268 (4th Cir. 2005). But the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 555).

**2. Rule 9(b)**

Compass' allegations of fraud implicate the heightened pleading standard set forth in Federal Rule of Civil Procedure 9(b). Cozzarelli v. Inspire Pharm. Inc., 549 F.3d 618, 629 (4th Cir. 2008). The rule states: "In alleging fraud . . . a party must state with particularity the circumstances constituting fraud." Fed.R.Civ.P. 9(b). Under the rule, a plaintiff alleging claims that sound in fraud "must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." U.S. ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co., 612 F.3d 724, 731 (4th Cir. 2010) (quoting U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc., 525 F.3d 370, 379 (4th Cir. 2008)). In other words, "Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story." Crest Constr. II, Inc. v. Doe, 660 F.3d 346, 353 (8th Cir. 2011) (quoting Summerhill v. Terminix, Inc., 637 F.3d 877, 880 (8th Cir. 2011)).

As the Fourth Circuit has explained, Federal Rule of Civil Procedure 9(b) serves several salutary purposes:

> First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . . Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999) (quoting U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Blue Cross Blue Shield of Ga., Inc., 755 F.Supp. 1055, 1056–57 (S.D.Ga. 1990)). By its terms, however, Rule 9(b) permits a general averment of aspects of fraud that relate to a defendant's state of mind. It states, in part: "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.R.Civ.P. 9(b). Moreover, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." Harrison, 176 F.3d at 784.

**B. Analysis**

**1. Limitations Defenses**

Compass alleges three federal claims: violation of the DTSA against the Flywheel Defendants (Count I);[2] civil RICO under 18 U.S.C. § 1962(c) against all Defendants (Count

[2] Compass also alleges violation of the Maryland analog to the DTSA, the MUTSA (Count II). The Court need not reach this claim, but it appears it would be time-barred for the same reasons above.

III); and civil RICO conspiracy under 18 U.S.C. § 1962(d) against all Defendants (Count IV). Defendants argue that some or all of the claims are barred by the applicable statutes of limitations. (Mem. Supp. Mot. Dismiss Flywheel ["Flywheel Mot."] at 13–17, ECF No. 23-1; Mem. L. Supp. Defs. Michael White & George White Mot. Dismiss ["Michael & George Mot."] at 7–10, ECF No. 41; Mem. L. Supp. Daniel White Mot. Dismiss ["Daniel Mot."] at 4–6, ECF No. 42-1). As such, the Court will first assess the timeliness of Compass' DTSA and RICO claims against Flywheel Defendants and then will address Compass' RICO claims against the Whites.

Trade secret appropriation under the DTSA "may not be commenced later than 3 years after the date on which the misappropriation with respect to which the action would relate is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d). RICO claims "are governed by a four-year statute of limitations, which runs from the date when the plaintiff discovered, or should have discovered, the injury." Potomac Elec. Power Co. v. Elec. Motor & Supply, Inc., 262 F.3d 260, 266 (4th Cir. 2001).

**a. Flywheel Defendants (Counts I, III, IV)**

Compass premises its DTSA and RICO claims against Flywheel Defendants on the alleged theft of its trade secrets. Flywheel Defendants argue that the claims are time-barred because Compass should have discovered the misappropriation through the exercise of due diligence in 2014, or no later than 2016, and Compass did not file suit until February 14, 2022. (Flywheel Mot. at 15–17). Compass responds that because it did not discover the power point presentation until 2020, the three-year statute of limitations did not start until

then, "at the earliest." (Pl.'s Opp'n Flywheel Defs.' Mot. ["Opp'n Flywheel Mot."] at 26–27, ECF No. 44). The Court agrees with Flywheel Defendants for several reasons and will dismiss the claims.

As an initial matter, the Court acknowledges that it can only reach limitations defenses at the 12(b)(6) stage in certain instances. Indeed, "[a] defendant's claim that an action is time-barred is an affirmative defense that it can raise in a motion to dismiss when the 'face of the complaint includes all necessary facts for the defense to prevail.'" Meridian Investments, Inc. v. Fed. Home Loan Mort. Corp., 855 F.3d 573, 577 (4th Cir. 2017) (quoting Leichling v. Honeywell Int'l, Inc., 842 F.3d 848, 850–51 (4th Cir. 2016)). For reasons explained more fully below, the Court finds that all facts necessary to decide whether Flywheel Defendants' affirmative defense applies to Compass' trade secret claims, including when the causes of action first accrued, appear on the face of Compass' Complaint. The Court will therefore reach Flywheel Defendants' affirmative defense.

Here, Compass describes several events in its Complaint that triggered the applicable statutes of limitations. First, it should have discovered the alleged misappropriation through the exercise of reasonable diligence in 2014 when two of its "trusted senior executives" left to form Flywheel, a direct competitor. (See Compl. ¶ 5). Miller and DiPaula did not keep their plan to form their own eCommerce company a secret—according to Compass' own allegations, which the Court accepts as true, they emailed John multiple times in September and October 2014 about how they were leaving to start their own business and how they hoped to buy Compass' eCommerce department. (Id. ¶¶ 15, 75, 78). At that time, Compass was on inquiry notice that Miller and DiPaula

might take Compass' proprietary information with them. Thus, the three-year statute of limitations for the DTSA claim ran in late 2017 and the four-year limitations period for the RICO claims, to the extent they are premised on theft of trade secrets, ran in 2018.

Second, even if the Court were to presume that Compass had no reason to investigate whether its "trusted" eCommerce executives might misappropriate its trade secrets during Flywheel's formation, Compass should have discovered the misappropriation no later than 2016. Compass alleges that in October 2016, there was a "mass exodus" of six of its eCommerce department employees to Flywheel. (Id. ¶ 83). Compass claims that DiPaula and Miller specifically "recruited" the eCommerce Team "to unlawfully compete with Compass using Compass's trade secrets and proprietary information." (Id. ¶ 84). Moreover, Compass claims that the eCommerce Team actually stole electronic or hard copy files "that memorialized Compass's trade secret, proprietary, and confidential information regarding maximizing sales on Amazon." (Id. ¶ 85). Reasonable diligence required Compass to investigate the "mass exodus" of its employees to a rival and ensure that those employees did not take its proprietary information with them. (See id.). Accordingly, even under a more forgiving read of the facts on the surface of Compass' Complaint, the statute of limitations for the DTSA claim against the Flywheel Defendants ran in 2019 and the RICO claims ran in 2020.

Further, Compass' argument that it could not discover the trade secret appropriation until 2020 strains credulity. The Profitero blog post it allegedly found in 2020 was posted online in 2015. If Compass exercised reasonable diligence, it would have found this

publicly accessible article written by its former executive and specifically mentioning Amazon, eCommerce, Flywheel, and Miller much sooner.

More importantly, Compass should have noticed the potential misappropriation when it began to lose prominent clients to Flywheel. In its own words, Flywheel "poached a long list of Compass eCommerce clients, including well-established brands such as [Proctor & Gamble], Allergan, Amplify Snacks Brands, Colgate, Ferrero, Johnson & Johnson, Mars, McCormick, Old Wisconsin, and 5 Hour Energy." (Id. ¶ 193). It is implausible that Compass never noticed or investigated these client losses in real time, and reasonable diligence required it to inquire as to where those clients went and whether Flywheel could be using its proprietary information to "poach" those clients. It is hard to imagine a scenario in which there could be more facts suggesting inquiry notice than exist here.

At the end of its Opposition, Compass argues that even if Flywheel Defendants are right about the notice, the "continuing harm" or "continuous violation" doctrine should toll the applicable statutes of limitations, rendering its claims timely. (See Opp'n Flywheel Mot. at 29). Compass does not cite any binding precedent in support of its theory. (See id.). Rather, Compass cites a lone, unreported decision from the Southern District of New York that states that, under New York law, "[t]he date of accrual may be extended under the continuing tort doctrine where the 'defendant has kept a secret confidential but continued to use it for commercial advantage.'" See iSentium, LLC v. Bloomberg Fin. L.P., No. 17-cv-7601, 2020 WL 248939, at *8 (S.D.N.Y. Jan. 16, 2020). Notably, even there, the court did not toll the deadline in question under the doctrine. Instead, it granted summary

judgment in favor of defendant because, much like here, it found that plaintiff should have discovered the misappropriation sooner. See id. Therefore, the New York case is of little help to Compass.

In any event, review of Maryland law reveals that the State has never applied the doctrine to a trade secret claim before, and the Court declines to expand the doctrine's use. In Cain v. Midland Funding, LLC, 256 A.3d 765 (Md. 2021), the Maryland Supreme Court explained that the continuing harm doctrine is typically applied in "limited contexts" such as "nuisance, trespass, and other tort cases." Id. at 791. The court did a thorough review of the Maryland precedent on the doctrine, and it appears that Compass' request would be novel under state law. See id. (summarizing caselaw on continuing harm doctrine and declining to extend it to subject consumer debt dispute); Shell Oil Co. v. Parker, 291 A.2d 64, 67 (Md. 1972) (applying doctrine without discussion regarding false advertisement on billboard); MacBride v. Pishvaian, 937 A.2d 233, 241 (Md. 2007) (declining to extend doctrine to landlord tenant dispute regarding water damage in apartment), abrogated by Litz v. Md. Dep't Env't, 76 A.3d 1076 (Md. 2013); Litz, 76 A.3d at 1091 (applying the doctrine in a nuisance claim regarding leaching effluent from failing septic systems); Duke St. v. Bd. Comm'rs of Calvert Cnty., 684 A.2d 40 (Md.Ct.Spec.App. 1996) (declining to apply doctrine to claim plaintiff was coerced into deeding his land for a public street). Compass does not address Maryland precedent in its briefing and does not offer any compelling reasons to apply the "limited" continuing harm doctrine here, particularly where Maryland has yet to extend it to such claims. (See Opp'n Flywheel Mot. at 29).

For these reasons, Compass' claims against the Flywheel Defendants are barred by the applicable statutes of limitations. The Court will grant Flywheel Defendants' Motion to Dismiss as to Counts I, III, and IV.[3]

**b. Daniel, Michael, and George White (Counts III & IV)**

Next, the Whites argue that that Compass' federal RICO claims that predate February 14, 2018, four years before Compass filed the Complaint, are time barred. (Michael & George Mot. at 7; Daniel Mot. at 4–5). The Court declines to dismiss the RICO claims against the Whites based on limitations.

Again, the Court may not consider a statute of limitations defense at the motion to dismiss stage unless the "face of the complaint includes all necessary facts for the defense to prevail." Meridian Investments, 855 F.3d at 577 (quoting Leichling, 842 F.3d at 850–51). Here, Compass' claims against the Whites do not contain all the necessary facts for the Court to reach a determination on limitations. Compass' claims are broad and occasionally vague, and thus more fact-finding would be necessary before the Court could assess notice. For example, Compass alleges:

- From 2008 to 2020, Michael and Daniel used "secret" bank accounts funded by Compass to financially benefit themselves and their families, (Compl. ¶¶ 99–106);

[3] Compass' DTSA claim against the Flywheel Defendants would also fail to the extent it seeks relief for the theft of trade secrets that took place before May 11, 2016. That is when the DTSA became effective, and it does not apply retroactively. See 18 U.S.C. § 1836. Thus, even if the DTSA claim were timely, Compass would fail to state a claim under 12(b)(6) regarding any conduct that preceded the date of DTSA's effectiveness—significantly, any theft of trade secrets that took place in 2014, when Miller and DiPaula left to form Flywheel, or 2015, when Miller wrote the Profitero article and presented the power point at a conference.

- From 1998 to 2019, Michael and Daniel added their family members, who Compass does not mention were by extension John's family members as well, to Compass' payroll as "ghost employees," (id. ¶¶ 109–18);
- Michael and Daniel "attempted to cover up their illicit conduct" by filing a regulatory complaint against Compass with the Department of Labor, which is still investigating Compass, (id. ¶¶ 158–61);
- Michael and Daniel embezzled millions of dollars from Compass through an IRS tax scheme, (id. ¶¶ 119–25);
- On April 29, 2019, after Compass fired Michael and Daniel, George tried to "leverage" his control over Compass IT systems to "demand" a promotion. When Compass refused, George resigned. Then, at some unspecified time "after April 30, 2019," George locked Compass out of its email domain and from using Microsoft, Quickbooks, and other online accounts in an "extortion attempt." Compass does not indicate that George requested a raise after he resigned, (id. ¶¶ 146–49).

Compass' allegations are far-reaching and often include only vague details about the dates of the alleged conduct and the sources of that information. Although Compass explains that it discovered the alleged misdeeds after hiring a private investigator, it does not plead details about how the investigator discovered this alleged misconduct, what concrete evidence exists of the misconduct, or whether or when Compass had access and control over the sources of this information. Accordingly, although Compass' claims include events that occurred well outside the four-year statute of limitations, the Complaint does not contain all the facts necessary for the Court to reach the Whites' limitations defenses now. Thus, the Court will deny the Whites' Motions on these grounds. Still, the Court's decision should not be read as a finding that Compass' RICO claims against the Whites are timely.

**2. Failure to State a Claim**

Next, the Court turns to whether Compass has stated claims against the Whites for civil RICO and RICO conspiracy under Rule 12(b)(6). At bottom, the Court finds that Compass has not and will dismiss the claims.

The RICO statute prohibits the conduct of an "enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). RICO establishes criminal penalties and also "a private civil right of action to '[a]ny person injured in his business or property by reason of a violation of the RICO provisions.'" Hardwire, LLC v. Ebaugh, No. JKB-20-0304, 2021 WL 3809078, at *5 (D.Md. Aug. 26, 2021) (quoting ESAB Grp., Inc. v. Centricut, Inc., 126 F.3d 617, 626 (4th Cir. 1997)). "A civil RICO action 'is a unique cause of action that is concerned with eradicating organized, longterm, habitual criminal activity.'" Ekstrom v. Cong. Bank, No. ELH-20-1501, 2020 WL 6565251, at *16 (D.Md. Nov. 9, 2020) (quoting U.S. Airline Pilots Ass'n v. Awappa, LLC, 615 F.3d 312, 317 (4th Cir. 2010)). To properly plead a civil RICO claim, plaintiffs must allege "1) conduct [causing injury to business or property] 2) of an enterprise 3) through a pattern 4) of racketeering activity." Id. at *17 (alteration in original) (citing Morley v. Cohen, 888 F.2d 1006, 1009 (4th Cir. 1989)). A RICO conspiracy claim, on the other hand, "requires that the plaintiff allege and later prove that the defendants knew of the RICO violations of the enterprise and agreed to facilitate those activities." Chambers v. King Buick GMC, LLC, 43 F.Supp.3d 575, 607 (D.Md. 2014). As various fraud claims are asserted as the predicate acts for this civil RICO violation, Rule 9(b)'s particularity requirement applies. Ekstrom, 2020 WL 6565251 at *19.

In evaluating the viability of a RICO claim, the United States Court of Appeals for the Fourth Circuit instructs courts to differentiate between "garden-variety fraud claims," which do not amount to a RICO violation, and "cases involving a more serious scope of activity." See Al-Abood ex rel. Al-Abood v. El-Shamari, 217 F.3d 225, 238 (4th Cir. 2000). Courts have "limit[ed] [RICO's] severe penalties to offenders engaged in ongoing criminal activity, rather than isolated wrongdoers." Ekstrom, 2020 WL 6565251, at *17 (quoting Friedler v. Cole, No. CCB-04-1983, 2005 WL 465089, at *7 (D.Md. Feb. 28, 2005)). Indeed, RICO "is reserved for conduct whose scope and persistence pose a special threat to social well-being." Id. (quoting Biggs v. Eaglewood Mortg., LLC, 582 F.Supp.2d 707, 714 (D.Md. 2008)). Thus, the Court "will not lightly permit ordinary business contract or fraud disputes to be transformed into federal RICO claims." Flip Mortg. Corp. v. McElhone, 841 F.2d 531, 538 (4th Cir. 1988).

Compass' RICO claims fail because it has not established that the Whites were engaged in an enterprise. An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). A plaintiff must establish three elements: "(1) an ongoing organization; (2) associates functioning as a continuing unit for a common purpose; and (3) the enterprise is an entity separate and apart from the pattern of activity in which it engages." Rojas v. Delta Airlines, Inc., 425 F.Supp.3d 524, 537 (D.Md. 2019). Significantly, "a RICO enterprise requires the existence of collaboration or agreement between the members of the enterprise." Id. Further, "[b]ecause the core of a RICO civil conspiracy is an agreement to commit predicate acts,

a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement." Chambers, 43 F.Supp.3d at 607 (quoting Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 25 (2d Cir. 1990)).

Although Compass alleges that Daniel and Michael "engaged in a pattern of egregious behavior" since 2008, it has not pleaded that they formed any type of agreement to engage in that conduct. (Compl. ¶ 255). At most, Compass claims that Defendants generally, including Flywheel Defendants, participated in a "coordinated effort to cause Compass financial harm." (Id. ¶ 258). That is simply not enough—conclusory allegations regarding an agreement are insufficient to state a RICO claim. See Rojas, 425 F.Supp.3d at 538 (finding that general allegation that a "collective decision was made" did not properly establish a RICO enterprise); SD3, LLC v. Black & Decker Inc., 801 F.3d 412, 437 (4th Cir. 2015) (finding no agreement where plaintiffs alleged only that "a collective decision was made"). As Compass has failed to provide "specific allegations as to how, when, or where" any agreement took place, it has not stated a RICO or RICO conspiracy claim. See Rojas, 425 F.Supp.3d at 538; Twombly, 550 U.S. at 555 (stating that courts must ignore conclusory allegations or formulaic recitations of the elements of a claim); Grant v. Shapiro & Burson, LLP, 871 F.Supp.2d 462, 473 (D.Md. 2012) (dismissing RICO complaint with "no factual averments" regarding agreement between defendants); Chambers, 43 F.Supp.3d at 607–08 (dismissing civil RICO conspiracy complaint where it contained conclusory statement that defendants "worked in combination with each other" to engage in fraud).

Curiously, in its Opposition, Compass claims that "the RICO enterprise alleged in the Complaint is Compass itself." (Pl.'s Opp'n Michael White & George White Mot. ["Opp'n Michael & George Mot."] at 14, ECF No. 47 (emphasis in original)). Despite Compass' willingness to implicate itself in a racketeering scheme, it mischaracterizes the allegations in the Complaint—Compass only substantively describes the RICO "enterprise" as Flywheel, not Compass itself. (Compl. ¶ 86). Nowhere does Compass allege that it was the RICO enterprise through which the Whites operated. (See generally id.). Regardless, Compass' claims still fail because it never pleads an agreement between the Whites to engage in any fraud.[4]

Accordingly, the Court will grant the Whites' Motions as to Counts III and IV and dismiss the claims.

---

[4] Although the Court need not reach it, Compass' claims against George White would also fail because it has not alleged that he engaged in a pattern of racketeering activity. A "pattern of racketeering activity" requires "at least two acts of racketeering activity." 18 U.S.C. § 1961(5). At least two predicate acts are required, but two acts alone still may not necessarily establish a pattern. GE Inv. Priv. Placement Partners v. Parker, 247 F.3d 543, 549 (4th Cir. 2001). In order to show a pattern of racketeering activity, the plaintiff must demonstrate "that the predicate acts are related and that they 'amount to or pose a threat of continued criminal activity.'" Id. (quoting H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239 (1989)).

The bulk of Compass' allegations are against Daniel and Michael. As for George, Compass' alleges that he requested a raise, which it refers to as "extortion," resigned when he did not receive the raise, and at some unspecified point, locked Compass' email access and access to certain programs. (Compl. ¶¶ 146–52). Of these, the only allegedly "criminal" act was the IT lockout—Compass does not allege any facts to suggest that George threatened the company some way when he requested a raise to justify its use of the term "extortion." Thus, Compass has only alleged one predicate act against George, and that is insufficient under the statute. See Parker, 247 F.3d at 549.

**3. State Law Claims**

Compass alleges a litany of other claims under state law. (Counts II, V–XXIII). Federal district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States" under 28 U.S.C. § 1331, as well as those "where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States" under 28 U.S.C. § 1332(a). Still, federal courts are courts of limited jurisdiction and "may not exercise jurisdiction absent a statutory basis." Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005). "A court is to presume, therefore, that a case lies outside its limited jurisdiction unless and until jurisdiction has been shown to be proper." United States v. Poole, 531 F.3d 263, 274 (4th Cir. 2008) (citing Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994)). "[B]efore a federal court can decide the merits of a claim, the claim must invoke the jurisdiction of the court." Miller v. Brown, 462 F.3d 312, 316 (4th Cir. 2006).

Here, Compass no longer has any surviving claims under federal law. The Court has discretion to exercise supplemental jurisdiction "[w]henever the basis for federal jurisdiction evaporates," and may decline to do so when it "has dismissed all claims over which it has original jurisdiction." Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir. 1995); 28 U.S.C. § 1367(c)(3). "Among the factors that inform this discretionary determination are convenience and fairness to the parties, the existence of any underlying issues of federal policy, comity, and considerations of judicial economy." Russell v. Cont'l Rest., Inc., 430 F.Supp.2d 521, 528 (D.Md. 2006). The Court declines to exercise supplemental

jurisdiction here, where it has dismissed all federal claims, the complaint presents no federal policy issues, and the Court has an extensive docket of cases over which it exercises original jurisdiction. The remaining claims should be presented to a state court. Accordingly, the Court will dismiss the Complaint in its entirety.

## III. CONCLUSION

For the foregoing reasons, the Court will grant Flywheel Defendants' Motion to Dismiss (ECF No. 23), Defendants Michael and George White's Motion to Dismiss (ECF No. 41), and Defendant Daniel White's Motion to Dismiss. (ECF No. 42).

A separate Order follows.

Entered this 24th day of February, 2023.

/s/
George L. Russell, III
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

COMPASS MARKETING, INC., *

Plaintiff, *

v. * Civil Action No. GLR-22-379

FLYWHEEL DIGITAL, LLC, et al., *

Defendants. *

***

**ORDER**

For the reasons stated in the foregoing Memorandum Opinion, it is this 24th day of February, 2023, by the United States District Court for the District of Maryland, hereby:

ORDERED that Defendants Flywheel Digital, LLC, James Columbus DiPaula, Jr., Patrick Miller, and Ascential, PLC's Motion to Dismiss (ECF No. 23), Defendants Michael White and George White's Motion to Dismiss (ECF No. 41), and Defendant Daniel White's Motion to Dismiss (ECF No. 42) (collectively, the "Motions") are GRANTED as to the federal law counts, Counts I, III, and IV;

IT IS FURTHER ORDERED that Counts I, III, and IV are DISMISSED;

IT IS FURTHER ORDERED that the Court DECLINES to exercise supplemental jurisdiction over the remaining state law counts, Counts II, V–XXIII;

IT IS FURTHER ORDERED that Counts II, V–XXIII are DISMISSED, but may be raised in state court; and

IT IS FURTHER ORDERED that the Clerk shall CLOSE this case.

/s/
George L. Russell, III
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **COMPASS MARKETING, INC.,** | § | |
| **Plaintiff,** | § | |
| **v.** | § | **Case Number: 1:22-cv-00379-GLR** |
| **FLYWHEEL DIGITAL LLC, *et al*.,** | § | |
| **Defendants.** | § | |

**NOTICE OF APPEAL**

Pursuant to Federal Rule of Appellate Procedure 3(a)(1)(A), Plaintiff Compass Marketing, Inc. ("Compass") appeals to the United States Court of Appeals for the Fourth Circuit from the final judgment entered on February 24, 2023 (D.I. 64, 65).

Dated: March 24, 2023

Respectfully submitted,

/s/ *Steven A. Luxton, Esq.*

Steven A. Luxton, Esq. (MD Bar No. 9812160173)
Natalie A. Bennett, Esq. (admitted *pro hac vice*)
**Morgan, Lewis & Bockius LLP**
1111 Pennsylvania Avenue
7th Floor
Washington, DC 20004-2541
steven.luxton@morganlewis.com
natalie.bennett@morganlewis.com
T. (202) 739-5559
F. (202) 739-3001

Troy S. Brown, Esq. (admitted *pro hac vice*)
Rachel A. Ward, Esq. (admitted *pro hac vice*)
**Morgan, Lewis & Bockius LLP**
1701 Market Street

Philadelphia PA 19103
troy.brown@morganlewis.com
rachel.ward@morganlewis.com
T. (215) 963-5000
F (215) 963-5001

James J. Kritsas, Esq. (admitted *pro hac vice*)
**Morgan, Lewis & Bockius LLP**
110 North Wacker Drive
Chicago, IL 60606
james.kritsas@morganlewis.com
T. (312) 324-1000
F. (312) 324-1001

Susan K. Stradley, Esq. (admitted *pro hac vice*)
**Morgan, Lewis & Bockius LLP**
1000 Louisiana Street
Suite 4000
Houston, TX 77002
susan.stradley@morganlewis.com
T. (713) 890-5000
F. (713) 890-5001
*Counsel for Plaintiff Compass Marketing, Inc.*