**RECORD NO. 23-1324**

# UNITED STATES COURT OF APPEALS
## FOR THE
## FOURTH CIRCUIT

───────────────────────

COMPASS MARKETING, INCORPORATED,

*Plaintiff-Appellant*

v.

FLYWHEEL DIGITAL LLC, JAMES COLUMBUS DIPAULA JR, PATRICK MILLER, AND ASCENTIAL PLC,

*Defendants-Appellees*

───────────────────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
No. 1:22-cv-00379-GLR
(GEORGE L. RUSSELL, JUDGE)

───────────────────────

**RESPONSE BRIEF OF APPELLEES FLYWHEEL DIGITAL LLC, ASCENTIAL PLC, JAMES COLUMBUS "CHIP" DIPAULA JR., AND PATRICK MILLER**

Michael C. Keats
FRIED, FRANK, HARRIS SHRIVER
& JACOBSON LLP
One New York Plaza
New York, NY 10004
T: (212) 859-8914

Tonya Kelly Cronin
BAKER DONELSON
100 Light St., 19th Floor
Baltimore, MD 21202
T: (410) 685-1120

Rebecca L. Martin
FRIED, FRANK, HARRIS SHRIVER

Alison Schurick
BAKER DONELSON

& JACOBSON LLP
One New York Plaza
New York, NY 10004
T: (212) 859-8305

Samuel H. Truesdell
FRIED, FRANK, HARRIS SHRIVER
& JACOBSON LLP
One New York Plaza
New York, NY 10004
T: (212) 859-8580

*Counsel for Defendants-Appellees*
*Flywheel Digital LLC, James*
*Columbus DiPaula Jr., Patrick Miller,*
*and Ascential plc*

100 Light St., 19th Floor
Baltimore, MD 21202
T: (410) 685-1120

David B. Hamilton
DLA PIPER LLP (US)
650 South Exeter St., 11th Floor
Baltimore, MD  21202
T: (410) 580-4120

*Counsel for Defendants-Appellees*
*James Columbus DiPaula Jr. and*
*Patrick Miller*

Harry P. Rudo
DLA PIPER LLP (US)
650 South Exeter St.,11th Floor
Baltimore, MD  21202
T: (410) 580-4923

**CORPORATE DISCLOSURE STATEMENTS**

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure:

1. Appellee Flywheel Digital LLC ("Flywheel") certifies that it is a wholly-owned subsidiary of Ascential Inc., which is owned by WGSN Ltd., which is owned by WGSN Group Ltd., which is owned by Ascential UK Holdings Ltd., which is owned by Ascential Group Ltd., which is owned by Ascential Financing Ltd., which is owned by Ascential plc.

2. Appellee Ascential plc ("Ascential") certifies that it is a publicly held company that has no parent corporation and no other publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

Corporate Disclosure Statements..................................................... i

Table of Contents ....................................................................... ii

Table of Authorities .................................................................. iii

Statement of the Issues.............................................................. 1

Statement of the Case ............................................................... 1

    A.    Factual Background............................................................ 2

    B.    This Litigation ................................................................ 12

Summary of the Argument......................................................... 14

Argument.............................................................................. 16

I.    The District Court's Decision Dismissing All Claims Should Be Affirmed 16

    A.    Compass's DTSA Claim (Count I) Is Time-Barred............................ 17

        1.    Compass Was on Notice in 2014 .............................. 19

        2.    Compass Was on Notice Again in 2015 .................................. 21

        3.    Compass Was on Notice No Later Than 2016 ........................ 22

    B.    Compass's RICO Claims (Counts III & IV) Are Time-Barred ......... 23

    C.    The District Court Correctly Applied the Inquiry Notice Standard................................................................ 25

    D.    Maryland's "Discovery Rule" Does Not Toll the Statutes of Limitations for Compass's Federal Claims........................................ 26

    E.    Compass Failed to Allege Fraudulent Concealment........................... 27

II.    The District Court Properly Dismissed All Claims Against Ascential ........ 30

III.    The District Court Did Not Abuse Its Discretion By Declining to Grant Compass Leave to Amend................................................................ 34

Conclusion ...................................................................... 36

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alpine View Co. v. Atlas Copco AB*,
  205 F.3d 208 (5th Cir. 2000) ............................................................33

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).............................................................16, 25, 28

*Behrmann v. Goldstein*,
  698 F. App'x 134 (4th Cir. 2017) (per curiam) ................................16

*Birmingham v. PNC Bank, N.A.*,
  2016 WL 3855686 (D. Md. July 15, 2016) ......................................22

*Carefirst of Maryland, Inc. v. Carefirst Pregnancy Ctrs., Inc.*,
  334 F.3d 390 (4th Cir. 2003) ...........................................................33

*CMI Roadbuilding, Inc. v. Iowa Parts, Inc.*,
  920 F.3d 560 (8th Cir. 2019) .....................................................18, 22

*Consulting Eng'rs Corp. v. Geometric Ltd.*,
  561 F.3d 273 (4th Cir. 2009) ...........................................................33

*Detrick v. Panalpina, Inc.*,
  108 F.3d 529 (4th Cir. 1997) .....................................................27, 29

*Drager v. PLIVA USA, Inc.*,
  741 F.3d 470 (4th Cir. 2014) .....................................................34, 35

*Dual Inc. v. Lockheed Martin Corp.*,
  383 Md. 151 (2004) ..................................................................*passim*

*Echols v. CSX Transp., Inc.*,
  2017 WL 2569734 (E.D. Va. June 13, 2017), *aff'd*, 700 F. App'x
  267 (4th Cir. 2017).........................................................................35

*Epcon Homestead, LLC v. Town of Chapel Hill*,
  62 F.4th 882 (4th Cir. 2023) ......................................................16, 26

*Fowler v. Wells Fargo Home Mortg., Inc.*,
2015 WL 2342377 (D. Md. May 13, 2015)...................................................23, 24

*Frederick Road Ltd. P'ship v. Brown & Sturm*,
360 Md. 76 (2000) ...........................................................................27

*Hardwire, LLC v. Ebaugh*,
2021 WL 3809078 (D. Md. Aug. 26, 2021) .................................................24, 32

*Jemsek v. N. Carolina Med. Bd.*,
2017 WL 696721 (E.D.N.C. Feb. 21, 2017), *aff'd*, 697 F. App'x
234 (4th Cir. 2017)...........................................................................35

*Lukenas v. Bryce's Mountain Resort, Inc.*,
538 F.2d 594 (4th Cir. 1976) .......................................................27, 29

*Lumsden v. Design Tech Builders, Inc.*,
358 Md. 435 (2000) ...........................................................................27

*Marmott v. Maryland Lumber Co.*,
807 F.2d 1180 (4th Cir. 1986) .....................................................34

*Mathews v. Kidder, Peabody & Co.*,
260 F.3d 239 (3d Cir. 2001) .......................................................27

*Meridian Invs. v. Fed. Home Loan Mortg. Corp.*,
855 F.3d 573 (4th Cir. 2017) ..............................................17, 21, 25

*In re Merrill Lynch Ltd. P'ships Litig.*,
154 F.3d 56 (2d Cir. 1998) ...........................................................24

*Muth v. United States*,
1 F.3d 246 (4th Cir. 1993) ...........................................................31

*Mylan Lab'ys, Inc. v. Akzo, N.V.*,
2 F.3d 56 (4th Cir. 1993) ...........................................................34

*Pilz v. F.D.I.C.*,
1997 WL 360639 (4th Cir. 1997) ...............................................26-27

*Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*,
828 F.2d 211 (4th Cir. 1987) ...............................................27, 28, 30

*Poffenberger v. Risser*,
290 Md. 631 (1981) ...................................................................26

*Prudential Ins. Co. of Am. v. U.S. Gypsum Co.*,
359 F.3d 226 (3d Cir. 2004) ...............................................29, 30

*Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*,
338 F.3d 773 (7th Cir. 2003) .....................................................34

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*,
713 F.3d 175 (4th Cir. 2013) .....................................................31

*United States v. Bestfoods*,
524 U.S. 51 (1998) ................................................................ 31-32

*Wallace v. Yamaha Motors Corp, U.S.A.*,
2022 WL 61430 (4th Cir. Jan. 6, 2022)......................................32

*Weddington v. Saunders*,
2023 WL 4075175 (4th Cir. June 20, 2023) (per curiam)..............17

*Zero Friction LLC v. Bali Leathers, Inc.*,
2023 WL 3792408 (N.D. Ill. June 2, 2023)...........................18, 21

*Zirvi v. Flatley*,
838 F. App'x 582 (2d Cir. 2020) ................................................28

**Statutes**

18 U.S.C. § 1832(a) ...................................................23, 24, 32

18 U.S.C. § 1836(d) ...................................................................17

18 U.S.C. § 1839(5), (6) ...........................................................31

Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(1), (3)....................33

**Other Authorities**

Md. Local Rule 6(a) ...................................................................34

v

## STATEMENT OF THE ISSUES

1. Whether the District Court correctly found Compass Marketing, Inc.'s ("Compass") Defend Trade Secrets Act ("DTSA") and Racketeer Influenced and Corrupt Organizations Act ("RICO") claims barred by the applicable three- and four-year statutes of limitations after concluding that "[i]t is hard to imagine a scenario in which there could be more facts suggesting inquiry notice than exist here"?

2. Whether Compass can add new allegations and arguments for the first time on appeal that appear nowhere in its Complaint, were not presented to the District Court, and would not warrant reviving Compass's time-barred claims?

3. Whether the District Court properly exercised its discretion in declining to grant Compass's single-sentence request to make unspecified amendments to its Complaint to escape the applicable statutes of limitations?

## STATEMENT OF THE CASE[1]

The District Court correctly ruled that Compass's own Complaint established that its DTSA and RICO claims against Appellants James Columbus "Chip" DiPaula Jr. ("DiPaula"), Patrick Miller ("Miller"), and Flywheel (collectively, the "Flywheel

---

[1] For purposes of this Appeal, Defendants-Appellees assume without conceding that the allegations in the Complaint are true.

1

Defendants") and Flywheel's UK-based affiliate, Ascential, are time-barred. As alleged in the Complaint, although DiPaula and Miller left Compass in September 2014 and immediately established Flywheel as a direct competitor, and then hired many employees from Compass in 2016 (which Compass describes as a "mass exodus"), Compass did not file this action until February 2022, nearly a decade later. As the District Court explained, "[i]t is hard to imagine a scenario in which there could be more facts suggesting inquiry notice than exist here." JA289. The District Court's Order dismissing Compass's DTSA and RICO claims on statute of limitations grounds should be affirmed.

### A.     Factual Background[2]

***Compass Marketing.*** Compass is a marketing consulting company with an "eCommerce Department" that uses "data-driven insights" to advise sellers of consumer-packaged goods like "beverages, cosmetics, and cleaning products" how to sell their products on online platforms like Amazon.com ("Amazon"). JA16-17, 24, 34 ¶¶ 2-4, 32, 57. "[D]ue in large part to the early success of its eCommerce Department," Compass "secured significant growth from 2005 to 2014" and "was dominant in the eCommerce marketing space." JA30, 34 ¶¶ 44, 60.

---

[2] All internal quotations, citations, and alterations are omitted and all emphasis is added unless otherwise stated.

***The eCommerce Guide.***  Compass's eCommerce Department developed "best practices" by "downloading Amazon data" on behalf of clients, "querying that data through keyword searches, and manually entering data inputs into Compass internal spreadsheets" for analysis.  JA16, 28-29 ¶¶ 4, 42-43.  Compass's eCommerce Department allegedly compiled its "data-driven insights" into a "step-by-step" training tool called the "eCommerce Guide," which Compass never attached to its Complaint or otherwise submitted to the District Court.  JA28-29, 34-36 ¶¶ 42, 57, 63, 65.

***The White Family.***  Compass was run by three brothers.  JA43-44 ¶ 92.  John White "managed sales and ran the Company as CEO."  JA43-44 ¶ 92.  Daniel White "oversaw legal and accounting," while Michael White "directed operations and finances."  JA43-44 ¶ 92.  Michael's son, George White (together with Michael and Daniel, the "White Defendants"), managed Compass's IT systems.  JA22 ¶ 20.

***DiPaula's and Miller's Employment with Compass.***  DiPaula and Miller began working for Compass in 2010 and 2011, respectively, and subsequently became the managers of the eCommerce team, reporting directly to John White.  JA17, 30-33, 35, 43-44 ¶¶ 5, 45, 47, 50, 53, 63, 92.  As Compass's eCommerce business grew, DiPaula and Miller "emerged as … senior executives who ran the fastest growing part of Compass."  JA17-18 ¶ 5.  DiPaula and Miller were among a

"select" group of "eCommerce team members" with an "electronic copy of the eCommerce Guide." JA38, 70 ¶¶ 71, 230.

DiPaula and Miller each signed an "Agreement Relating to Employment and Post Employment" containing restrictive covenants, including a confidentiality provision and a non-solicitation provision with a two-year term (each an "NDA"). JA30-31 ¶¶ 45-47. The NDAs do not contain non-competition provisions.[3]

***DiPaula and Miller Formed Flywheel.*** On September 3, 2014, DiPaula and Miller formed Flywheel. JA39 ¶ 77. The next day, "DiPaula and Miller each sent resignation emails at the same time to John White." JA39 ¶ 75. Miller told John White that he had "long wanted to own [his] own company" and was resigning from Compass "[t]o do so." JA39 ¶ 75. Less than a month after resigning, DiPaula tried to buy Compass's eCommerce Department, telling John White that he and Miller "feel vested ***in our colleagues we recruited and trained***, and ***the clients we have nurtured*** these past few years." JA40 ¶ 78 (emphasis in Complaint). DiPaula followed up one week later, expressing "urgency" and that he and Miller remained interested in acquiring Compass's eCommerce business. JA40-41 ¶ 80. Compass

---

[3] The Complaint does not identify any provision in the NDAs barring DiPaula or Miller from competing directly with Compass—and there is none. JA211-14; *see also* JA31 ¶ 47 (alleging that the NDAs "contained the same relevant terms and conditions").

4

did not sell the eCommerce business, and, instead, Flywheel became "Compass's *main competitor*" by offering "*identical* services as Compass."  JA35 ¶ 61.

***Compass Contemplated Legal Action Against Flywheel Eight Years Ago.***
After Flywheel's founding, Compass's CEO, John White, sought legal advice from Compass's General Counsel, Daniel White, who allegedly advised John White "that Compass should not pursue legal action against Flywheel, DiPaula, and/or Miller"— who were not subject to any contractual non-compete provisions—"and should instead compete with Flywheel in the marketplace, where Compass's trade secrets and proprietary information and know how" would provide Compass with "*a substantial competitive advantage* in comparison to a newly formed business like Flywheel *without such information*."  JA41 ¶¶ 81-82.  Compass declined to pursue legal action at that time.

***Compass Struggled to Compete with Flywheel.***  Compass found its prospects "changed *drastically* … when Flywheel arrived on the scene."  JA35 ¶ 61.  For example, The Procter & Gamble Company ("P&G") had been "a long-time" client of Compass's "traditional marketing services" when DiPaula and Miller "pitched … to expand the relationship, which P&G expressed interest in doing."  JA61 ¶¶ 194-95.  "Shortly after DiPaula and Miller left Compass, however, P&G representatives became unresponsive" and "terminated its engagement with Compass …."  JA61 ¶¶ 196-97.  Compass alleges solely on "information and belief" that "DiPaula and

Miller falsely told" unnamed "P&G representatives that Compass was exiting the eCommerce business" and "Flywheel was being set up to service the P&G account." JA61 ¶ 197. Compass alleges that *nine* other Compass clients "ultimately terminated their service contracts with Compass and hired Flywheel," though Compass does not allege when they did so. JA86 ¶ 317. Compass also fails to allege any steps taken before 2020 to investigate why its clients terminated their contracts, why they hired Flywheel, or how Flywheel was purportedly able to assume those contracts. JA41 ¶ 82.

***Flywheel Publicized Its Experience, Clients, and Marketing Strategy.*** In August 2015, Miller published an online article titled "The Future of Amazon Fresh?" via a company called Profitero (the "Profitero Article") that referenced Miller's experience over "the last four years," which included his time at Compass. JA57-58 ¶ 184 & n.1. In November 2015, Miller presented at an industry conference called the Online & Digital Grocery Summit USA. JA58 ¶ 186. In the audio recording on the conference website, the moderator identifies *seven* current or former Compass clients as *Flywheel* clients. JA58 ¶ 186. While Compass alleges that the downloadable Flywheel-branded PowerPoint presentation (the "Digital Grocery Presentation")[4] is "prima facie evidence of misappropriation *in 2014*,"

---

[4] The Flywheel Defendants and Ascential refer to the Profitero Article and the Digital Grocery presentation together as the "2015 Online Materials."

6

JA58, 60 ¶¶ 187, 190, Compass conspicuously fails to allege that these 2015 Online

Materials were not publicly available online since 2015. Instead, Compass focuses

on its alleged discovery of these materials in *January 2020*. JA60 ¶ 191.

*The "Mass Exodus" of Compass Employees After the Non-Solicitation*

*Period Expired.* In October 2016, a "mass exodus" of six Compass employees—

including a "Vice President and Accounts Manager of eCommerce" and Compass's

"Chief of Staff"—left to join Flywheel. JA41-42 ¶ 83. Compass alleges "[o]n

information and belief" that DiPaula and Miller recruited these employees

"specifically because of their deep knowledge of Compass's trade secrets" and that

the departing employees took "electronic or hard copy files that memorialized

Compass's trade secret, proprietary, and confidential information regarding

maximizing sales on Amazon." JA42 ¶¶ 84-85. Compass does not identify any

steps taken to investigate whether critical files had been downloaded or copied

before they left.

*Compass Again Contemplated Legal Action Against Flywheel.* John White

asked Compass General Counsel, Daniel White, "whether Compass could pursue

[the Flywheel Defendants] for non-solicitation issues associated with the [October]

2016 gutting of the eCommerce Department." JA43 ¶ 89. "Daniel advised Compass

against from [sic] pursuing legal action," and told John that, "if Compass wished to

pursue the claims, it would need to hire outside counsel to do so." JA43 ¶ 89.

Compass "decided not to pursue non-solicitation legal remedies at that time." JA43 ¶ 90.

*The Flywheel Acquisition Prompted a "Storm" at Compass.* In November 2018, a subsidiary of Ascential "acquired Flywheel for [a] purchase price of approximately $400 million." JA65 ¶ 209. "Within days of Compass learning that Flywheel had been sold to Ascential [in November 2018] …, a storm began brewing inside the Company that involved Michael and Daniel White." JA43 ¶ 91. By early 2019, John White had fired his brothers Daniel and Michael, and they were subsequently removed from Compass's Board of Directors. JA44-45 ¶¶ 94-95. John White then hired a "criminal investigator" to investigate his brothers' conduct and "a certified forensic fraud examiner as Compass's new Controller." JA45 ¶ 96.

*The "Internal Investigation."* An "internal investigation" allegedly revealed that "Michael and Daniel … knowingly engaged in a pattern of egregious behavior" since 2008. JA51, 75 ¶¶ 142, 255. Michael and Daniel allegedly used client funds deposited in "Secret Bank Accounts" opened "in Compass's name" to "financially benefit themselves." JA46 ¶¶ 99, 102, 104. They allegedly added family members to Compass's payroll "without Compass's knowledge or approval." JA47 ¶¶ 108-12. Michael allegedly issued "very large" payments "coded as 'tax checks'" to himself, Daniel, and their wives. JA48-49 ¶¶ 120, 122-24. Michael also allegedly used Compass funds to pay himself and Daniel for "fake loans" which "were never

8

made to the company." JA49 ¶ 126. Finally, Michael and Daniel allegedly "used Compass corporate credit cards to charge personal expenses to Compass." JA56 ¶ 171.

Compass claims that, "[a]fter Compass removed Daniel and Michael as directors and employees, … they set out on a revenge campaign intended to destroy [Compass] and punish their brother John …" JA45 ¶ 98. Daniel informed Compass's 401(k) plan administrator and the Department of Labor that Compass's President had embezzled funds from the company 401(k) plan. JA54 ¶ 159. Daniel and Michael brought a lawsuit in Virginia state court seeking "judicial dissolution of Compass." JA55 ¶ 162. An "anonymous author" also began sending letters to "damage Compass's reputation" in October 2019 to "individuals, companies, and the government" through an "untraceable" ProtonMail email account (where Daniel had previously "purchased an annual subscription"). JA55-56 ¶¶ 165, 168-69.

"Sometime after April 30, 2019," George White allegedly "cut off Compass access to employee email accounts … and other business records and accounts" (the "IT Lockout"). JA52 ¶ 149. Compass claims that "George and Michael maintain dominion and control over the lost accounts and business records" based on a monthly "Google invoice to George White" and "email from Google Payments to Michael White for the domain name compassmarketnginc.com [sic]." JA54 ¶ 156. While Compass claims to have "reason to believe that the IT [L]ockout coincided

with additional misuse of its proprietary information, including valuable trade secret information," JA53 ¶ 153, there are *no facts* connecting the Flywheel Defendants or Ascential to the IT Lockout or suggesting the White Defendants ever provided any information to the Flywheel Defendants or Ascential. By 2019, Flywheel had been openly operating, and DiPaula and Miller had been gone from Compass, for nearly five years.

***The Supposed "Conspiracy."*** Compass alleges that "the internal investigation team" also discovered "that Michael and Daniel White are part of [a] conspiracy by DiPaula and Miller to found and operate Flywheel …" JA63 ¶ 202. Compass alleges that Daniel *wrote* two checks to DiPaula—not to Flywheel—in late 2015 for a total of $35,000, JA63-64 ¶¶ 203, 205, and *received* one check from Compass with "Final Payments to James DiPaula and Patrick Miller" in the "Memo" field, JA63 ¶ 204. This so-called "'severance payment scheme' was false" and allegedly violated unspecified company policies. JA64 ¶ 206. Compass asserts, "[u]pon information and belief," that Daniel provided the funds "to support" the "funding and operation of Flywheel." JA65 ¶ 207.[5] Compass does not allege why Daniel White would do so or why Compass could not have identified the issue in

---

[5] There are no well-pled facts to support Compass's bare assertion that the checks to DiPaula were part of any "false" "severance payment scheme" by Daniel White as opposed to, for example, payments for unused accrued vacation days or unpaid expense reimbursements. JA64 ¶ 206.

2015.  No other well-pled facts tie the Flywheel Defendants or Ascential to the White Defendants.

*The 2015 Online Materials.*  "On or about January 20, 2020," Compass's new Controller found the 2015 Online Materials, apparently via a Google search.  JA57-58 ¶¶ 184, 186.  Compass alleges that, only after this discovery, it began "investigat[ing] whether any of the clients that left Compass since 2014 subsequently engaged Flywheel for identical eCommerce services."  JA61 ¶ 192. When John White saw the Digital Grocery Presentation, he supposedly "recognized the contents … as content that could only have been generated with knowledge of Compass's trade secret information."  JA58 ¶ 187.  Compass tarried another two years before filing this lawsuit.

*Compass Belatedly Attempted to Extract Consideration from Ascential.* In 2021, years after Ascential acquired Flywheel, a "friend of John White" contacted Ascential to convey "Compass's concerns" and seek "a business resolution."  JA66 ¶¶ 214-16.  Compass alleges that, since that time, "Ascential has been fully on notice as to [Compass's] trade secret misappropriation contentions …"  JA73 ¶ 243. Compass also alleges, without factual support, that Ascential has "chosen to enable, participate in, and profit from the past and continued misappropriation …."  JA73 ¶ 243.  In October 2021, Compass sent its first cease and desist letter to Ascential and Flywheel.  JA68 ¶ 222.

### B.    This Litigation

On February 14, 2022, nearly eight years after DiPaula and Miller founded Flywheel, Compass filed this omnibus lawsuit asserting 23 counts, including 21 claims naming the Flywheel Defendants, 11 claims naming Ascential, and 9 claims naming the White Defendants.  *See generally* JA69-94.  On February 24, 2023, the District Court dismissed all of Compass's federal claims with prejudice and declined to exercise supplemental jurisdiction over Compass's state law claims.  JA299.  The District Court explained that Compass's Complaint not only included "all facts necessary" to rule on the timeliness of Compass's federal claims against the Flywheel Defendants and Ascential, "including when the causes of action first accrued," but that "[i]t is hard to imagine a scenario in which there could be more facts suggesting inquiry notice than exist here."  JA287, 289.  The District Court found that Compass's RICO claims against the White Defendants failed on the merits.  JA293.

The District Court concluded that Compass was first put "on inquiry notice that Miller and DiPaula might take Compass' proprietary information with them" in 2014, when they left Compass "to form Flywheel, a direct competitor."  JA287-88.  As such, Compass's DTSA claim ran in late 2017 and its RICO claims against the Flywheel Defendants and Ascential ran in 2018.  JA288.  The District Court then found that "even under a more forgiving read of the facts on the surface of Compass'

Complaint," Compass was put on inquiry notice no later than 2016, after the "mass exodus" of "eCommerce department employees to Flywheel." JA288. Therefore, at the very latest, "the statute of limitations for the DTSA claim … ran in 2019 and the RICO claims ran in 2020." JA288.

The District Court rejected Compass's argument that it was only put on notice of its claims against the Flywheel Defendants and Ascential in 2020. The District Court explained that "[i]t is implausible that Compass never noticed or investigated … in real time" as it "began to lose prominent clients to Flywheel." JA289. Because the "evidence" cited in the Complaint was published online in 2015, written by a former Compass executive, and "specifically mention[s] Amazon, eCommerce, Flywheel, and [Patrick] Miller," the District Court found Compass's argument that it "could not discover the trade secret appropriation until 2020" "strains credulity." JA288-89.

The District Court then held that Compass's RICO claims against the White Defendants failed because Compass had not pled facts to show "the existence of collaboration or agreement" necessary to establish a RICO enterprise. JA294. Instead, Compass alleged nothing more than "conclusory allegations regarding an agreement," such as allegations that Daniel and Michael had "engaged in a pattern of egregious behavior" and that the "Defendants generally … participated in a coordinated effort to cause Compass financial harm." JA295. The District Court

separately found that Compass's RICO claim against George would fail RICO's pattern requirement because RICO "requires at least two acts of racketeering activity" and "the only allegedly 'criminal' act" committed by George "was the IT [L]ockout."  JA296.

## SUMMARY OF THE ARGUMENT

The facts alleged in Compass's Complaint establish that the three- and four-year statutes of limitations for Compass's DTSA and RICO claims against the Flywheel Defendants expired long before Compass commenced this action. Compass knew in *2014* that two "senior executives" at "the helm" of its eCommerce Department, with access to the allegedly stolen eCommerce Guide, resigned simultaneously to start their own company and tried to buy Compass's eCommerce Department.  JA18, 33, 38-41 ¶¶ 5, 53, 71, 75, 78-80.  Compass contemplated legal action but declined to pursue any claims against the Flywheel Defendants, even though it alleges that its competitive prospects "changed drastically" once "Flywheel arrived on the scene" and it started losing clients "shortly" thereafter.  JA35, 41, 61 ¶¶ 61, 81, 196.  In *2015*, Miller allegedly presented a slide deck representing "prima facie evidence of misappropriation in 2014" at an industry conference, during which the moderator publicly listed as purported Flywheel clients *no fewer than seven* Compass clients.  JA58, 60 ¶¶ 186 190.  In *2016*, Compass alleges "there was a mass

exodus" of employees from the eCommerce Department, just *one month* after the non-solicitation period in DiPaula and Miller's NDAs expired.  JA 41 ¶ 83.

Given Compass's allegations, all claims against the Flywheel Defendants and Ascential rooted in the alleged theft and use of Compass's "trade secrets" by DiPaula and Miller to found Flywheel in 2014, including the DTSA and RICO claims, were time-barred by the applicable three- and four-year statutes of limitations.

Facing dismissal based on its own allegations, Compass's opening brief is a study in diversion.  Unable to contend with numerous factual allegations demonstrating inquiry notice as early as 2014, Compass largely ignores them and argues instead that the District Court erred by not accepting wholly conclusory assertions that Compass could not have discovered the alleged misappropriation until it *actually* discovered so-called "prima facie evidence" from 2015 through an internet search in 2020.  That is not the law.

Rather than address the District Court's findings, Compass attempts to re-cast the allegations in its Complaint.  For example, Compass now argues that nothing in its Complaint demonstrates that Compass "knew Flywheel was a 'direct competitor'" *in 2014* or "even knew the name of their company was Flywheel." Br.19. Yet, Compass expressly alleges it contemporaneously considered and declined to pursue claims "*against Flywheel, DiPaula and/or Miller*."  JA41 ¶ 81. Both cannot be true.

15

Nor, as Compass implies, did the District Court err by failing to toll the applicable statutes of limitations. Compass's conclusory allegations of fraudulent concealment fail to satisfy notice pleading standards, let alone Rule 9(b)'s heightened particularity requirements. In any event, Compass's failure to allege it engaged in any reasonable diligence before 2020 is reason enough to decline tolling.

Compass's claims against Ascential also fail because none of the meager allegations as to Ascential, which Compass attempts to revise and supplement on appeal, supports any claim against Ascential.

For these and other reasons set forth below, the Court should affirm the District Court judgment dismissing Compass's Complaint with prejudice.

## ARGUMENT

## I.    THE DISTRICT COURT'S DECISION DISMISSING ALL CLAIMS SHOULD BE AFFIRMED

This Court reviews orders granting a motion to dismiss under Rule 12(b)(6) de novo. *Epcon Homestead, LLC v. Town of Chapel Hill*, 62 F.4th 882, 885 (4th Cir. 2023). In doing so, the Court may "affirm on any ground appearing in the record, including theories not relied upon or rejected by the district court." *Behrmann v. Goldstein*, 698 F. App'x 134, 134 (4th Cir. 2017) (per curiam). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Offering "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertions

devoid of further factual enhancement" does not suffice. *Id.* at 678. Nor must a court accept as true "legal conclusion[s] couched as … factual allegation[s]." *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

There is no dispute that Compass's claims were filed in February 2022 and are all subject to three- or four-year statutes of limitations that may be triggered by inquiry notice alone. *E.g.*, Br.8, 27, 34. As the District Court explained, "[i]t is hard to imagine a scenario in which there could be more facts suggesting inquiry notice than exist here." JA289. Where "the face of the complaint includes all necessary facts for the defense to prevail," the statute of limitations "is an affirmative defense that [defendants] can raise in a motion to dismiss." *Meridian Invs. v. Fed. Home Loan Mortg. Corp.*, 855 F.3d 573, 577 (4th Cir. 2017) (affirming dismissal on statute of limitations grounds); *Weddington v. Saunders*, 2023 WL 4075175, at *1 (4th Cir. June 20, 2023) (per curiam) (same).

### A.    Compass's DTSA Claim (Count I) Is Time-Barred

DTSA claims must be brought within three years of when the alleged misappropriation "is discovered or by the exercise of reasonable diligence should have been discovered." 18 U.S.C. § 1836(d). Thus, Compass is charged with notice of its DTSA claim as soon as it *should have discovered* the purported "original trade secret theft by DiPaula and Miller in 2014." JA37 ¶ 67.

Courts evaluating the timeliness of trade secret claims have found such claims time-barred where, for example, the plaintiff knew a client contract had been terminated, triggering a duty "to investigate how another company was able to assume" that contract "so quickly" after termination, *Dual Inc. v. Lockheed Martin Corp.*, 383 Md. 151, 175 (2004); where the defendant "established itself as a direct competitor" to plaintiff "almost as soon as it began operating," including by "sell[ing] its parts to [plaintiff's] customers" and "promoting itself with exhibits at … [a] trade show," *CMI Roadbuilding, Inc. v. Iowa Parts, Inc.*, 920 F.3d 560, 565-66 (8th Cir. 2019); and where the plaintiff "knew it was wronged" based on the existence of a competing product *even if* it did not yet know the identity of its competitor, *Zero Friction LLC v. Bali Leathers, Inc.*, 2023 WL 3792408, at *5 (N.D. Ill. June 2, 2023).

Tellingly, Compass omits many of the allegations on which the District Court *based its decision*, implicitly acknowledging those allegations are fatal to its claims. As set forth below, the Complaint repeatedly and colorfully alleges facts establishing that Compass was on notice as early as 2014 or, at the latest, 2016, such that Compass's DTSA claim was time-barred no later than 2019.

1. <u>Compass Was on Notice in 2014</u>

The District Court correctly determined that, given the facts alleged, Compass was on inquiry notice of the alleged misappropriation in 2014, and the DTSA's statute of limitations therefore expired in 2017. JA287-88.

According to the Complaint, only a "select" group of people had access to the eCommerce Guide, and two of them resigned "*at the same time*" in September 2014 to start Flywheel. JA17-18, 38-40, 70-71 ¶¶ 5, 71, 75, 230, 234. Far from keeping their plans secret, DiPaula emailed Compass's CEO multiple times in 2014 asking to buy the eCommerce Department because he and Miller felt "vested in" both "their colleagues" and "clients" still with Compass. JA40-41 ¶¶ 78, 80; JA287-88.

Compass claims that "no allegations" demonstrate that Compass knew in 2014 that Flywheel was a "direct competitor" or that "the name of their company was Flywheel," Br.19, but that is not true. On the face of the Complaint, Compass made a conscious choice after DiPaula and Miller's departure to forgo legal action "*against Flywheel*, DiPaula and/or Miller" and instead leverage its "established client relationships" and "intellectual property" to "*compete with Flywheel in the marketplace*." JA41 ¶¶ 81-82. Against these facts, Compass cannot plausibly allege it was not on notice of its new competitor in 2014.

Moreover, if Compass truly believed that Flywheel had "no established clients or personnel or intellectual property of its own" and was at a "substantial"

19

competitive disadvantage compared to Compass, JA41 ¶ 81-82, it was on notice to investigate why and how P&G, a "long-time" client that DiPaula and Miller were courting for Compass, suddenly "terminated its engagement with Compass shortly" after their departure. JA61 ¶¶ 194, 197; *e.g.*, *Dual*, 383 Md. at 175 (Maryland trade secrets claim time-barred because "[plaintiff's] knowledge of the termination of its [client] contract was sufficient to place [plaintiff] on notice to investigate how another company was able to assume the [client] contract so quickly after [plaintiff's] termination"). That is especially true where Compass expressly alleges that "[t]he opportunities available to Compass *changed drastically … when Flywheel arrived on the scene*." JA35 ¶ 61. As the District Court explained, "[i]t is implausible that Compass never noticed or investigated" this client loss "in real time, and reasonable diligence required it to inquire as to where [its] clients went." JA289.

Compass also alleges Flywheel "poached a long list of Compass eCommerce clients …." JA289 (citing JA61 ¶ 193). Compass argues that the District Court misconstrued its allegations to infer contemporaneous knowledge that these clients "were being lost to Flywheel at the time". Br.23. But the District Court's decision was based upon inquiry notice, which it correctly computed based upon the first lost client "shortly" after DiPaula and Miller left in 2014, which prompted a duty, reinforced by each subsequent lost client, to investigate where Compass's clients went. *Dual*, 383 Md. at 175.

The Complaint "includes all necessary facts" to establish that, through the exercise of reasonable due diligence, Compass should have known about the alleged misappropriation in 2014, triggering the statute of limitations for Compass's DTSA claim, which ran in 2017. *Meridian*, 855 F.3d at 577; *Zero Friction*, 2023 WL 3792408, at *5 (DTSA); *Dual*, 383 Md. at 175 (MUTSA).

### 2.    Compass Was on Notice Again in 2015

Compass alleges two more events in 2015 that demonstrate it was on inquiry notice. First, Miller allegedly presented materials publicly at an industry conference in 2015 that, according to Compass, constitute "prima facie evidence of misappropriation *in 2014*," JA60 ¶¶ 190-91, JA58 ¶ 186 (linking to presentation). Moreover, Compass alleges the moderator named *no fewer than seven* purported Flywheel clients—all of which were "immediately" recognizable as "Compass clients or former Compass clients." JA58 ¶¶ 186-87. Second, also in 2015, Miller published an article online identifying himself as the "Co-Founder" of "Flywheel Digital" who had "spent the last four years deconstructing eCommerce sites and helping American manufacturers figure out Amazon." JA57-58 ¶ 184.

After Compass's conscious choice to forgo legal action in 2014 and compete with Flywheel in the marketplace, with the knowledge it was already losing clients, Compass was bound to investigate its former employees-turned-competitors, including at the very least by reviewing publicly available information about

21

Flywheel.  *E.g.*, *CMI Roadbuilding*, 920 F.3d at 565-66 (DTSA claim time-barred where defendant "established itself as a direct competitor" to plaintiff "almost as soon as it began operating," including by "sell[ing] its parts to [plaintiff's] customers" and "promoting itself with exhibits at … [a] trade show"); *see also Birmingham v. PNC Bank, N.A.*, 2016 WL 3855686, at *5 (D. Md. July 15, 2016) (dismissing negligent misrepresentation claim where, among other things, "the information contained in the transaction journal … was neither unknowable nor undiscoverable during the limitations period").  As alleged, Miller and Flywheel's open competition with Compass was discoverable by at least 2014 and 2015, in either case barring Compass's claims.

### 3.   Compass Was on Notice No Later Than 2016

The District Court also correctly determined that, based on alleged events in 2016, the statute of limitations for Compass's DTSA claim ran by 2019 at the latest. JA288.

Compass alleges that in **2016**, "one month after" the two-year non-solicitation period in DiPaula and Miller's NDAs expired, JA30-31, 41 ¶¶ 46-47, 83, "there was a *mass exodus* of Compass's eCommerce Department employees"—all of whom allegedly "had detailed knowledge" of Compass's trade secrets—"gutting" the department DiPaula and Miller previously ran and tried to buy.  JA41-43 ¶¶ 83-84,

22

89.  On these facts, Compass was required to investigate where these employees

ended up and whether they took proprietary information with them.  JA288.

As with its 2014 allegations, Compass now claims that "nothing in the

Complaint alleges that Compass knew ***in 2016*** that its employees were leaving *for*

*Flywheel*.  Br.21-22.  That is not true either.  The Complaint expressly alleges that

Compass considered and declined to pursue claims against "DiPaula, Miller, *and*

*Flywheel*" specifically "*for non-solicitation issues associated with the 2016 gutting*

*of the eCommerce Department*."  JA28 ¶ 89.

Compass's DTSA claim was properly dismissed as time-barred.

## B.    Compass's RICO Claims (Counts III & IV) Are Time-Barred

Compass's RICO claims fare no better.    RICO's four-year statute of

limitations "runs from the date when the plaintiff discovered, or should have

discovered, *the injury*."  JA286 (citing *Potomac Elec. Power Co. v. Elec. Motor &*

*Supply, Inc.*, 262 F.3d 260, 266 (4th Cir. 2001)); *see also Fowler v. Wells Fargo*

*Home Mortg., Inc.*, 2015 WL 2342377, at *3 (D. Md. May 13, 2015) ("Plaintiff's

knowledge of her own injury … and not Plaintiff's knowledge of the underlying

RICO pattern" starts the clock).

The only RICO predicate alleged against the Flywheel Defendants is a

violation of 18 U.S.C. § 1832—*i.e.,* a criminal theft of trade secrets.  JA74 ¶¶ 251-

52.  This provision only covers *theft* of trade secrets, not their subsequent use or

disclosure. *E.g.*, *Hardwire, LLC v. Ebaugh*, 2021 WL 3809078, at *7 (D. Md. Aug. 26, 2021) (claims related to the "further *use* of [misappropriated] trade secrets … fall[] outside the scope of conduct prohibited under § 1832") (emphasis in original). As alleged, Compass's injuries from the purported theft of trade secrets include "Compass's competitive disadvantage in relation to Flywheel" and "Compass's loss of business and market share to Flywheel." JA73 ¶ 245. Thus, the limitations period for Compass's RICO claims began as soon as Compass knew or should have known it was losing business and market share.

Compass knew it was losing business, including at least one client DiPaula and Miller had been actively courting on behalf of Compass, "shortly" after they left. JA61 ¶¶ 195-96. Therefore, the limitations period for Compass's RICO claims started to run in 2014, and certainly no later than 2016. Compass's RICO claims were thus time-barred in 2018 (and certainly no later than 2020). *E.g.*, *Fowler*, 2015 WL 2342377, at *3 (RICO claim was time-barred based on allegations of defendants' actions); *accord In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998) (affirming dismissal of RICO claim and noting that "the question of inquiry notice need not be left to a finder of fact").

Compass has pleaded itself out of court, and the District Court's Order dismissing Compass's federal claims should be affirmed.

24

### C.    The District Court Correctly Applied the Inquiry Notice Standard

In its brief, Compass argues that the District Court erred by disregarding allegations and drawing inferences against Compass concerning what Compass "knew" at the time. *E.g.*, Br.19, 21, 23. But the District Court's dismissal was based on the inquiry notice standard, not Compass's actual knowledge, and the allegations in the Complaint amply support the District Court's finding that Compass was on inquiry notice as early as 2014 and no later than 2016.

The laundry list of allegations purportedly ignored by the District Court, which allegedly concern whether and when Compass had *actual* knowledge of the alleged misconduct, *e.g.*, Br.16-18, do not undermine the District Court's conclusion as to *inquiry* knowledge and can be properly disregarded. Moreover, Compass's conclusory assertions that it "could not have reasonably known" about Defendants' alleged misconduct before discovering "prima facie evidence" of misappropriation, *e.g.*, Br.16-17, are similarly unavailing as legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 679.

As the District Court correctly held, Compass pleads more than enough facts to put it on notice of its claims as early as 2014 and no later than 2016. JA288. The District Court's Order dismissing Compass's claims against the Flywheel Defendants thus should be affirmed. *Meridian*, 855 F.3d at 577.

25

### D.    Maryland's "Discovery Rule" Does Not Toll the Statutes of Limitations for Compass's Federal Claims

In its opening brief, Compass implies that Maryland's "discovery rule" should be applied to toll the statutes of limitations for Compass's federal claims under the DTSA and RICO.  Br.25-33.  As this Court recently reiterated, however, "[s]tate rules on tolling apply when a state statute of limitations is borrowed in a federal question case."  *Epcon,* 62 F.4th at 888.  Because the DTSA and RICO have their own statutes of limitations under federal law, state law tolling rules do not apply.

Even if this Court is inclined to consider Maryland law, Compass's claims still fail.  The Supreme Court of Maryland is clear that a plaintiff "will be held guilty of bad faith and must suffer from [their] neglect" where they "fail to investigate when the propriety of the investigation is naturally suggested by circumstances known to him."  *Poffenberger v. Risser*, 290 Md. 631, 637 (1981).  That is the case here.

Moreover, as discussed above, Maryland's Court of Appeals affirmed dismissal of an analogous state law trade secrets claims on statute of limitations grounds at the pleadings stage based on the plaintiff's knowledge of the termination of a client contract.  *Dual*, 383 Md. at 175.  The same result is warranted here.

By contrast, the decisions cited in Compass's brief applying Maryland's "discovery rule" to substantially different state law claims, Br.25-27, do not support (let alone require) tolling of Compass's federal claims.  *E.g.*, *Pilz v. F.D.I.C.*, 1997

26

WL 360639, at *4 (4th Cir. 1997) (state law claims arising from deed for real property); *Frederick Road Ltd. P'ship v. Brown & Sturm*, 360 Md. 76, 96 (2000) (state law claims arising from legal malpractice); *Lumsden v. Design Tech Builders, Inc.*, 358 Md. 435, 437 (2000) (state law claims for peeling driveways).

### E.    Compass Failed to Allege Fraudulent Concealment

Compass erroneously claims that the District Court erred by failing to consider fraudulent concealment. Br.35. To toll statutes of limitations on that basis, "a claimant must establish that (1) *the party pleading the statute* fraudulently concealed facts which are the basis of a claim, and that (2) the claimant failed to discover those facts within the statutory period, despite (3) the exercise of due diligence." *Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.*, 828 F.2d 211, 218 (4th Cir. 1987). Satisfying the first element requires "affirmative acts of concealment by [the defendant]." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 541(4th Cir. 1997) (alteration in original); *Lukenas v. Bryce's Mountain Resort, Inc.*, 538 F.2d 594, 597 (4th Cir. 1976) (requiring "that *the defendant* was guilty of 'some affirmative act'"). "[T]o determine what constitutes 'reasonable' due diligence," federal courts will "consider the magnitude of the existing storm warnings. The more ominous the warnings, the more extensive the expected inquiry." *Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 255 (3d Cir. 2001). Vague allegations of concealment that do not meet Rule 9(b)'s heightened particularity requirements are

"rightly rejected on their face." *Pocahontas*, 828 F.2d at 219; *see also Dual*, 383 Md. at 170-71 (plaintiff must "plead with specificity facts that would tend to support … fraud and concealment").

Compass does not identify any affirmative act by any Flywheel Defendant to avoid detection. *E.g.*, *Pocahontas*, 828 F.2d at 218 (requiring more than "an alleged failure to own up to illegal conduct"). Merely reciting that the Flywheel Defendants engaged in unspecified "concealment efforts," *e.g.*, Br.16, or "defendants" collectively committed unidentified "wrongful acts and misrepresentations," *e.g.*, Br.18, is precisely the kind of "formulaic recitation of the elements of a cause of action" that cannot survive a motion to dismiss. *Iqbal*, 556 U.S. at 678; *e.g.*, *Zirvi v. Flatley*, 838 F. App'x 582, 587 (2d Cir. 2020) ("Plaintiffs' conclusory claims that … defendants engaged in a decades-long fraudulent 'conspiracy' of 'camouflage, disguise and nomenclature changes,' … lack particularity and are unavailing."); *Dual*, 383 Md. at 170-71 (no tolling absent "specific or detailed factual assertions as to how [defendant] concealed … its alleged role in the termination of the [client] contract").

Lacking any allegations that the Flywheel Defendants concealed anything from Compass, Compass is forced to rely on the White Defendants' supposed misconduct. *E.g.*, Br.28 (statement "made by Daniel"); Br.37 (severance payments "from Daniel and Michael"). But the decisions Compass cites, Br.35-38, do not

28

support tolling for claims against the Flywheel Defendants based on purported acts by anyone else. *Detrick*, 108 F.3d at 541; *Lukenas*, 538 F.2d at 597.

Compass's own allegations also directly contradict any notion of concealment or secrecy. In 2014, Miller told Compass's CEO he was leaving to start his own business, DiPaula twice asked to buy Compass's eCommerce Department, and Compass started losing clients DiPaula and Miller had been courting for Compass. JA40-41, 43, 61 ¶¶ 78-80, 195-196. By 2015, Miller openly published an article online, gave a presentation at an industry conference in which Compass clients were described as Flywheel clients, and posted so-called "prima facie evidence" of Compass's alleged misappropriation on the internet. JA57-58, 60 ¶¶ 184, 186, 190. By 2016, Miller and DiPaula were purportedly "gutting" Compass's eCommerce Department by hiring employees a mere month after their non-solicitation periods expired. JA41-43 ¶¶ 83, 89. That is far from concealment.

Given the magnitude of the threat to Compass's business, as evidenced by the "drastic[]" changes to Compass's available opportunities "when Flywheel arrived on the scene" and the immediate loss of a "long-time Compass client," JA35, 61 ¶¶ 61, 194, "a substantial and diligent investigation" was called for as early as 2014 and no later than 2016. *Prudential Ins. Co. of Am. v. U.S. Gypsum Co.*, 359 F.3d 226, 238 (3d Cir. 2004) (declining to toll RICO limitations period because "a

substantial and diligent investigation" was required given "the significance of the threat" to plaintiff's investment).

Yet Compass does not identify any steps taken to investigate *why* clients terminated their contracts with Compass, *how* Flywheel was able to assume those contracts without Compass's trade secrets, *who* would provide them with eCommerce services if not Compass, or "why it was unable to discover that [Flywheel] assumed [Compass's] former role" in the contract with any terminating client. *Dual*, 383 Md. at 175. Nor does Compass allege any effort to investigate whether any of the six employees who left Compass in 2016 to work for its main competitor took any files with them. Moreover, tolling is especially inappropriate because supposedly "prima facie evidence of misappropriation" was publicly available online. *Cf. Pocahontas*, 828 F.2d at 218 (declining to apply tolling where facts at issue were "discoverable upon … consultation of public records"). Compass's failure to perform any investigation whatsoever until 2020 demonstrates a lack of diligence that precludes tolling. *Prudential*, 359 F.3d at 238.

## II. THE DISTRICT COURT PROPERLY DISMISSED ALL CLAIMS AGAINST ASCENTIAL

By Compass's own admission, "[n]othing in the Complaint alleges or indicates Ascential was involved in stealing trade secrets from Compass in 2014 and 2016 …" Br.33. Instead, Compass argues on appeal that Ascential can be held separately liable for purportedly "purchas[ing] the stolen trade secrets from

Flywheel in late 2018." *Id.* But that is not what Compass argued below. "As this [C]ourt has repeatedly held, issues raised for the first time on appeal generally will not be considered." *Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993).

To be clear, Compass has never alleged that Ascential purchased any "stolen trade secrets from Flywheel." Br.33 (citing JA65-66 ¶¶ 209-212). Rather, the allegations Compass cites state only that, ***in 2018***, Ascential "acquired *Flywheel*" and issued a press release describing Flywheel's business model, JA65-66 ¶¶ 209-11, and, ***in 2021***, Ascential publicly reported Flywheel's growth, JA66 ¶ 212. "It is well-established that parties cannot amend their complaints through briefing or oral advocacy." *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013).

Nor can Compass state a claim against Ascential for simply buying Flywheel. As relevant here, the DTSA prohibits the "acquisition of a trade secret" by someone "who knows or has reason to know that the trade secret was acquired by improper means" (like theft), as well as the "use of a trade secret … without express or implied consent" by someone "who … knew or had reason to know that the knowledge of the trade secret was … acquired under circumstances giving rise to a duty to" limit its use. 18 U.S.C. § 1839(5), (6). But there are no allegations that *Ascential* ever acquired or used Compass's trade secrets. That alone is fatal to any claim against Ascential. *See United States v. Bestfoods*, 524 U.S. 51, 61-62 (1998) ("It is a general

principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation … is not liable for the acts of its subsidiaries.").

Compass's RICO claims against Ascential also fail. Only the *theft* of trade secrets (not their use or disclosure) is a RICO predicate act. 18 U.S.C. § 1832(a); *Hardwire*, 2021 WL 3809078, at *7. The supposed "theft" allegedly occurred in 2014 or 2016, which Compass concedes Ascential had nothing to do with. Br.33.

While it was unnecessary for the District Court to reach the issue, there is also no question that personal jurisdiction over Ascential is lacking here, which is an independent reason to affirm the District Court's dismissal of all claims against Ascential. General jurisdiction, which may be exercised "in a corporation's place of incorporation, a corporation's principal place of business, and any state where a corporation's affiliations with the State are so continuous and systematic as to render it essentially at home in the forum State," *Wallace v. Yamaha Motors Corp, U.S.A.*, 2022 WL 61430, at *2 n.3 (4th Cir. Jan. 6, 2022), does not apply. "Ascential is a public limited company in the United Kingdom, with its principal place of business" in "London, England," JA22 ¶ 21, and Compass does not allege any continuous or systematic contacts between Ascential and Maryland.

Federal courts may only exercise specific personal jurisdiction over a non-resident defendant where "such jurisdiction is authorized by the long-arm statute of the state in which it sits and application of the long-arm statute is consistent with the

due process clause of the Fourteenth Amendment." *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009). Maryland's long-arm statute confers personal jurisdiction over any person who, among other things, "[t]ransacts any business … in [Maryland]" or "[c]auses tortious injury in [Maryland] by an act or omission in [Maryland]," Md. Code Ann., Cts. & Jud. Proc. § 6-103(b)(1), (3), consistent with "the limits of personal jurisdiction set by the due process clause of the Constitution." *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003).

Here, Compass asserts without any basis that Ascential (i) was "doing business in Maryland;" (ii) was "engaging in tortious conduct in Maryland related to the misappropriation and use of Compass's trade secrets;" (iii) was "having contact with Maryland in furtherance of a conspiracy;" and (iv) that two "Ascential officers … served on the Flywheel Board of Directors, and upon information and belief, regularly travel to Maryland to manage Flywheel operations." JA24 ¶ 30. None of these theories confers personal jurisdiction over Ascential.

Contrary to the conclusory allegation in the Complaint, JA22 ¶ 21, *Ascential* (an "indirect shareholder" of Flywheel, JA256-57 ¶¶ 8-9), does not do business or maintain offices in Maryland, JA256-57 ¶¶ 6, 11, and is not subject to jurisdiction merely because Flywheel "is present or doing business there." *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 218 (5th Cir. 2000). Compass alleges no conduct by

Ascential related to the alleged misappropriation, and the Court cannot attribute Flywheel's alleged conduct to Ascential absent facts "to warrant piercing the veil between parent and subsidiary." *Mylan Lab'ys, Inc. v. Akzo, N.V.*, 2 F.3d 56, 63 (4th Cir. 1993). Mere "common ownership and directorship" does not suffice. *Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 788 n.17 (7th Cir. 2003).

Moreover, Ascential and the Flywheel Defendants cannot conspire as a matter of law under the intracorporate conspiracy doctrine, which also precludes finding personal jurisdiction. *E.g.*, *Marmott v. Maryland Lumber Co.*, 807 F.2d 1180, 1184 (4th Cir. 1986) ("[A] conspiracy between a corporation and its agents, acting within the scope of their employment, is a legal impossibility").

The District Court's Order dismissing all claims against Ascential should be affirmed.

## III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY DECLINING TO GRANT COMPASS LEAVE TO AMEND

Decisions denying leave to amend are reviewed for abuse of discretion. *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014). "Regardless of the merits of the desired amendment," however, "a district court does not abuse its discretion 'by declining to grant a motion that was never properly made.'" *Id.* As in *Drager*, there is no dispute that Compass "never filed a motion to amend [its] complaint or a proposed amended complaint with the district court." *Id.*; *see also* D. Md. Local Rule 103.6(a) ("[T]he original of the proposed amended pleading shall

accompany the motion."). Rather, Compass included a single sentence in its opposition brief requesting leave to amend in place of dismissal. JA258. But "[a] responsive brief is not an appropriate means to request leave to amend a complaint." *Jemsek v. N. Carolina Med. Bd.*, 2017 WL 696721, at *12 (E.D.N.C. Feb. 21, 2017), *aff'd*, 697 F. App'x 234 (4th Cir. 2017). Thus, "regardless of the merits" of amendment, the District Court did not abuse its discretion in declining to grant Compass's improper request. *Drager*, 741 F.3d at 474.

Even if this Court overlooks Compass's disregard for the rules, amendment is futile. The District Court's dismissal on statute of limitations grounds was based on facts Compass pleaded—not what Compass failed to plead. New allegations concerning Compass's lack of actual knowledge would not save its claims. Rather, to escape inquiry notice, Compass would have to remove or even contradict allegations in its initial Complaint that are central to its claims, which Compass does not suggest and should not be permitted. *Cf. Echols v. CSX Transp., Inc.*, 2017 WL 2569734, at *6 (E.D. Va. June 13, 2017), *aff'd*, 700 F. App'x 267 (4th Cir. 2017) (plaintiff's request "to amend his complaint to allege facts that are wholly contradictory to his initial Complaint so as to avoid having his suit barred by statute of limitations" was "in bad faith and is futile").

## CONCLUSION

For these reasons, Defendants respectfully request that this Court affirm the District Court Order dismissing all claims against the Flywheel Defendants and Ascential.

Dated:                                              Respectfully submitted,
         August 7, 2023

                                    By:   _____*/s/ Ty Kelly Cronin*_____
                                                Ty Kelly Cronin

                                    FRIED, FRANK, HARRIS, SHRIVER
                                       & JACOBSON LLP
                                    Michael C. Keats
                                    Rebecca L. Martin
                                    Samuel H. Truesdell
                                    One New York Plaza
                                    New York, New York 10004-1980
                                    Telephone: (212) 859-8000
                                    Fax: (212) 859-4000
                                    michael.keats@friedfrank.com
                                    rebecca.martin@friedfrank.com
                                    samuel.truesdell@friedfrank.com

                                    BAKER DONELSON
                                    Tonya Kelly Cronin
                                    Alison Schurick
                                    100 Light St., 19th Floor
                                    Baltimore, MD 21202
                                    Telephone: (410) 685-1120
                                    Fax: (410) 547-0699
                                    tykelly@bakerdonelson.com
                                    aschurick@bakerdonelson.com

                                    *Counsel for Defendants-Appellees Flywheel
                                    Digital LLC, James Columbus DiPaula Jr., Patrick
                                    Miller, and Ascential plc*

                                              36

DLA PIPER LLP (US)
David B. Hamilton
Harry P. Rudo
650 South Exeter St., 11th Floor
Baltimore, MD 21202
Telephone: (410) 580-3000
Fax: (410) 580-3001
david.hamilton@dlapiper.com
harry.rudo@dlapiper.com

*Counsel for Defendants-Appellees
James Columbus DiPaula Jr. and
Patrick Miller*

60561337

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. _23-1324_     **Caption:** _Compass Marketing Inc. v. Flywheel Digital LLC, et al._

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

- ☑ this brief or other document contains ____7,981____ [*state number of*] words

- ☐ this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

- ☑ this brief or other document has been prepared in a proportionally spaced typeface using
  Word_____ [*identify word processing program*] in
  Times New Roman 14 font_____ [*identify font size and type style*]; **or**

- ☐ this brief or other document has been prepared in a monospaced typeface using
  _____ [*identify word processing program*] in
  _____ [*identify font size and type style*].

*Ty Kelly Cronin*
(s)_____

Party Name_Flywheel Digital LLC, et al._____

Dated:_August 7, 2023_____

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of August 2023, a copy of the foregoing Response Brief of Appellees Flywheel Digital LLC, Ascential PLC, James Columbus "Chip" DiPaula Jr., and Patrick Miller was served on all counsel of record using the CM/ECF filing system.

_/s/ Ty Kelly Cronin_____